The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. ERISA LITIGATION | No. 2:08-md-01919-MJP |
| | Lead Case No. C07-1874 MJP |
| THIS DOCUMENT RELATES TO: | **CONSOLIDATED AMENDED COMPLAINT FOR BREACHES OF DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| ALL ACTIONS | |

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

1

## TABLE OF CONTENTS

2
**PAGE**

3
I.       NATURE OF THE ACTION ............................................................................1

4
II.      JURISDICTION AND VENUE ......................................................................4

5
III.     PARTIES ...........................................................................................................4

6
         A.       Plaintiffs ................................................................................................4

7
         B.       Defendants .............................................................................................5

8
IV.      THE WAMU SAVINGS PLAN ......................................................................9

9
         A.       Background ............................................................................................9

10
         B.       Participant and Employer Contributions to the Plan.........................10

11
         C.       Investment options in the Plan, including the WaMu Company Stock Fund........11

12
         D.       Losses to the Plan................................................................................12

13
V.       DEFENDANTS' FIDUCIARY STATUS .......................................................13

14
         A.       The Nature of Fiduciary Status ...........................................................13

15
         B.       WaMu's Fiduciary Status ....................................................................14

16
         C.       Defendant Killinger's Fiduciary Status ..............................................15

17
         D.       HR Committee Defendants' Fiduciary Status.....................................17

18
         E.       Investment Committee Defendants' Fiduciary Status ........................18

19
         F.       Administration Committee Defendants' Fiduciary Status...................20

20
VI.      FACTS BEARING ON FIDUCIARY BREACH.............................................22

21
         A.       WaMu Was an Imprudent Investment for the Plan during the Class Period........22

22
                  1.       Summary ...................................................................................22

23
                  2.       The rise of the subprime lending industry and the proliferation of high-risk loan products for "prime" and "subprime" borrowers ...............22

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

3.      The fall of the subprime lending industry...................................................28

4.      WaMu shifts its focus to the high-risk subprime market and high-risk
        mortgage loan products............................................................................31

5.      WaMu continued to originate, buy, sell and hold subprime and
        Option ARM loans despite the high risk of default or foreclosure............35

6.      WaMu masked its exposure and artificially inflated the price of its
        stock through questionable accounting......................................................42

        a.      WaMu failed to sufficiently reserve for various liabilities and
                obligations related to mortgages that it securitized or sold............43

        b.      WaMu's questionable valuation of its loans held for
                investment, and failure to account for the declining quality
                of those loans ...............................................................................45

        c.      The shifting of loans from the "held for sale" to the "held for
                investment" category ....................................................................47

        d.      The questionable recognition of interest income from
                "Negative Amortization" loans.......................................................48

        e.      WaMu's reliance on "Gain on Sale" accounting ..........................49

        f.      WaMu's questionable valuation of mortgage servicing rights ......50

7.      WaMu concealed the fact that its fraudulent and illegal property
        appraisals artificially inflated the value of its loans..................................52

8.      WaMu's "SuperScore Scorecard Monitoring" Reports.............................58

9.      WaMu's Financial Problems Come to Light ..............................................58

10.     WaMu's financial statements failed to reflect the actual liabilities
        and losses to which the Company was exposed..........................................63

B.      Defendants Knew or Should Have Known That WaMu Stock Was an
        Imprudent Investment. .........................................................................104

C.      Defendants Failed to Provide Plan Participants, Beneficiaries, and
        Co-Fiduciaries with Complete and Accurate Information about the True
        Risks of Investment in WaMu Stock in the Plan ................................111

D.      Defendants Suffered From Conflicts of Interest................................115

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11 254688 V1

VII.   THE RELEVANT LAW ..................................................................................... 115

VIII.  ERISA § 404(c) DEFENSE INAPPLICABLE .............................................. 118

IX.    DEFENDANTS' INVESTMENT IN COMPANY STOCK IS NOT ENTITLED
       TO A PRESUMPTION OF PRUDENCE ......................................................... 120

X.     CAUSES OF ACTION ..................................................................................... 122

       A.     Count I:  Failure to Prudently and Loyally Manage the Plan and  Its Assets ...... 122

       B.     Count II:  Failure to Monitor Fiduciaries ........................................... 128

       C.     Count III:  Breach of Fiduciary Duty to Disclose Necessary Information
              to Co-Fiduciaries ................................................................................... 131

       D.     Count IV: Breach of Fiduciary Duty – Failure to Provide Complete and
              Accurate Information to the Plan's Participants and Beneficiaries ........... 132

       E.     Count V:  Co-Fiduciary Liability ....................................................... 134

       F.     Count VI:  Knowing Participation in a Breach of Fiduciary Duty. .......... 136

XI.    CAUSATION ................................................................................................... 137

XII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY ................................. 137

XIII.  CLASS ACTION ALLEGATIONS ................................................................ 139

XIV.   PRAYER FOR RELIEF ................................................................................. 141

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

Plaintiffs Gregory Bushansky, Dana Marra and Marina Ware  ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Washington Mutual, Inc. ("WaMu" or the "Company"), including the Company's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), registration statement (Form S-8), and the annual reports (Form 11-K) filed on behalf of the WaMu Savings Plan (the "Plan"), a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor (the "Department of Labor" or the "DOL"), interviews with participants of the Plan, and a review of available documents governing the operations of the Plan.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

2.    The Plan is a defined contribution retirement plan sponsored by WaMu.

3.    Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period October 19, 2005 through the present (the "Class Period").

4.    Plaintiffs allege that Defendants allowed the imprudent investment of the Plan's assets in WaMu common stock throughout the Class Period despite the fact that they knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices, including, among other practices: (a) the Company's over-reliance on the origination, securitization, purchase and sale of subprime mortgage loans and other risky mortgage loan products such as "negative amortization" loans;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 1
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

(b) the Company's lax underwriting policies for mortgage loans and related loan products; (c) the Company's participation in the systematic manipulation of the loan origination and property appraisal processes; (d) the Company's failure to implement and maintain risk management control processes; and (e) the Company's failure to properly account for its subprime lending and related business operations, all of which caused WaMu's financial statements to be misleading and which artificially inflated the value of shares of WaMu stock and the WaMu Company Stock Fund in the Plan. In short, during the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that rendered WaMu stock an unduly risky and inappropriate investment option for participants' retirement savings. Top management, including certain of the Defendants herein, had a complete picture of how all of the foregoing practices made WaMu stock an unduly risky and inappropriate investment for Plan participants' retirement accounts. To the extent any Defendant lacked actual knowledge of these risks, they would have acquired knowledge of most or all of them had they conducted the investigation required by ERISA.

5. Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in WaMu stock. In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the Plan's other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiffs allege that the Defendants, with knowledge of the risks associated with WaMu stock, breached their duty to disclose necessary information to co-fiduciaries. In Count IV, Plaintiffs allege that the Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information regarding the soundness of WaMu stock and the prudence of investing and holding retirement contributions in WaMu equity. In Count V, Plaintiffs allege that Defendants breached their duties and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 2
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

1    responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties

2    of prudent and loyal management, complete and accurate communications, and adequate

3    monitoring.  Finally, in Count VI, Plaintiffs state a claim against WaMu for knowing

4    participation in the fiduciary breaches alleged herein.

5            6.      As more fully explained below, during the Class Period, Defendants imprudently

6    permitted the Plan to hold and acquire millions of dollars in WaMu stock despite the

7    fundamental problems the Company faced.  Based on publicly available information for the Plan,

8    it appears that Defendants' breaches have caused the Plan to lose over *250 million dollars* of

9    retirement savings during the Class Period.

10           7.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan

11   for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C.

12   §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3),

13   Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive

14   relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and

15   other monetary relief.

16           8.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiffs to sue

17   in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary

18   duty.  Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P.

19   23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested

20   in WaMu common stock during the Class Period.

21           9.      In addition, because the information and documents on which Plaintiffs' claims

22   are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs'

23   allegations are made by necessity upon information and belief.  At such time as Plaintiffs have

24   had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate,

25   amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as

26   are discovered that further support Plaintiffs' claims.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 3
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

## II.   JURISDICTION AND VENUE

10.   **Subject-Matter Jurisdiction**.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.   **Personal Jurisdiction**.  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Washington.

12.   **Venue**.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## III.   PARTIES

**A.   Plaintiffs**

13.   Plaintiff Gregory Bushansky is a resident of Massapequa, New York.  Plaintiff Bushansky was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), during the Class Period and held shares of Company stock in his retirement account in the Plan during the Class Period.

14.   Plaintiff Dana Marra is a resident of Palatine, Illinois.  Plaintiff Marra is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and was a participant in the Plan throughout the Class Period.  She continues to hold shares of Company stock in her retirement account in the Plan and did so throughout the Class Period.

15.   Plaintiff Marina Ware is a resident of Concord, California.  Plaintiff Ware is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and was a

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 4
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1  participant in the Plan throughout the Class Period.  She continues to hold shares of Company

2  stock in her retirement account in the Plan and did so throughout the Class Period.

3  **B.    Defendants**

4     16.    The Defendants are identified below.  All of the Defendants are fiduciaries of the

5  Plan within the meaning of ERISA, as is explained below in Section VI ("Defendants' Fiduciary

6  Status"), and all of them breached their fiduciary duties in various ways as is explained in

7  Section XI ("Causes of Action").

8     17.    **Defendant Washington Mutual, Inc.** is a consumer and small business banking

9  company with operations in major U.S. markets.  WaMu is incorporated in the State of

10  Washington, with its principal executive offices located at 1301 Second Avenue, Seattle,

11  Washington.  WaMu's common stock is listed on the New York Stock Exchange and trades

12  under the ticker symbol "WM."  As described more fully below, the Company was a fiduciary

13  for the Plan.

14     18.    **Defendant Kerry K. Killinger ("Killinger")**.  Defendant Killinger has served as

15  a Director of WaMu since 1988 and was the Chairman of the Board until July 1, 2008, a position

16  he held since 1991.  Defendant Killinger has served as the Chief Executive Officer of WaMu

17  since 1990, and served as the President of the Company from 1988 until 2005.  As is explained

18  in more detail below, Defendant Killinger engaged in acts of Plan administration by

19  communicating extensively with employees regarding the Company and Company stock, the

20  single largest asset of the Plan.

21     19.    **Human Resources Committee Defendants**.  As explained in more detail below,

22  the Human Resources Committee of the Board of Directors ("HR Committee") had certain

23  responsibilities with respect to the Plan, including appointment and oversight responsibilities.

24  The HR Committee and its members were therefore fiduciaries of the Plan.  The Defendants

25  identified in this paragraph are referred to as the "HR Committee Defendants."  The HR

26  Committee Defendants during the Class Period are as follows:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 5
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

a.   **Defendant Steven I. Chazen** served as a member of the HR Committee during the Class Period;

b.   **Defendant Stephen E. Frank** served as a member of the HR Committee during the Class Period;

c.   **Defendant Charles M. Lillis** served as a member of the HR Committee during the Class Period;

d.   **Defendant Phillip D. Matthews** served as a member of the HR Committee during the Class Period;

e.   **Defendant Osmer McQuade** served as a member of the HR Committee during the Class Period;

f.   **Defendant James H. Stever** served as a member of the HR Committee during the Class Period and is the Committee's Chairman; and,

g.   **Defendant Willis Wood** served as a member of the HR Committee during the Class Period.

20.   **Investment Committee Defendants**.  As explained in more detail below, the Investment Committee (or the "PIC") had certain responsibilities with respect to the Plan, including selecting and monitoring the investment funds in the Plan.  The PIC and its members were therefore fiduciaries of the Plan.  The Defendants identified in this paragraph are referred to as the "Investment Committee Defendants" or the "PIC Defendants."  The Investment Committee Defendants during the Class Period are as follows:

a.   **Defendant Todd Baker** has served as a member of the PIC since August 23, 2007, and is Executive Vice President of Corporate Strategy and Development for the Company;

b.   **Defendant Melissa Ballenger** has served as a member of the PIC since April 28, 2007, and is a Senior Vice President and the Company's Controller;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 6
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

c.    **Defendant David Beck** has served as a member of the PIC during the Class Period, and is an Executive Vice President and Head of Capital Markets;

d.    **Defendant Curt Brouwer** has served as a member of the PIC since August 21, 2007, and is a Senior Vice President;

e.    **Defendant Daryl David** has served as a member of the PIC during the Class Period and is Executive Vice President, Chief Human Resources Officer;

f.    **Defendant Michelle McCarthy** has served as a member of the PIC since January 20, 2006, and is a Senior Vice President and a Market Risk Manager for the Company, having market risk oversight responsibility for WaMu's interest rate risk management and capital markets activities;

g.    **Defendant Tony Meola** served as a member of the PIC through January 20, 2006, and served as Executive Vice President for Home Lending Sales and Distribution during the Class Period;

h.    **Defendant Robert Williams** has served as a member of the PIC during the Class Period as well as the PIC's Chair, and served as Senior Vice President and Treasurer during the Class Period; and

i.    **Defendant John Woods** served as a member of the PIC from January 20, 2006 through April 28, 2007, and served as the Chief Financial Officer, Home Loans Division and the Controller during the Class Period.

21.    **Administration Committee Defendants**.  As explained in more detail below, the Plan assigns certain fiduciary responsibilities and duties to the Plan Administration Committee Defendants (the "Administration Committee Defendants").  The members of the Administration Committee (or the "PAC") have full authority and power to administer and construe the Plan. The PAC and its members were therefore fiduciaries of the Plan.  The Defendants identified in

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 7
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

this paragraph are referred to as the "Administration Committee Defendants" or the "PAC Defendants." The Administration Committee Defendants during the Class Period are as follows:

    a.    **Defendant Mike Amato** served as a member of the PAC through February 16, 2006;

    b.    **Defendant Beck** served as a member of the PAC through July 31, 2007, in addition to serving as a member of the PIC as described above;

    c.    **Defendant Deborah Bedwell** has served as a member of the PAC since August 1, 2007;

    d.    **Defendant John Berens** has served as a member of the PAC since August 1, 2007, and is a Senior Vice President of Servicing at the Company and manages the service delivery team for the Company's Home Loans division;

    e.    **Defendant Tom Casey** served as a member of the PAC through July 31, 2007, and is Executive Vice President and the Chief Financial Officer of the Company;

    f.    **Defendant Ron Cathcart** served as a member of the PAC from August 1, 2007 through April 29, 2008, and was an Executive Vice President and Chief Enterprise Risk Officer of the Company, having responsibility for the oversight of the credit, market, operational and compliance risk functions for WaMu;

    g.    **Defendant David** served as a member of the PAC during the Class Period, in addition to serving on the PIC as described above;

    h.    **Defendant Michele Grau-Iverson** has served as a member of the PAC since August 1, 2007;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 8
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

i.    **Defendant Pia Jorgenson** has served as a member of the PAC since August 1, 2007, and is a Senior Vice President and Chief Technology Officer of the Company;

j.    **Defendant Suzanne Krahling** has served as a member of the PAC since August 1, 2007;

k.    **Defendant Bill Longbrake** served as a member of the PAC through July 31, 2007, and is a Vice Chair, Enterprise Risk Management; and

l.    **Defendant Williams** has served as a member of the PAC since August 1, 2007, in addition to serving as Chair of the PIC as described above.

## IV.    THE WAMU SAVINGS PLAN

**A.    Background**

22.    The Plan, sponsored by WaMu, is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

23.    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in a trust fund administered by Fidelity Management Trust Company, the Plan's Trustee.  *See* WaMu Savings Plan Summary Plan Description (Jan. 2007) (hereinafter the "SPD"), WMU-ERISA 000096-140, at WMU-ERISA 000128; Trust Agreement Between Washington Mutual, Inc. and Fidelity Management Trust Company, WaMu Savings Plan Trust, Dates as of May 17, 2004 (hereinafter the "Trust Agreement"), WMU-ERISA 000174-240.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 9
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

24.     The Plan became effective on July 1, 1973.  The purpose of the Plan is to assist employees in accumulating capital for their retirement.  *See* WaMu Savings Plan as Amended and Restated Effective January 31, 2006 (hereinafter the "Plan Document"), WMU-ERISA 000001-95, at WMU-ERISA 000007.

25.     Employees are eligible to participate in the Plan at the commencement of their employment.  *Id.* at WMU-ERISA 000019.

26.     Effective April 1, 2002, the Plan is comprised of the WaMu Savings Program (the "WSP") and the Employee Stock Ownership Program (the "ESOP").  *Id.*  The ESOP purports to qualify as an ESOP within the meaning of ERISA § 407(d)(6).  *Id.*

27.     All participant and Company contributions to the Plan (described below) which are directed for investment in the Company Stock Fund are first made to the WSP.  *Id.* at WMU-ERISA 000049.  To the extent those contributions are eligible to be made to the ESOP, they are immediately transferred to the ESOP, subject to limitations or restrictions the PAC adopts.  *Id.* at WMU-ERISA 000049.

28.     An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A).  As with a 401(k) plan without an ESOP component, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

**B.     Participant and Employer Contributions to the Plan**

29.     Individual accounts are maintained for each Plan participant.  Participants' accounts are credited with Employer and Participant-directed contributions and earnings, expenses, gains and losses.  *Id*. at WMU-ERISA 000047.

30.     Throughout the Class Period, participants in the Plan were permitted to defer a percentage of their base compensation for investment in the Plan.  Effective January 1, 2005,

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 10
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1   Plan participants are allowed to contribute between 1% and 75% of their compensation, up to the

2   annual maximum permissible under the Internal Revenue Code.  *Id*. at WMU-ERISA 000021.

3         31.   As explained directly below, during the Class Period, the Company made the

4   following types of contributions to the Plan:  (1) Matching Contributions; (2) Profit Sharing

5   Contributions; and (3) Top Heavy Minimum Contributions.  *Id.* at WMU-ERISA 000023-24.

6         32.   Effective January 1, 2004, the Company provides a Matching Contribution as

7   follows:  (a) 100% of a participant's contributions that does not exceed 3% of the participant's

8   considered compensation for the Plan Year; plus (b) 50% of a participant's contribution in excess

9   of the first 3% of the participants considered compensation, up to 5% of a participant's

10  considered compensation for the Plan Year, for a maximum total matching contribution of 4% of

11  a participants considered compensation for the Plan Year.  *Id*. at WMU-ERISA 000023.

12        33.   Effective January 1, 2004, a Profit Sharing Contribution is made in an amount, if

13  any, determined by the Employer, in its sole and absolute discretion.  *Id*.

14        34.   For any Plan Year in which the Plan is determined to be top heavy under the

15  Internal Revenue Code, the Company shall make a minimum contribution of not less than 3% of

16  a participant's compensation for those participants who are not "key employees."  *Id.* at WMU-

17  ERISA 000024.

18        35.   Plan participants are authorized to direct the investment of their contributions and

19  the Company Matching Contributions and Profit Sharing Contributions among the various

20  investment options in the Plan.  *Id.* at WMU-ERISA 000049.

21  **C.    Investment options in the Plan, including the WaMu Company Stock Fund**

22        36.   The Plan fiduciaries, by and through the PIC, select the investment options made

23  available to participants of the Plan.  *Id.* at WMU-ERISA 000049.

24        37.   The Plan fiduciaries, by and through the PIC, are provided with authority to

25  change Plan investment options at their discretion.  *Id*. at WMU-ERISA 000049, WMU-ERISA

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 11
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1  000056; SPD at WMU-ERISA 000114; Washington Mutual, Inc. Plan Investment Committee

2  Charter ("Investment Committee Charter"), WMU-ERISA 000241-243.

3          38.     For example, in March, 2008, following a comprehensive review by a consulting

4  firm of the core investment options in the Plan, the PIC "implemented a new investment

5  structure featuring separate accounts and target date funds offered by a broad group of

6  professional investment managers."  2007 Form 11-K at 13.

7          39.     During the Class Period, the WaMu Company Stock Fund has been one of the

8  investment options selected by the PIC and made available to the Plan participants.  Plan

9  Document at WMU-ERISA 000049.  Nothing in the Plan requires this option or limits the ability

10 of the Plan fiduciaries to remove the option, or divest assets invested in the option as prudence

11 dictates.  The PIC has and exercises discretionary authority with regard to the decision to make

12 the WaMu Company Stock Fund available as a Plan investment option, and manages the

13 investment of Plan assets in the WaMu Company Stock Fund.

14 **D.     Losses to the Plan**

15         40.     The Plan has incurred substantial losses as a result of the Plan's investment in

16 WaMu common stock.  As of December 31, 2006, the Plan held approximately 8 million shares

17 of WaMu common stock, then having a market value of approximately $341.4 million.  *See*

18 WaMu Savings Plan, Annual Report (Form 11-K) (Dec. 31, 2006) (hereinafter the "2006 Form

19 11-K"), WMU-ERISA 000157-173 at WMU-ERISA 0000170.  Following revelations that

20 WaMu failed to establish adequate reserves for its loan losses due to subprime lending and

21 participated in the manipulation of loan originations, among other improper business and

22 accounting practices, WaMu common stock has collapsed.  The price of WaMu stock has

23 dropped over 85% since the beginning of the Class Period, and the Plan has incurred devastating

24 losses.  The losses could have been avoided in whole or in part had the Plan fiduciaries acted

25 prudently, loyally and in the best interest of Plan participants as required by ERISA.

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 12
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1

## V.     DEFENDANTS' FIDUCIARY STATUS

2

### A.     The Nature of Fiduciary Status

3

41.     **Named Fiduciaries**.  Every ERISA plan must have one or more "named

4

fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the

5

"administrator" in the plan instrument is automatically a named fiduciary, and in the absence of

6

such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C.

7

§ 1002(16)(A).

8

42.     **De Facto Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly

9

named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who

10

in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises

11

any discretionary authority or discretionary control respecting management of such plan or

12

exercises any authority or control respecting management or disposition of its assets, (ii) he

13

renders investment advice for a fee or other compensation, direct or indirect, with respect to any

14

moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

15

has any discretionary authority or discretionary responsibility in the administration of such plan."

16

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

17

43.     Each of the Defendants was a fiduciary with respect to the Plan and owed

18

fiduciary duties to the Plan and the participants and beneficiaries under ERISA in the manner

19

and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

20

44.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

21

§ 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest

22

of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

23

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

24

such matters would use in the conduct of an enterprise of a like character and with like aims.

25

45.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all

26

aspects of the Plan's management and administration.  Rather, as set forth below, Defendants

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 13
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

46.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, WaMu chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn selected WaMu employees, officers and agents to perform most fiduciary functions.

47.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.     WaMu's Fiduciary Status**

48.     WaMu had the responsibility to appoint, and hence to monitor and remove, the Trustee, and, on information and belief, to execute the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plan.  Plan Document at WMU-ERISA 000053.

49.     On information and belief, the Company exercised *de facto* authority and control with respect to the *de jure* responsibilities of the PAC, the PIC, and the HR Committee Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing plan documents to the those Defendants, without relieving them of any such responsibility.

50.     On information and belief, in order to comply with ERISA, the Company and the PAC exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 14
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

receiving benefits under the plan a summary plan description or "SPD").  In this regard, the Company and the PAC disseminated the Plan's documents and related materials which, among other things, incorporated by reference WaMu's misleading SEC filings, thus converting such materials into fiduciary communications.

51.     Moreover, WaMu, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the PIC Defendants and PAC Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  WaMu is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

52.     Finally, under basic tenets of corporate law, WaMu is imputed with the knowledge that the other Defendants had regarding the misconduct alleged herein, and, hence, like the fiduciaries who acted on WaMu's behalf, had knowledge of the imprudent actions alleged herein.

53.     Consequently, in light of the foregoing duties, responsibilities, and actions, WaMu was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**C.     Defendant Killinger's Fiduciary Status**

54.     According to the Investment Committee Charter, the PIC was to report to the Board "at least twice each year" on the financial status of the Plan.  Investment Committee Charter at WMU-ERISA 000243.  Thus, the Board monitored the activities of the PIC, and as such under ERISA was required to ensure that the PIC was fully informed of critical information

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 15
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1  that it needed to faithfully discharge its duties under ERISA.  As a member of the Board,

2  Defendant Killinger had and exercised this authority.

3      55.    In addition, throughout the Class Period, Defendant Killinger made numerous

4  statements, many of which were incomplete and inaccurate, to employee Plan participants

5  regarding the Company, and future prospects of the Company specifically with regard to the risk,

6  or purported lack thereof, faced by the Company as a result of its exposure to the subprime

7  market and high-risk loans.  These statements, which were made, among other places, in

8  Company publications sent to all employees, on employee intranet, and in quarterly letters sent

9  to all employees, were made in an ERISA fiduciary capacity because they contained information

10 about the likely future of the Plan's benefits, in particular the value and prudence of the Plan's

11 largest single investment, WaMu stock, and, thus were acts of Plan administration under

12 controlling legal precedent.  Killinger made these statements knowing that, due to his position as

13 CEO, employees would view him as a fully informed, knowledgeable and trustworthy source of

14 information regarding WaMu's financial condition and future prospects.

15     56.    Furthermore, documents produced by Defendants show that Defendant Killinger

16 attended HR Committee meetings.  In light of his role as a *de facto* Plan fiduciary, Defendant

17 Killinger was obligated to provide critical information to the HR Committee with regard to the

18 real but undisclosed risks the Company faced.

19     57.    Consequently, in light of the foregoing duties, responsibilities and actions as a

20 member of the Board (the sole executive, insider Director), and as a result of his communications

21 with the Plan's participants which constitute acts of Plan administration, Defendant Killinger

22 was a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21),

23 during the Class Period in that he exercised discretionary authority or discretionary control

24 respecting management of the Plan, exercised authority or control respecting management or

25 disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility

26 in the administration of the Plan.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 16
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1  **D.      HR Committee Defendants' Fiduciary Status**

2         58.      The Board of Directors established the HR Committee to act as a fiduciary to

3  "[o]versee the management of any Plan trust funds and periodically review the performance of

4  the funds and the investment managers of the funds for the purpose of assessing their

5  effectiveness."  *See* HR Committee Charter at 1.  The HR Committee reported to the Board,

6  including Defendant Killinger, which retained decision-making authority on behalf of the

7  Company.  HR Committee Charter.

8         59.      According to the Investment Committee Charter, the PIC was to report to the HR

9  Committee "at least twice each year" on the financial status of the Plan.  Investment Committee

10  Charter at WMU-ERISA 000243.

11        60.      According to the Form 11-K for 2007, upon the enactment of the Pension

12  Protection Act of 2006, in order to ensure that Plan participants continue to have an appropriate

13  range of investment choices in the Plan, the HR Committee "requested a complete evaluation of

14  fund performance and expenses."  2007 Form 11-K at 13.  As a result of such evaluation, a new

15  investment structure was implemented in March, 2008.

16        61.      Additionally, according to the Plan Document, the PAC Defendants and the PIC

17  Defendants were appointed by the HR Committee.  Plan Document at WMU-ERISA 000055.

18        62.      Although the Plan Document identifies the HR Committee as the entity

19  responsible for appointing members to the PAC, a PAC Charter that was adopted circa July,

20  2007, states that, in addition, the Chair of the HR Committee may add, remove, or replace

21  members of the PAC.  Read together, it appears that prior to July, 2007, the HR Committee

22  appointed, removed and replaced PAC members, and after July, 2007, the Chair of the HR

23  Committee took on express responsibility for removing and replacing PAC members.

24        63.      A similar ambiguity exists with respect to the PIC members.  Although the Plan

25  Document identifies the HR Committee as the entity responsible for appointing members to the

26  PIC, an undated PIC Charter states that, in addition, the Chair of the HR Committee may remove

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 17
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

or replace members of the PIC.  Read together, it appears that prior to the undated PIC Charter, the HR Committee appointed, removed and replaced PIC members, and after the undated PIC Charter, the Chair of the HR Committee took on express responsibility for removing and replacing PIC members.

64.    Accordingly, both the HR Committee and its Chair had a duty to monitor the members of the PAC and the PIC, 29 C.F.R. § 2509.75-8 at FR-17 ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary…."), and exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).[1]

65.    Consequently, in light of the foregoing duties, responsibilities, and actions, the HR Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**E.     Investment Committee Defendants' Fiduciary Status**

66.    The Plan provides that the PIC is a "Named Fiduciary" pursuant to ERISA.  Plan Document at WMU-ERISA at 000055.

67.    The PIC Defendants had the responsibility of selecting the investments in the Plan and monitoring the performance of the investment funds, including the WaMu Company Stock Fund in the Plan.  *Id.* at WMU-ERISA 000049, 000056-57; Investment Committee Charter WMU-ERISA 000241-42.

---

[1]    The Plan Document also states that the "Company or the Board" is responsible for appointing the PIC.  Plan Document § 2.38.  Plaintiffs reserve the right to amend the Complaint, or seek leave to do so if necessary, to add additional members of the Board as Defendants if discovery demonstrates that they functioned as Plan fiduciaries and breached their duties as such under ERISA.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 18
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

68.     According to the Investment Committee Charter, the PIC consists of five members, with the Company's Chief Investment Officer being the chairman.  Investment Committee Charter at WMU-ERISA 000241.   The other members of the PIC are:  the Chairman of the PAC; two senior officers of the Company with backgrounds in "finance, investments or accounting"; and one other "at large" senior officer.  *Id.*

69.     The PIC is authorized to change the investment funds at its discretion.  Plan Document at WMU-ERISA 000049; SPD at WMU-ERISA 000114; Investment Committee Charter at WMU-ERISA 000241-243.

70.     In addition, the PIC has the following powers and duties:

i.     To direct the Trustee in the investment, reinvestment, and disposition of the Trust, including the investment of up to 100% of the Trust in qualifying employer securities (as defined in section 407(d)(5) of ERISA) without regard to the limitations of ERISA sections 407(a)(2), (3), or (4), as provided in the Trust Agreement;

ii.    To review, select or remove, and monitor investment funds and fund managers;

iii.   To receive and review reports of the financial condition and of the receipts and disbursements of the Trust from the Trustee;

iv.    To furnish the Employer with information which the Employer may require for tax or other purposes;

v.     To engage the services of or remove an Investment Manager or Managers (as defined in ERISA section 3(38)), each of whom shall have full power and authority to manage, acquire or dispose (or direct the Trustee with respect to acquisition or disposition) of any Plan asset under its control; and

vi.    To interpret and construe the Plan with respect to the investment, reinvestment, and disposition of Plan assets.

Plan Document at WMU-ERISA 000056-57.  *See also* Investment Committee Charter at WMU-ERISA 000241-242.

71.     According to the Plan's Form 11-K for 2007, following the HR Committee's request of a "complete evaluation of fund performance and expenses," the PIC "engaged a nationally respected consulting firm to perform a comprehensive review of the core investment

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 19
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1  options in the Plan." 2007 Form 11-K at 13.  Based on this review, in March, 2008, the PIC

2  "implemented a new investment structure featuring separate accounts and target date funds."  *Id.*

3      72.    The PIC is to report to the HR Committee and the Board of Directors on the

4  financial status of the Plan "at least two times per year."  Investment Committee Charter at

5  WMU-ERISA 000242-43.

6      73.    Consequently, in light of the foregoing duties, responsibilities, and actions, the

7  PIC Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29

8  U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C.

9  § 1002(21), in that they exercised discretionary authority or discretionary control respecting

10  management of the Plan, exercised authority or control respecting management or disposition of

11  the Plan's assets, and/or had discretionary authority or discretionary responsibility in the

12  administration of the Plan.

13  **F.    Administration Committee Defendants' Fiduciary Status**

14      74.    The Plan provides that the PAC is a "Named Fiduciary" pursuant to ERISA.  Plan

15  Document at WMU-ERISA 000055.  The Plan also provides that the PAC is the "Plan

16  Administrator," and that it shall have the following powers and duties:

17      i.    Make and enforce such rules and regulations as it shall deem necessary or
18          proper for the efficient administration of the Plan;

19      ii.    Interpret the provisions of the Plan and resolve any question arising under
        the Plan, or in connection with the administration or operation thereof;

20      iii.    Make all determinations affecting the eligibility of any Employee to be or
21          become a Participant;

22      iv.    Determine eligibility for and amount of retirement benefits for any
        Participant;

23      v.    Authorize and direct the Trustee with respect to all disbursements of
24          benefits under the Plan;

25      vi.    Employ and engage such persons, counsel and agents and to obtain such
        administrative, clerical, medical, legal, audit and actuarial services as it
26          may deem necessary in carrying out the provisions of the Plan;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 20
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

vii.  Delegate and allocate specific responsibilities, obligations and duties imposed by the Plan to one or more employees, officers or such other persons as the Plan Administrator deems appropriate; and

viii.  Amend the Plan for changes in the laws or regulations related to the Plan, to clarify any provisions in the Plan or correct any errors in the document, to simply administration or for administrative convenience, and for any other reason provided that with respect to an amendment .for any other reason., the delegate reasonably believes that the amendment will not have the impact of significantly increasing the cost or potential liability exposure of the Plan to the Employer. The authority set forth in this section 12.2(b)(viii) may be delegated only to a senior executive of the Company.

Plan Document § 12.2(b) at WMU-ERISA 000055-56.

75.  The PAC consists of up to fifteen members, with the Company Chief Human Resources Officer being the Chairman.  The other members of the PAC are:  the Chairman of the PIC and other senior officers of the Company.

76.  On information and belief, in order to comply with ERISA, the Company and the PAC exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA.  *See, e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, the Company and the PAC disseminated the Plan's documents and related materials which, among other things, incorporated by reference WaMu's misleading SEC filings, thus converting such materials into fiduciary communications.

77.  Consequently, in light of the foregoing duties, responsibilities, and actions, the PAC Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 21
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1

## VI.    FACTS BEARING ON FIDUCIARY BREACH

2

**A.    WaMu Was an Imprudent Investment for the Plan during the Class Period**

3

**1.    Summary**

4

78.    During the Class Period, WaMu stock became an imprudent investment for

5 participants' retirement savings due to the Company's serious mismanagement and improper

6 business practices which elevated the risk of WaMu stock far beyond what is appropriate for

7 retirement savings,  including that the Company:  (1) was heavily dependant on the origination,

8 purchase, sale and holding for investment of subprime mortgage loans and other high-risk loan

9 products, including Option ARMs (or "Pay Option ARMs"),"stated income" or "liar loans" and

10 so-called "piggyback" loans, and home equity lines of credit ("HELOCs"); (2) maintained lax

11 underwriting standards in connection with the origination of subprime and other high-risk

12 mortgage loans; (3) spearheaded an illegal scheme to systematically inflate property appraisals

13 during the loan origination process; (4) lacked adequate risk-management controls; and (5) failed

14 to adequately account for its exposure to loan losses, engaged in other questionable accounting

15 practices and made misrepresentations regarding the Company's financial condition, all of which

16 caused the price of WaMu stock to be artificially inflated during the Class Period.

17

79.    Throughout the Class Period, the Company suffered from grave mismanagement

18 and corresponding deterioration of its financial condition.  As the consequences of this conduct

19 have come to light, WaMu's share price has lost more than 85% of its value.  Under these

20 circumstances, investment in WaMu stock was imprudent.

21

**2.    The rise of the subprime lending industry and the proliferation of high-risk
loan products for "prime" and "subprime" borrowers**

22

23

80.    WaMu, like the mortgage banking industry as a whole, experienced rapid growth

24 in mortgage loan revenue in the years just prior to the start of the Class Period.  Between 2003

25 and 2005, WaMu's production of subprime loans increased from $14.1 billion to $34.5 billion.

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 22
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

Washington Mutual, Inc., Annual Report (Form 10-K) (Dec. 31, 2005) (hereinafter the "2005 Form 10-K").

81.    Industry experts have attributed the proliferation of subprime loans to a confluence of factors in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Federal Deposit Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html.

82.    On information and belief, in 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment, and also set out to entice prime borrowers to take out ever-larger mortgage loans.  Lenders did this in order to profit from the heavy demand for mortgage loans that could be securitized and sold by Wall Street to institutional investors.

83.    To take advantage of this new market lenders, including WaMu, weakened their underwriting standards by, among other things:

      a.    reducing the minimum credit score borrowers need to qualify for certain loans;

      b.    allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

      c.    introducing new products designed to lower borrowers' monthly payments for an initial period; and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 23
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

d.      allowing borrowers to take out loans with little, if any, documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

84.      In addition to lowering underwriting standards, lenders, including WaMu, introduced and/or accelerated the use of an array of non-traditional mortgage loan products, which enticed borrowers to take out large mortgage loans, but also put them at greater risk of default.  These mortgage loan products are explained, in part, in the following paragraphs.

85.      **Adjustable-Rate Mortgages ("ARMs")**:  ARMs are typically marketed with promotional or "teaser" rates during the loan's introductory period that later balloon to much higher rates once the introductory period has ended.  ARMs accounted for between one-half and one-third of subprime mortgages.  *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets*, Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.  Among the ARMs issued by WaMu were so-called "2/28", "3/27", and "5/25" ARMs (also known as "Hybrid ARMs").  By way of example, a 3/27 ARM offered a low, fixed interest rate for the first three years (the "3" in "3/27").  After the initial rate expires, the interest rates adjust upward over the remaining 27 years.  During this period, the interest rate typically is determined by adding a margin to the LIBOR index.  For example, if the LIBOR index is 6% and the margin on the loan is 5%, the fully indexed interest rate will be 11%.  Thus, the borrower faces payment shock when the "teaser" period ends, as well as the potential for steadily increasing payments.  The risk of nonpayment is further exacerbated by the fact the "2/28" "3/27" and other ARM loans were available to subprime borrowers.  In July of 2007, WaMu announced that it would no longer offer "2/28" or "3/27" ARMs, but it continued to offer "5/25" ARMs.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 24
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

86.     **"Option ARMs" (also known as "Pay Option ARMs")**:  WaMu was particularly aggressive in the origination of "Option ARMs."  Option ARMs enticed borrowers by offering a very low "teaser" rate of as low as 1% for an introductory period of one to three months, after which the interest would spike dramatically.  When the teaser rate expired, Option ARMs became adjustable rate loans in which the rate could fluctuate monthly based on changes to a rate index.  Each month the borrower could choose one of four options for payment: (1) minimum payments; (2) interest only payments; (3) full principal and interest; or (4) accelerated principal and interest.  Borrowers who chose to make minimum payments saw the amount owed on their loans *increase*.  On November 29, 2007, the Wall Street Journal reported that roughly 70% of Option ARM borrowers were making minimum payments; hence their principle amounts were *increasing* during the life of their loan.  These "negative amortization" loans were ticking time bombs, as they had negative amortization caps, in the range of 120% of the original principal of the loan.  Once the balance hits the cap, the monthly payment is immediately raised to the fully amortizing level (*i.e.*, all payments after the date the cap is reached must be sufficient to pay off the new balance after over the remaining life of the loan).  When this happens, the borrower will experience significant payment shock.  Nonetheless, on these negative amortization loans, WaMu declared the accrued (but *unpaid*) interest as income.  Even though WaMu did not make Option ARMs available to subprime borrowers, they were extremely high-risk loans, and have played a significant role in the Company's financial crisis.  Incredibly, WaMu did not discontinue the origination of Option ARMs until June 2008.

87.     **"Stated-income," "No-Documentation" or "Low-Documentation" Loans (also known as "Liar Loans")**:  The practice of making loans based on "stated income" or requiring little or no documentation from borrowers became pervasive; such loans constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.  *See* Gretchen Morgenson, *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007.  These loans usually

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 25
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

carried higher interest rates than fully documented loans.  For much of the Class Period, WaMu had very lax standards in this regard.  Between 2004 and the end of 2007, WaMu made $44 billion worth of "limited documentation" loans.  Drew DeSilver, *Where WaMu Went Wrong*, Seattle Times, Apr. 14, 2008.  Only on August 8, 2007, did WaMu announce that it would no longer accept mortgages unaccompanied by traditional documentation of income or assets if the loan exceeds 65% of the home's value and the borrower's credit score is below 680.

88.     **"PiggyBack" Loans**:  This type of loan combines a mortgage with a HELOC, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000.  *See Id.*; *see also* James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3.  The first loan typically covered 80% of the mortgaged home's appraised value, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%.  Thus the HELOC and the first loan together often encumbered 100% or more of a home's appraised value.  Because WaMu offered HELOCs as piggybacks to Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest only payments or allowed for negative amortization.

89.     **Interest-Only Mortgages**:  These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

90.     Traditionally, lenders such as WaMu typically retained ownership of the loan and mortgage for the life of the loan.  Hence, their primary interest was in ensuring that a borrower is able to repay a loan, and that the loan is adequately collateralized in case the borrower defaults.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 26
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

91.     This model changed in recent times, as lenders such as WaMu started to sell off the majority of their mortgage loans to investment banks, trusts or government sponsored enterprises such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac").  The loans were pooled together, securitized, and sold as mortgage-backed securities, allowing lenders such as WaMu to profit from the volume and value of loans procured, as well as from the retention of rights such as Mortgage Servicing Rights ("MSRs") and pre-payment penalties.  In addition, lenders often retained a portion of the earnings streams from the pools.

92.     As lenders such as WaMu sold more and more of the loans they originated in a lucrative secondary market, the lenders lost their incentives to protect their assets through vigorous underwriting standards and accurate property appraisals.

93.     In addition, on information and belief, lenders such as WaMu incentivized employees and executives to generate as many subprime loans and Option ARM loans as possible.  That is because bank profits now correlated more strongly to the volume and value of loans generated than to the likelihood that a loan would be repaid.

94.     Subprime loans were more valuable to lenders than traditional loans – ***provided*** that the less-creditworthy borrowers who took them were able to pay the high interest rates.  As set forth in WaMu's regulatory filings, the average return rate in WaMu's subprime mortgage channel (WaMu's held for investment portfolio) was 6.31%, but only 5.83% for other mortgage loans.  In 2005, the interest rate spread was nearly one full percentage point – 5.9% vs. 4.97%.  Washington Mutual, Inc., Annual Report (Form 10-K) (Dec. 31, 2007) (hereinafter the "2007 Form 10-K") at 26.

95.     Option ARM loans were also attractive fodder for mortgage-backed securities, and – in general and as long as it could – WaMu off-loaded many of these high-risk loans.

96.     Lenders such as WaMu were able to obtain higher returns on both subprime loans and Option ARMs that were bundled and sold to investors as mortgage-backed securities.  That

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 27
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

is because subprime loans carried higher (and often increasing) interest rates, and tended to carry harsh prepayment penalties, making it less likely that they would be paid off in the near future (and therefore making it more likely that monthly payments would continue). Subprime and ARM loans (whether subprime or not) were ideal for securitization because an increase in market rates would make the loans more profitable, yet a drop in market interest rates would not lessen the return (and concomitantly the value) of the associated mortgage-backed security.

97.     However, for reasons discussed in part *infra,* even after lenders such as WaMu had sold subprime and Option ARM loans, they retained a devastating exposure to the subsequent impairment of those loans. WaMu's top executives knew of this exposure, but failed to in any meaningful way manage the risk it presented to the Company and to the Plan's huge investment in the Company.

98.     WaMu's aggressively pursued and rapidly developed subprime mortgage business and Option ARM mortgage business ultimately was doomed by one simple fact: the subprime loans and the Option ARM loans at the heart of the business were inherently low quality and faced inevitable and devastating impairments over time – even though the WaMu was able to mask its exposure for a period of time.

**3.      The fall of the subprime lending industry**

99.     As early as 2004, industry watchdogs began expressing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Simon, *Mortgage Lenders, supra.* As lenders made it easier for borrowers to qualify for a loan by such practices as described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would increase. Of particular concern was the prevalence of adjustable-rate loans, which, in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

100.     By this time, WaMu was aware of the risks associated with subprime lending. In its 2004 Form 10-K WaMu acknowledged:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 28
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

> A continuing emphasis on subprime lending could negatively impact our business. The Company began accelerating purchases of subprime loans in 2003, increased its specialty mortgage finance portfolio significantly in 2004 and intends to continue to grow this portfolio in the future … [h]owever, if there were a downturn in the national economy or local economics where we do business, the credit performance of this portfolio could suffer, with a potential adverse effect on our earnings.

Washington Mutual, Inc., Annual Report (Form 10-K) (Dec. 31, 2004) (hereinafter the "2004 Form 10-K") at 3.

101. In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, proposed new guidelines for mortgage lenders were issued as well. *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Credit Risk Management Guidance for Home Equity Lending,* May 16, 2005, http://www.occ.treas.gov/ftp/bulletin/2005-22a.pdf; Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Addendum to Credit Risk Management Guidance for Home Equity Lending*, Oct. 4, 2006, http://www.occ.treas.gov/ftp/bulletin/2006-43a.pdf; Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Products,* Dec. 29, 2005, http://www.occ.treas.gov/fr/fedregister/70fr77249.pdf; Testimony of Sandra L. Thompson, *supra*. The proposed "Interagency Guidance on Nontraditional Mortgage Products" sent a clear message to high-ranking industry insiders that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

102. In September of 2005, the Wall Street Journal reported that "bank regulators [were] sounding the alarm bells about rising risks in the mortgage market." The then Federal Reserve Chairman Alan Greenspan testified that "the apparent froth in housing markets may have spilled over into mortgage markets" and stated that the "dramatic increase" in interest-only mortgages and "more exotic forms of adjustable rate mortgages" were "developments that bear

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 29
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

close scrutiny."  Ruth Simon and James R. Hagerty, *Mortgage Lenders Tighten Standards*, Wall St. J., Sept. 29, 2005.

103.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes and the interest rates on variable rate loans, including mortgage loans, began to rise.  Subprime borrowers who were able to afford the initially low "teaser rate" loan payments no longer could meet their monthly payment obligations.  At the same time, home values began to decline sharply, leading some borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell the property for a profit.  As a result, many borrowers no longer paid their mortgages, causing defaults to increase significantly.

104.    As of mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – as of October 2005 the delinquency rate was twice that recorded on new subprime loans a year earlier.  *See* Simon & Hagerty, *More Borrowers*, *supra*.

105.    The risks of Option ARMs also were identified by industry watchdogs.  As reported in November of 2005, "[r]egulators have raised concerns about the risks of these complex loans and whether borrowers truly understand them."  Ruth Simon, *A Trendy Mortgage Falls from Favor – Demand for Option ARMS, Which Helped Fuel Boom, Wanes Amid Rising Rates, Growing Risk,* Wall St. J., Nov. 29, 2005.

106.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period.  Testimony of Sandra L. Thompson, *supra*.

107.    ARM subprime loans accounted for the largest rise in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006; foreclosures rose from 1.5% to 2.7% during the same period.  *Id.*

108.    The high delinquency rates of ARM subprime borrowers ought to have been particularly troubling to WaMu, as the Company originated large volumes of ARMs.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 30
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

109.     In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination.  *See* Simon & Hagerty, *More Borrowers*, *supra*.

110.     On October 4, 2006, the bank regulators issued their final guidelines for mortgage lenders.  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Products Risks,* Oct. 4, 2006, http://www.occ.treas.gov/fr/fedregister/71fr58609.pdf.

111.     The imminent collapse of the subprime lending industry was documented by industry experts.  In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.  Shortly after, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from SEC and FDIC, and resulting in several bankruptcy filings.  WaMu executives, including Defendants Killinger, Casey, Cathcart, and Woods, knew the risks created by WaMu's imprudent business practices, but failed to control the risk in any meaningful way.

## 4.     WaMu shifts its focus to the high-risk subprime market and high-risk mortgage loan products

112.     During the real estate industry's rapid growth from 2002 - 2005, WaMu grew its mortgage business substantially, recording record levels of revenue in 2005.  However, WaMu, which sold its direct subprime lending business to Citigroup in 2003, was late to expand into the subprime lending business.

113.     WaMu's subsidiary, Long Beach Mortgage, experienced strong growth in the subprime lending market, which prompted WaMu executives to target the broader subprime market for expansion. WaMu decided to expand its subprime business despite the cooling housing market and despite the fact that the subprime lending is a notoriously dodgy segment of the mortgage industry.  Prior to its acquisition by WaMu, Long Beach Mortgage had been sued

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 31
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

by the United States Department of Justice for violations of the Fair Housing Act and related discriminatory practices.  *See* http://www.usdoj.gov/crt/housing/documents/longbeachsettle.htm.

114.   In 2004, Option ARM loans accounted for as much as 40% of WaMu's mortgage volume.  In 2005, increases in short term interest rates led to a temporary drop-off, such that Option ARM loans accounted for 29% of WaMu's mortgage volume.  Ruth Simon, *Demand for Option ARMs Drops as Short-Term Interest Rates Rise,* Wall St. J., Dec. 1, 2005.   Nonetheless, in 2006 and 2007, WaMu aggressively underwrote Option ARM loans, and booked the "negative amortization" generated by these loans as profit.

115.   In its 2005 Form 10-K, WaMu announced that:

> The Company remains committed to the subprime mortgage
> market and intends to increase the loan volume of its subprime
> mortgage business, Long Beach Mortgage Company, and to
> maintain the size of its purchased subprime home loan portfolio. A
> portion of the Company's Card Services portfolio is made up of
> subprime credit card loans and Card Services may continue to
> originate a portion of its credit card loans to subprime borrowers.

2005 Form 10-K at 4.

116.   Contemporaneous industry observers questioned both the wisdom and timing of WaMu's decision to make subprime lending a prominent part of its business operations.  As *The Seattle Times* reported in November 2005:

> For anyone who thinks of Washington Mutual as a buttoned-down
> bank dishing up only plain-vanilla loans, meet Long Beach
> Mortgage.
>
> The WaMu subsidiary is one of the country's largest lenders to
> people with damaged credit.
>
> That's not the kind of business most folks associate with WaMu, a
> conservative institution with roots in the meat-and-potatoes thrift
> industry.  By dipping into subprime lending – a term that refers to
> borrowers who can't get best, or prime, rate – WaMu has moved
> into an arena that was once dominated by specialty lenders, such as
> Household Finance and The Money Store.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 32
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

***

Long Beach made more than a quarter of all WaMu home-purchase loans last year, and [CEO] Killinger wants the business to grow faster than WaMu's traditional mortgage lending.

For one thing, it's more profitable.

"We earn better margins in the subprime business because we're very efficient and have an advantage over some competitors," he said.

That does not appease analysts who worry about what will happen when interest rates go up and borrowers have a harder time making payments.

"I hate the business," said Richard Bove, an analyst with Punk, Ziegel & Co. "Asking people who can't afford to buy something to pay up to buy that product is a concept that, for me, doesn't work."

Long Beach is one of the top 10 subprime mortgage lenders in the country and growing fast. It made loans of $8.4 billion in the third quarter, more than twice its volume a year earlier. And it has added about 900 of its 2,500 employees in the past year.

WaMu sells many of Long Beach's loans to investors, and it buys subprime mortgages from other lenders as investments. About 10 percent of the loans in its portfolio at the end of the quarter were subprime.

Robert Napoli, an analyst at Piper Jaffray, asked executives on a recent conference call why they want to expand the subprime area.

"It seems that margins in the industry are, for the most part, at record lows, so it seems that maybe this isn't the best time to be aggressively growing the business," Napoli said.

Melissa Allison and Justin Mayo, *WaMu Has Stake In Risky, Sub-Prime Arena*, Seattle Times, Nov. 13, 2005.

117. Turnover of key personnel exacerbated the risk posed by WaMu's increased exposure to the subprime market and to high-risk "prime" products such as Option ARMs. In November 2005, WaMu announced the retirement of its Chief Enterprise Risk Officer, James

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 33
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1  Vanasek.  *See* Washington Mutual, Inc., Current Report (Form 8-K) (Nov. 2, 2005) at Ex. 99.1.

2  Defendant Cathcart replaced Mr. Vanasek as Chief Enterprise Risk Officer.

3       118.  Then, in late December 2005, WaMu announced a dramatic re-alignment of its

4  subprime lending oversight, and that Craig Chapman, then-president of the group responsible for

5  overseeing subprime, would leave WaMu in January 2006.  WaMu touted the operating

6  efficiencies that this shift would produce and assured investors and Plan participants that "we

7  have a strong and experienced leadership team that recognizes the unique characteristics of the

8  subprime business."  *See* Washington Mutual, Inc., Current Report (Form 8-K) (Dec. 21, 2005)

9  at Ex. 99.1.  Under the new structure, management responsibility for the Long Beach Mortgage

10  Company and Mortgage Banker Finance moved from the Commercial Group to the Company's

11  Home Loans Group.

12       119.  Despite its ramp-up of its subprime and Option ARM business, WaMu

13  consistently represented that it had implemented and maintained adequate internal controls and

14  sufficient risk management strategies.  *See* Washington Mutual, Inc., Quarterly Report (Form 10-

15  Q) (June 30, 2006) at 59; Washington Mutual, Inc. Quarterly Report (Form 10-Q) (Sept. 30,

16  2006) at 58; Washington Mutual, Inc., Annual Report (Form 10-K) (Dec. 31, 2006 (hereinafter

17  the "2006 Form 10-K") at 3.  These representations were false.

18       120.  During this period of time, WaMu dramatically increased both its origination of

19  subprime and Option ARM mortgages and its securitization and resale of those mortgages to

20  other banks and investors.  The short-term revenue and profit gains appeared promising.  In

21  2005, revenue from sales and servicing of home mortgage loans grew to $1.79 billion, compared

22  with $1.47 billion in 2004.  WaMu attributed the improved performance to increased sales of the

23  Company's Option ARM product.  *See* Washington Mutual, Inc., Current Report (Form 8-K)

24  (Jan. 18, 2006) at Ex. 99.1.

25       121.  The Company's 2005 results also showed that the mortgage-lending boom had

26  run out of steam.  Revenue from sales and servicing of home mortgage loans, mortgage sales and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 34
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

servicing revenue fell from $497 million in the third quarter to only $264 million in the fourth quarter. *Id.* Despite the declining revenue and deteriorating market conditions, including a cooling market and interest rate increases, WaMu threw caution to the wind and expanded its subprime operations and its issuance of high-risk "prime" loan products.

   **5.    WaMu continued to originate, buy, sell and hold subprime and Option ARM loans despite the high risk of default or foreclosure**

   122.   Despite the many warnings issued by industry analysts and government regulators, as well as other negative indicators that WaMu's top executives appeared to ignore, such as rising interest rates and a cooling housing market, for much of the Class Period, WaMu continued to engage in risky, inappropriate and illegal practices in connection with its origination of mortgage loans and its issuance of HELOCs.

   123.   Even after the risks of the subprime and Option ARM lending business indisputably were known by WaMu's top executives, WaMu continued to extend subprime and Option ARM loans to borrowers which contained many of the perilous lending terms discussed in Section VI(A)(2), *supra*. WaMu's aggressive marketing of these loans resulted in massive increases in loan delinquencies and foreclosures and put the financial health of the Company in jeopardy.

   124.   For every quarter from Q1 2006 through Q3 2007, WaMu ranked as one of the largest subprime lenders in the country. *See* Nat'l Mortgage News Online, http://data.nationalmortgagenews.com.

   125.   In 2005, WaMu booked $949 million in revenue for sales of mortgage loans and originated mortgage-backed securities. In 2006, WaMu booked an additional $735 million in mortgage sales revenue. 2007 Form 10-K at 30.

   126.   WaMu was particularly aggressive in its origination of Option ARM loans. Between April 2004 and the end of 2007, WaMu underwrote $184.8 billion worth of Option

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 35
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1  ARM loans, and $9.5 billion of other ARM loans. Drew DeSilver, *Where WaMu Went Wrong*,

2  Seattle Times, Apr. 14, 2008.

3      127.    In December 2006, over 50% the Option ARM Loans held by WaMu (68% by

4  value) had negative amortization and these principle increases added $888 million to WaMu's

5  bottom line. In December 2007 the negative amortization remained at 50% (69% by value) and

6  added an astonishing (and illusory) $1.73 billion to the Company's balance sheet. 2007 Form

7  10-K at 38, 57.

8      128.    During this same time period, WaMu made $44 billion worth of "limited

9  documentation" loans. Drew DeSilver, *Where WaMu Went Wrong,* Seattle Times, Apr. 14,

10  2008. These loans did not require borrowers to even provide the lender with documentation

11  supporting their ability to afford the loan. *Id.* WaMu issued these low documentation loans even

12  though, as the Company has acknowledged, these loans are more prone to default in an economic

13  downturn. *Id.* WaMu was eager to originate as many mortgage loans as possible because it

14  could package them into mortgage-backed securities and sell them to hedge funds and

15  institutional investors. *Id.*

16      129.    In a statement responding to the *Interagency Guidance on Nontraditional*

17  *Mortgage Products*, WaMu Home Loans President David Schneider reiterated that "the Option

18  ARM is an attractive product for many of our customers." *WaMu Statement from David*

19  *Schneider, President, Home Loans, Regarding Interagency Guidance on Nontraditional*

20  *Mortgages*, Business Wire, Sept. 29, 2006.

21      130.    Indeed, WaMu responded to worsening conditions in the mortgage market by

22  introducing new risky loan products.

23      131.    In May 2006, WaMu introduced another high-risk loan product in the form of the

24  "enhanced" WaMu Equity Plus™ account that allowed customers to obtain lines of credit for

25  89.9% of the value of their home and to make interest-only payments for an introductory period.

26  After this introductory period, the loan would convert to a variable interest rate. Customers

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 36
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

could convert the loan to another fixed loan at the current interest rate or remain in a variable line and continue to make interest-only payments. *See Washington Mutual Enhances Home Equity Line of Credit Product to Provide Greater Flexibility; Allows Consumers to Make Interest Only Payments on Fixed-Rate Loan Option*, Business Wire, May 16, 2006.

132.    In April 2007, WaMu introduced the WaMu Mortgage Plus™, another high-risk "piggyback" product that bundled a first mortgage and home equity line of credit into a single loan.  The equity line in this product would automatically increase as principal payments on the mortgage were made.  WaMu allowed customers to move their loan from a fixed-rate to a variable-rate at no cost, but, after the first reset, charged $250 to move the loan from a variable-rate to a fixed-rate.  *See WaMu Delivers Unprecedented Mortgage Product to Market*, Business Wire, Apr. 26, 2007.

133.    Not until early 2007 did WaMu even begin to acknowledge the dire consequences of its risky business practices, as management publicly recognized the impact of the deteriorating housing market on its business and increased its forecast for losses due to loans.

134.    However, these increased forecasts for loan losses were themselves grossly understated, as detailed further below.

135.    Defendant Killinger admitted that lending standards had deteriorated during the subprime boom:

> Q:    Why would anyone make a stated-income loan in the first place?  Why would a practice like that become the norm?
>
> A:  From competitive pressures, from significant excess of capital flooding into the business from Wall Street.  That's really what it was.  Severe competitive pressure leading to a loosening of underwriting standards for the industry.

*Kerry Killinger Washington Mutual CEO*, S.F. Chron., Aug. 12, 2007, at E-1.

136.    In January of 2007, the *Wall Street Journal* reported on what would become a quarterly habit, the Company's substantially increasing its forecast for loan losses:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 37
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

WaMu's mortgage unit was hit hard by the slowing housing market. The thrift's subprime mortgage business, which lends to customers with blemished credit, was hurt as more borrowers struggled to make their payments and more loans became delinquent.

"Subprime encountered significant difficulties," Chief Executive Kerry Killinger said, citing a mix of a slowing housing market, overcapacity in the sub-prime mortgage-origination industry and credit deterioration.

The Seattle bank now forecasts that its overall provision for loan and credit-card losses this year would reach between $1.1 billion and $1.2 billion, up from the $850 million to $950 million it had projected in October. In addition to worsening subprime credit quality, WaMu also attributed the increase to an accounting change for credit-card loans held for sale, among other factors. But management stressed that its credit-card portfolio has performed very well.

Ann Carrns, *Earnings Digest: WaMu Net Rises On Sale of Unit; Revenue Declines*, Wall St. J., Jan. 18, 2007.

137.    On January 18, 2007, WaMu's stock closed at $44.26 per share.

138.    As noted in a Motley Fool article dated January 18, 2007, WaMu was being dragged down by its subprime mortgage division. For Q4-06, subprime mortgage losses totaled $160 million. For the full year 2006, the Home Loans Division lost $48 million, while it had made $1 billion in net income during the year 2005.

139.    The Company's 2006 Form 10-K detailed the marked increase in delinquencies and loan foreclosures for the subprime loans the Company was servicing. 2006 Form 10-K.

140.    In March of 2007, Defendant and Chief Financial Officer Tom Casey told analysts that 2006 subprime mortgages were performing "exceedingly poorly relative to price." Such loans to the riskiest borrowers represented 9 percent of the Company's loan portfolio at the end of 2006. Eric Martin & Jeff Kearns, *Experts Predict Snag at WaMu*, Seattle Post-Intelligencer, Mar. 13, 2007.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 38
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

141.     In April of 2007, WaMu announced a 20% decline in first quarter profit and once again revised its estimated losses due to bad loans – this time nearly tripling its estimate for loan losses.  The Wall Street Journal reported:

> Washington Mutual Inc., taking a beating from the cratering subprime-mortgage sector amid a housing downturn, said first-quarter profit fell 20%.
>
> The Seattle thrift, the largest U.S. savings and loan by stock-market value, nearly tripled its provision for loan losses, to $234 million from $82 million, as its home-loans business swung to a loss of $113 million from a profit of $52 million a year ago.
>
> Chief Executive Kerry Killinger said the thrift has curtailed its subprime-mortgage lending by 51% from the prior-year quarter to reduce its exposure.  The thrift also stopped buying mortgages from smaller "correspondent" lenders because it has less control over loan underwriting in that business.
>
> WaMu ranked 11th last year in originating subprime mortgages, as home loans to borrowers with weak credit are called, according to Inside Mortgage Finance, a Bethesda, Md., industry newsletter.
>
> Also, among the top-five U.S. home-mortgage lenders, WaMu last year made the highest percentage of loans to investors or second-home buyers, according to a Wall Street Journal analysis of data filed with banking regulators.  Such loans are generally considered riskier than those to owner-occupants.
>
> Our home-loans business was challenged during the first quarter by difficult market conditions, Mr. Killinger said in a statement. He said the steps taken so far should position the thrift to grow as the market improves.

Ann Carrns, *Earnings Digest: Washington Mutual Earnings Slide on Home-Loan Losses*, Wall St. J., Apr. 18, 2007.

142.     Despite the constant stream of negative results relating to its subprime operations, WaMu continued to write the riskiest subprime loans as late as July 2007.  Defendant Killinger acknowledged so during an interview with reporters from the San Francisco Chronicle:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 39
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1

2

3

4

> But at significantly lower volumes.  We tried to reduce our
> participation.  The conclusion we have made is that the slowdown
> in housing prices and the risk of the housing market have increased
> this year, making the 2/28 and 3/27 products less appropriate than
> they'd been in the past.  Those products worked well when housing
> prices were continuing to increase.

5  *Kerry Killinger Washington Mutual CEO*, S.F. Chron., Aug. 12, 2007.

6      143.  Defendant Killinger attempted to assure investors and Plan participants:

7

8

9

10

> "Over the past 12 months, we have taken a number of prudent
> actions to reduce our exposure to the subprime mortgage industry,"
> Mr. Killinger said in a statement.  "These actions, along with a
> diversified business mix, limited our exposure to the mortgage
> market's downturn and position us well to expand and grow as
> market conditions improve."

11  *Bad Loans Inhibit Profits At Three Regional Banks*, Associated Press, Apr. 18, 2007.

12      144.  Killinger also opined that the mortgage crisis presented WaMu with an

13  *opportunity*:

14

15

16

> With a number of competitors going out of business, we're now
> able to have better pricing, and the credit quality of the loans being
> originated thus far in '07 is significantly better than in '06….It's
> too early to declare victory, but we are seeing encouraging signs.

17  Amy Martinez, *Subprime Fallout Hits WaMu*, Seattle Times, Apr. 18, 2007.  At the time

18  Defendant Killinger made these statements, shares of WaMu stock were trading at about $41.

19  Statements such as this one and others Defendant Killinger made directly to employees

20  obfuscated the dire circumstances faced by WaMu as a result of its perilous and highly risky loan

21  practices.

22      145.  Defendant Killinger reiterated his positive outlook in July 2007, when he

23  announced his expectation that the Company's home loans group would return to profitability.

24  *WaMu Beats Forecasts With 8.2% Profit Gain*, Seattle Times, July 18, 2007.  In fact, the full

25  extent of WaMu's exposure to the mortgage market's downturn had yet to be disclosed.

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 40
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

146.   By August 2007, the Company was forced to acknowledge that liquidity had diminished significantly in the market for subprime-backed securities.  WaMu's share price lost 2.2% of its value, falling to $35.95 per share. *WaMu's Shares Decline on Mortgage Woes*, Seattle Times, Aug. 11, 2007.

147.   In the interview appearing in the San Francisco Chronicle on August 12, 2007, Defendant Killinger admitted that the Company had been aware of serious risks in the subprime sector at least since 2004:  "We were concerned that there was a risk of correction in housing prices" as early as 2004, "[s]o we did sell off all our 2004 and 2005 residuals of subprime origination.  ... We also sold off the majority of our prime loan originations in the last two years, whereas in the past we had retained those."  *Kerry Killinger Washington Mutual CEO*, S.F. Chron., Aug. 12, 2007.  Nonetheless, Killinger conceded, the Company had held onto the MSRs, and therefore retained substantial risk as discussed below.  Finally, Killinger conceded that "in hindsight, we would probably have made additional adjustments . . . ." *Id.*

148.   On September 10, 2007, Defendant Killinger spoke at the Lehman Brothers 2007 Financial Services Conference and assured the market that WaMu had positioned itself "to be successful in what is rapidly *becoming* a challenging business environment."  *See* Washington Mutual Current Report (Form 8-K) (Sept. 13, 2007) at Ex. 99.1 (emphasis added).

149.   Defendant Killinger lauded, among other things, the quality of loans held in the Company's investment portfolio.  On a PowerPoint slide, he assured investors that 82% of WaMu's home loans, including those made through the subprime mortgage channel, had loan-to-value ratios of less than 80%. *Id.* at Slide 12.

150.   Two days later, WaMu announced that it was shuttering its erstwhile subprime juggernaut, Long Beach Mortgage.  Matthew Padilla, *Washington Mutual Shutting Down Anaheim Subprime Unit*, Orange County Register, Sept. 14, 2007.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 41
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

151.    WaMu's belated efforts to rein in its subprime business could not mitigate the impact of its subprime binge.  On October 5, 2007, WaMu announced a 75% drop in third-quarter profit:

> The other shoe dropped Friday for Washington Mutual, as the giant Seattle-based thrift said the collapsed housing and mortgage markets will lead to a 75 percent drop in third-quarter profit.
>
> ***
>
> As the nation's housing bubble has deflated, WaMu's stockpile of delinquent loans, foreclosed properties and other non-performing assets has risen – both in absolute terms, to more than $4 billion, and as a share of its total assets, to 1.3 percent, as of June 30.

Drew DeSilver, *WaMu Forecasts Big Drop in Profit*, Seattle Times, Oct. 6, 2007.

**6.    WaMu masked its exposure and artificially inflated the price of its stock through questionable accounting**

152.    In light of the increasingly risky nature of the loans that WaMu originated and purchased, the quality of the Company's held for investment portfolio grew weaker and weaker as foreclosure and default rates increased – yet the Company refused to reasonably recognize this impairment.

153.    As the market for subprime loans and mortgage-backed securities inevitably dried up, WaMu was left holding low-quality loans that it could no longer jettison, and faced the risk of being forced to buy back now-worthless loans when it became known that WaMu originated them by using a fraudulent property appraisal scheme that it had also concealed from investors.

154.    All the while, the Company and certain of the Defendants, including Defendant Killinger, made inaccurate and misleading prognostications about the Company's financial future.

155.    Even after it curtailed its subprime origination practices in the latter part of 2007, WaMu refused to adequately account for its mounting losses, and, as detailed in part below, the

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 42
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1   Company used various methods of questionable accounting in order to mask the burgeoning

2   crisis that ultimately threatened the very survival of the Company.

3           a.      **WaMu failed to sufficiently reserve for various liabilities and
                    obligations related to mortgages that it securitized or sold**

4

5       156.    In part for the reasons detailed below in ¶¶ 162-218, WaMu's financial statements

6   throughout the Class Period failed to reflect the actual liabilities and losses to which the

7   Company was exposed.

8       157.    As the credit squeeze tightened and mortgage woes escalated through late 2006

9   and into early 2007, WaMu failed to disclose and adequately account for the increased risks it

10  faced as a result.  The Company allocates allowances for loan and lease losses, and, as a

11  specialized subprime lender, WaMu expressly allocates allowances for losses from its subprime

12  mortgage channel.  But as the subprime crisis loomed over the mortgage market, WaMu

13  allocated *less* for both general loan and lease losses and losses in its subprime mortgage channel

14  in December 31, 2006 than it did in the prior year ending December 31, 2005 as demonstrated in

15  the following chart of WaMu's publicly stated allowances for loan and lease losses:

16

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 43
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

| **2006 Allowances for Loan and Lease Losses** | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] |
|---|---|---|---|
| Allocated allowance: | | | |
| Loans secured by real estate: | | | |
| Home loans[2] . . . . . . . . . . . . . . . . . . . . . . | $ 202 | 0.20% | 44.22% |
| Home equity loans and lines of credit[2] . . . . . | 184 | 0.35 | 23.51 |
| Subprime mortgage channel[3] . . . . . . . . . . | 326 | 1.57 | 9.23 |
| Home construction[4] . . . . . . . . . . . . . . . | 5 | 0.24 | 0.93 |
| Multi-family . . . . . . . . . . . . . . . . . . . . . | 85 | 0.28 | 13.41 |
| Other real estate . . . . . . . . . . . . . . . . . . | 54 | 0.80 | 2.99 |
| Total allocated allowance secured by real estate . . . . . . . . . . . . . . . . . . . . . . | 856 | 0.40 | 94.29 |

| **2005 Allowances for Loan and Lease Losses** | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans[1] |
|---|---|---|---|
| | (dollars in millions) | | |
| Allocated allowance: | | | |
| Loans secured by real estate: | | | |
| Home loans[2] . . . . . . . . . . . . . . . . . . . . . . | $ 222 | 0.19% | 49.71% |
| Home equity loans and lines of credit[2] . . . . . | 106 | 0.21 | 22.14 |
| Subprime mortgage channel[3] . . . . . . . . . . | 374 | 1.77 | 9.21 |
| Home construction[4] . . . . . . . . . . . . . . . | 6 | 0.29 | 0.89 |
| Multi-family . . . . . . . . . . . . . . . . . . . . . | 122 | 0.48 | 11.15 |
| Other real estate . . . . . . . . . . . . . . . . . . | 69 | 1.37 | 2.19 |
| Total allocated allowance secured by real estate . . . . . . . . . . . . . . . . . . . . . . | 899 | 0.41 | 95.29 |

$202M allocated for home loan losses

$326M allocated for subprime loan losses

$856M allocated for total loan/lease losses

$222M allocated for home loan losses

$374M allocated for subprime loan losses

$899M allocated for total loan/lease losses

*See* 2006 Form 10-K at 61.

158.   WaMu retains subordinated interests in mortgages that it securitizes and makes representations to buyers about performance and other characteristics of mortgages that it sells. The Company's Quarterly Reports for 2007 reveal that WaMu under-reserved for credit risk arising from its retained subordinated interests and understated liabilities arising from representations it made regarding sold mortgages.

159.   For instance, between March 31, 2007 and September 30, 2007, the Company increased its recorded reserves and liabilities despite a substantial *decrease* of the related assets

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 44
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

or revenue.  From March 31, 2007 to September 30, 2007 WaMu's subordinated interests decreased from $2.71 billion to $2.29 billion; during the same period, its allowance for loan and lease losses mushroomed from $1.54 billion to $1.89 billion, an increase of more than 20% despite the decrease in subordinated interests.  *See* Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Mar. 31, 2007) and Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Sept. 30, 2007) (hereinafter, "Q3 2007 Form 10-Q").

160.    WaMu's need to increase its loan loss provisions demonstrates that its previously announced earnings and equity were inflated and did not properly account for the actual condition of the Company's loan holdings.

161.    As detailed further below, these increased loan loss provisions in 2007 were themselves grossly understated.

### b.    WaMu's questionable valuation of its loans held for investment, and failure to account for the declining quality of those loans

162.    Generally Accepted Accounting Principles ("GAAP") are the conventions, rules and procedures recognized by the accounting profession as necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

163.    Pursuant to Statement of Financial Accounting Standards (FAS) 65:  "Accounting for Certain Mortgage Banking Activities," a loan held for investment is considered "impaired" only when the holder determines in its discretion that the impairment is "other than temporary."

164.    According to Statement of Financial Accounting Standards (FAS) 115: "Accounting for Debt and Equity Securities," investments (including debt securities such as

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 45
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

mortgages) must be placed in one of three categories at the time of acquisition, depending on the company's intentions with regard to holding the investment:

i.   *Securities held to maturity*:  This category includes mortgages that the company intends to hold to maturity.  Under FAS 115, unrealized losses on mortgages held to maturity are only reflected in financial statements if they are considered to be ***permanent*** in nature.  Because this determination is made at the discretion of management, classifying a loan in this category gives the Company the ability to hide losses.

(ii)   *Trading securities*:  ***This*** category includes debt and equity securities that are held with the short-term objective of generating profits from short-term differences in price.  Mortgage loans held for sale are treated as trading securities, and unrealized gains and losses form trading securities are included in the determination of net income.

(iii)   Securities available for *sale*.  All other mortgage loans are included in this category.  Unrealized gains and losses are excluded from the determination of net income, except in cases of ***permanent impairment,*** which is, again, subject to management discretion.

165.   Despite mounting evidence of significant impairments to the Company's held for investment portfolio, the Company failed to adequately increase its loan loss reserves.

166.   According the Company's Q3 2007 Form 10-Q, non-performing loans were up 126.3% year-over-year to $5.45 billion; on a relative basis, non-performing loans surged from 0.69% of total assets up to 1.65% of total assets during the same period.  Q3 2007 Form 10-Q at 54.

167.   Despite this massive decrease in the quality of the Company's loans, the allowance for loan losses increased by only 18.3% (from $1.54 billion to $1.82 billion).  The inadequacy of this allowance is evident from the fact that in the year ending September 30, 2006, the allowance equaled 63.9% of nonperforming loans, while in the year ending September 30, 2007, the allowance accounted for only 33.4% of nonperforming loans.  ***If the allowance for loan and lease losses remained constant as a percentage of nonperforming loans, trailing one-year income would have been reduced by $1.6 billion.***

168.   ARMs played a major role in decreasing the quality of the Company's held for investment portfolio.  As of the end of the third quarter of 2007, WaMu carried $111.3 billion

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 46
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

(90.4% of its home loan portfolio) in ARMs.  These loans are highly risky given that:  (i) when they reset at higher rates, the borrower's payments will often dramatically increase; and (ii) it is all but impossible for many borrowers to refinance at favorable terms, if at all (and has been since the summer of 2007).

169.    Still more troubling, approximately 52% (or $57.9 billion) of the ARMs held in the Company's portfolio as of this time were Option ARMs.  These loans were particularly susceptible to impairment.  According to the Q3 press release, $1.5 billion, or 2.59% of the total Option ARMS held by the Company represented unpaid principal, in contrast to one year earlier when the figures were $0.9 billion, or 1.4% of the total Option ARMs held by the Company.

170.    In light of the concentration of ARMs, and Option ARMs, in the Company's held for investment portfolio, the Company should have assumed that impairments would *increase*, and, correspondingly, should have *increased* its loan and lease loss allowances.

171.    Instead, the Company chose not to recognize any material decline in the market value of any of its loans held for investment.

### c.    The shifting of loans from the "held for sale" to the "held for investment" category

172.    Pursuant to Statement of Financial Accounting Standards (FAS) 65: "Accounting for Certain Mortgage Banking Activities," a bank's balance sheet must distinguish between a loan held for sale and a loan held for investment.

173.    According to paragraph 6 of FAS 65, a loan held for investment is one that the holder has both the ability and the intent to hold "for the foreseeable future <u>or</u> until maturity." Similarly, under FAS 115, "*Securities held to maturity*" includes mortgages that the holder intends to hold to maturity.

174.    In the third quarter of 2007, the Company shifted "$17 billion in home, multi-family and other commercial real estate loans" from the "held for sale" to the "held for investment" category.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 47
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

175.    Presumably, these are questionable loans that the Company could not sell due to adverse market conditions.

176.    However, on the date of transfer, the Company marked the dollar value of these loans down by only $147 million, or less than 1% of the total value of the loans transferred.

177.    By changing the classification of these loans, the Company avoided accounting for a much larger impairment.  That is because, pursuant to both FAS 65 and FAS 115, a loan held for investment is considered to be impaired only when management determines the impairment to be permanent.

178.    Regardless of whether the Company's $17 billion transfer into the "held for investment" category was proper, the Company's mark-down of the value of the loans was grossly understated, and was therefore false.

> d.    The questionable recognition of interest income from "Negative Amortization" loans

179.    A "negative amortization" loan is one in which the balance owed on the loan actually *increases* over time.  That is because the borrower's monthly payments do not even cover the monthly interest, and the unpaid interest amounts are added to the loan balance.

180.    Option ARMs can be negative amortization loans at the discretion of the borrower who chooses to make a minimum monthly payment.

181.    At all relevant times, the Company knew or should have known that negative amortization loans carry a high risk of delinquency and default.  Indeed, common sense suggests that many (or most) borrowers postponing their interest payments did so because they could not afford to pay them.

182.    Nonetheless, the Company recognized interest income when borrowers postponed their interest payments, even though the Company received no cash.

183.    In the first nine months of 2007, WaMu recognized $1.05 billion in interest income from negative amortization, or 7.2% of the Company's interest income during that time

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 48
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11 254688 V1

1    period.  That represented a massive increase from the year 2005, when negative amortization

2    income was just 1.8% of the Company's interest income.

3        184.    The Company's reliance on low-quality negative amortization income, and its

4    failure to adequately account for impairments to that income, was the result of serious

5    mismanagement.

6        **e.    WaMu's reliance on "Gain on Sale" accounting**

7        185.    FAS 140, "Accounting for the Transfer and Servicing of Financial Assets and

8    Extinguishments of Liabilities," sets out the accounting treatment for mortgages that are

9    transferred to a third party.  A major purpose of FAS 140 is to proscribe when the securitization

10   of a debt (such as a mortgage) may be deemed a "sale" for accounting purposes.

11       186.    When a securitization is deemed a "sale," a gain on sale is realized and that loan

12   is shifted off the bank's books.

13       187.    However, if a securitization is deemed a collateralization of assets in support of a

14   financing, no gain is realized and the asset (as well as the related borrowings) remains on the

15   bank's balance sheet.

16       188.    Under FAS 140, the securitization of a debt security can be considered a "sale" if

17   (i) the debt security has been properly isolated in a qualifying special purpose entity ("QSPE")

18   and (ii) control over the security has been transferred to the securitization trust.

19       189.    After the "sale" of a mortgage debt via securitization to a secondary entity such

20   trust or a QSPE, the secondary entity sells bonds that represent claims on the principal and some

21   of the interest that will come in from the mortgage debt.

22       190.    After such a "sale," the primary enterprise (here, the Company) retains the right to

23   certain interests in the mortgage – such as the servicing rights and possibly other elements such

24   as the right to collect prepayment penalties.  To calculate the profits that (theoretically) are still

25   to come, the primary enterprise makes estimates about future losses from nonperforming loans

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 49
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback I.I.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

and how long the average account will stay on the books generating interest.  The hypothetical earnings, discounted to current value, are then reported as a "gain on sale."

191.    During the years 2005-2007, WaMu was second (behind only Countrywide Financial Corp.) among major lenders in its reliance on "gain on sale" income.  During this time period, gain on sale income accounted for 11.8% of the Company's operating income.

192.    Though securitization income declined as the secondary market for subprime mortgages evaporated, WaMu's prior aggressive use of gain on sale accounting left it highly vulnerable to later write-downs of the Company's "trading securities" and "available for sale securities," where most of its retained interests are held.

193.    Despite the high level of gains on sale from the securitization of low-quality loans, the Company was slow to write down the value of its retained interests through the first six months of 2007.

194.    Inevitably, however, WaMu was forced to account for the poor quality of its retained interests.  In the Third Quarter of 2007, the Company reported impairments to "trading securities" of $153 million, and impairments to "available for sale securities" of $104 million.  Unfortunately for unsuspecting Plan participants, that was just the tip of the iceberg.  In fact, the Company's heavy reliance on "gain on sale" accounting together with its failure to account for the poor quality of its retained interests meant that its earnings were materially overstated.

     **f.**  **WaMu's questionable valuation of mortgage servicing rights**

195.    As discussed above, one of the assets WaMu typically retained after the "sale" of a mortgage was the MSR.  Mortgage servicing is the activity of keeping a mortgage loan current, including collecting monthly mortgage payments, forwarding principal and interest payments to the current mortgage holder (if the loan has been sold), maintaining escrow accounts, paying taxes and insurance premiums, and taking steps to collect overdue payments.  An MSR is the right to perform these services in exchange for a fee.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 50
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

196.     Significantly, in 2007 WaMu voluntarily adopted FAS 156, "Accounting for Servicing of Financial Assets, an Amendment of FASB Statement No. 140." This standard was optional, and, by adopting it, WaMu obtained the ability to revalue servicing assets, such as MSRs, on a quarterly basis.

197.     Under FAS 156 and FAS 157, companies are required to report various assets at "fair value" – including MSRs.

198.     In order to determine the "fair value" of an asset, a company must consider three "levels" of information. When available, a company must use "Level 1" values, which come from quoted prices in active markets. When Level 1 values are unavailable, a company must next look to "Level 2" evidence; Level 2 values are based on "observable inputs" such as market prices for similar assets. When Level 2 values are unavailable, the company must rely on "Level 3" values.

199.     Level 3 valuations are based on "unobservable inputs." They are therefore the lowest quality, inherently subjective and most highly suspect valuations.

200.     According to the Company's 10-Q for the second quarter of 2007, in the first six months of that year WaMu recognized $849.0 million in Level 3 gains on its MSRs – or some 52.6% of the Companies' H1 operating income.

201.     In the first three quarters of 2007, WaMu reported $6.9 billion in MSRs. By the end of 2007, the Company reported $6.278 billion in MSRs for the year.

202.     As WaMu knew or should have known at the time, this amount was materially overstated given that these gains were reported during a period in which default and delinquency rates were rising, and, therefore, WaMu's earning were materially overstated during this time period.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 51
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

7.    **WaMu concealed the fact that its fraudulent and illegal property appraisals artificially inflated the value of its loans**

203.    On November 1, 2007, WaMu's woes were exacerbated, when New York State Attorney General Andrew Cuomo filed suit against First American Corp. ("First American") and its subsidiary eAppraiseIT, alleging that it had conspired with WaMu to artificially inflate property appraisals in connection with WaMu's origination of loans (hereinafter the "Attorney General Suit"), http://www.oag.state.ny.us/press/2007/nov/EA%20Complaint.pdf.

204.    The Attorney General Suit alleges that, beginning in July 2006, WaMu pressured First American and its affiliates to use certain "preferred appraisers" and that First American responded by allowing "WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure [] appraisers to change values that are too low to permit loans to close…." *Id.* at ¶ 8.

205.    Announcing the suit against First American, the New York Attorney General published a release that stated, in part, the following:

> Attorney General Andrew M. Cuomo today announced that he is suing one of the nation's largest real estate appraisal management companies and its parent corporation for colluding with the largest savings and loan in the country to inflate the appraisal values of homes.
>
> In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation (NYSE: FAF), caved to pressure from Washington Mutual ("WaMu") (NYSE: WM) to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes.  The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.
>
> "The independence of the appraiser is essential to maintaining the integrity of the mortgage industry.  First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo.  "The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market.  By

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 52
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11 254688 V1

allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."

As First American acknowledged in its 2006 annual report, appraisal fraud can damage the entire housing market, including consumers and investors alike.  Consumers are harmed because they are misled as to the value of their homes, increasing the risk of foreclosure and hindering their ability to make sound economic decisions.  Investors are hurt by such fraud because it skews the value and risk of loans that are sold in financial markets.

*In April 2006, EA began providing appraisal services for WaMu, which became EA's biggest client.  Within weeks, WaMu began complaining to EA that its appraisals were not high enough.  WaMu pressured EA to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers."  This set of appraisers was chosen by WaMu specifically because they inflated property appraisals.  WaMu profited from these higher appraisals because they could close more home loans, at greater values.  Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for WaMu.*

\*   \*   \*

Attorney General Cuomo's lawsuit seeks to end the illegal relationship between First American and EA and WaMu.  It also seeks penalties and disgorgement from First American and EA.  The lawsuit alleges that First American and EA violated appraiser independence laws, which regulate the conduct of real estate appraisers.  The lawsuit was filed in the Supreme Court of New York, New York County.

*NY Attorney General Sues First American and its Subsidiary for Conspiring with Washington Mutual to Inflate Real Estate Appraisals*, Nov. 1, 2007,

http://www.oag.state.ny.us/press/2007/nov/nov1a_07.html (emphasis added).

206.   The Attorney General investigation uncovered a series of e-mails between executives of eAppriaseIT, First American and WaMu that demonstrated that appraisal officials conspired to violate state and federal appraisal independence rules and regulations in order to

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 53
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

comply with pressure and demands by Defendants.  These emails, which evidenced this scheme and illegal course of conduct, were summarized in the release, in part, as follows:

> On February 22, 2007, in response to a description of the WaMu "proven appraiser" program as one in which "we will now assign all WaMu's work to WaMu's 'proven appraisers'… [and] performance ratings to retain position as a WaMu proven appraiser will be based on how many come in on value," eAppraiseIT's president told senior executives at First American: "We have agreed to roll over and just do it..."

> On April 4, 2007, eAppraiseIT's executive vice president stated in an e-mail to First American: "We as an AMC [appraisal management company] need to retain our independence from the lender or it will look like collusion…  eAppraiseIT is clearly being directed who to select.  The reasoning… is bogus for many reasons including the most obvious – the proven appraisers bring in the values."

> On April 17, 2007, eAppraiseIT's president wrote an e-mail to First American explaining why its conduct was illegal: "We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."

> E-mail evidence also shows that WaMu pressured eAppraiseIT to inflate appraisals as a condition for doing future business together: on September 27, 2006, First American's vice chairman reported that a WaMu executive told him: "If the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship…"

*Id.*

207.    The inflation of the property appraisals not only permitted WaMu to write loans in circumstances where none should have been written, but also, by falsifying the key Loan-to-Value ration, permitted WaMu's inflation of the value of those loans whether kept as investments or securitized and sold to third parties.  As WaMu explained in its Annual Report:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 54
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

1
2

> This greater credit risk arises because, in general, both default risk
> and the severity of loss is higher when borrowers have less equity
> to protect in the event of foreclosure.

3    2006 Form 10-K.

4        208.    Put differently, not only did WaMu dramatically alter its risk exposure through

5    increasing its subprime lending exposure, it also purposefully exposed itself to higher risk loans

6    and more severe loss – without disclosing so – by participating in the manipulation of the

7    origination process.

8        209.    In addition to creating the risk of liability for violating state and federal laws,

9    these fraudulent practices pose grave danger to WaMu's financial condition.  With regard to

10   affected loans that were sold to third-parties, WaMu is susceptible to the forced re-purchase of

11   the loan due to its breach of warranties regarding the loan's origination process or subsequent

12   performance.

13       210.    As set forth in the Company's 1986 Annual Report:

14
> In the ordinary course of business, the Company sells loans to third
> parties and in certain circumstances … retains credit risk exposure
> on those loans.  The Company may also be required to repurchase
> sold loans when representations and warranties made by the
> Company in connection with those sales are breached.

15
16

17       211.    WaMu fares little better with regard to those loans it has kept as its own

18   investments.  Discovery of the revised Loan-to-Value ratio requires that WaMu recalculate the

19   value of the asset in its own portfolio.  The heightened risk profile of the loans also means that

20   WaMu has insufficient reserves for loan losses.

21       212.    On November 2, 2007, MarketWatch.com, an internet financial news website,

22   reported that the revelations that WaMu had artificially inflated loans that were in its portfolio as

23   well as loans it sold and which were later securitized and re-sold, would result in charges to the

24   Company of between $400 million and $2.1 billion – a loss of as much as $1.57 per share.  In

25   addition to the foregoing, this report stated, in part, the following:

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 55
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

***Washington Mutual may have to set aside some $412 million to $2.1 billion in extra reserves*** if a lawsuit filed by New York state's attorney general against the mortgage lender succeeds, a Keefe Bruyette & Woods analyst estimated on Friday.

Attorney General Andrew Cuomo announced the suit on Thursday, alleging that First American Corp. and its eAppraiseIT unit had been "colluding" with Washington Mutual, also known as WaMu, to inflate the appraisal value of homes.

WaMu suspended its relationship with eAppraiseIT and said it has no incentive to have appraisers inflate home values. First American said the complaint "has no foundation in fact or law."

If Cuomo succeeds in proving eAppraiseIT's appraisals on WaMu home loans were fraudulent, that could create big problems for the Seattle-based lender, KBW's Frederick Cannon wrote in a note to clients.

After lenders like WaMu originate home loans, they are often packaged up into mortgage-backed securities and sold to institutional investors around the world. The process gets the loans off the lenders' books, freeing them from the risk that those loans may default and also providing fresh cash to make more new mortgages.

But if parts of the origination process are found to be fraudulent, investors can potentially force lenders to buy the mortgages back at the original price. If the assets have suffered delinquencies and have dropped in value, the lender takes a financial hit.

\*   \*   \*

**'Considerable risk'**

The lawsuit filed by Cuomo ***"raises an issue of considerable risk to Washington Mutual: that poorly performing securitized loans will be put back to WaMu from bondholders on the basis of fraudulent appraisals and WaMu would be forced to put bad loans back on its balance sheet,"*** Cannon said.

***"In such a scenario, WaMu would have to buy the loans back at par and then mark them to market on its balance sheet."***

Cannon also questioned WaMu's assertion that it has no incentive to inflate the appraised value of homes that it lends against.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 56
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

For mortgages that the company originates and then keeps on its balance sheet, the assertion is valid. But for home loans that WaMu sells as mortgage-backed securities, such an argument can be dubious, he said.

***For loans that a bank plans to sell, high appraisals support a greater amount of loans that can be sold, and loan officers are generally paid on volume,"*** Cannon explained.

"Further, if a mortgage loan is sold it is generally accepted by the lender that they have passed on the default risk to the security holder," he added. "Therefore, it would seem that there indeed could be an incentive for loan officers and the bank to push for inflated home values in the case of sold loans."

Cuomo's suit claims that eAppraiseIT provided appraisals or appraisal reviews on roughly 262,000 properties for WaMu between April 2006 and October 2007. If the average loan size was $200,000 to $300,000, this would account for between $52.4 billion and $78.6 billion of loans, Cannon estimated.

During the period in question excluding October 2007, WaMu originated $275.4 billion of real-estate loans, selling $172.5 billion as mortgage-backed securities. As a result, the loans appraised by eAppraiseIT could account for 19% to 29% of loan production, the analyst wrote.

***The value of mortgages that could be "put back" to WaMu may be about $33 billion, Cannon estimated. That may require additional reserves of $412 million, or the equivalent of 30 cents a share, he said.***

In a worst-case scenario -- in which inflated appraisals were systemic throughout WaMu -- the lender might need to set aside an extra $2.1 billion, or $1.57 a share, of reserves, he added.

Alistair Barr*, WaMu Vulnerable on Securitized Mortgages? Likely to Set Aside Extra Reserves if Appraisals Found Fraudulent: Analyst*, MarketWatch, Nov. 2, 2007 (emphasis added).

213.    The revelations that the Company had conspired to illegally inflate mortgage appraisals (which conspiracy had the effect of materially misrepresenting the Company's financial and operational condition, its controls and procedures, and its results of operations), caused shares of WaMu stock to fall precipitously.  On November 1 and 2, 2007, shares of the

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 57
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1  Company collapsed over 15%, on very high trading volume.  This share price decline

2  represented a huge loss for Plan participants and equated to a loss of almost $4 billion of

3  WaMu's market capitalization during that time.

4      214.    On November 7, 2007, WaMu stock closed at $20.04 per share, its lowest closing

5  price in seven years.  Jessica Mintz, *Tough Looking 2008 Sinks WaMu Shares*, Associated Press,

6  Nov. 7, 2007.

7      **8.    WaMu's "SuperScore Scorecard Monitoring" Reports**

8      215.    Further allegations of corporate wrongdoing at WaMu emerge from the federal

9  employment discrimination and whistleblower complaint of Yi Huang filed on May 11, 2007.

10 *See Huang v. Washington Mutual, Inc.,* No. 07-00736 (W.D. Wash.).

11     216.    Huang was a Risk Analyst for WaMu.  According to his complaint, he witnessed

12 a colleague remove unfavorable data from a "SuperScore Scorecard Monitoring" default-risk

13 report to produce false results for federal banking examiner.  Because Mr. Huang believed this

14 conduct was in violation of 18 U.S.C. § 1006 and banking regulations, he reported it to

15 management at the Company, including Defendant Killinger.

16     217.    Mr. Huang alleges that, after his report, he was reassigned to a different job, and a

17 less-experienced Caucasian woman was assigned to his Scorecard Monitoring position.

18 Concerned that his report of fraud was not being taken seriously, Mr. Huang reported his co-

19 worker's conduct to the U.S. Attorney in July 2005.  The co-worker who made the allegedly

20 fraudulent report was transferred to another job.

21     218.    Defendant Killinger never responded to Huang's complaint or to the allegedly

22 discriminatory and retaliatory conduct to which Huang was subjected.

23     **9.    WaMu's Financial Problems Come to Light**

24     219.    WaMu's financial problems began to come to light shortly before the stunning

25 allegations of the New York Attorney General Suit became public.

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 58
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

220.    On October 17, 2007, WaMu officially reported its third-quarter results and dropped a bombshell regarding its losses on loans:

> If you think the worst is over for mortgage lenders, a close look at Washington Mutual's balance sheet should dispel that notion pretty quickly.  The largest U.S. savings and loan stunned investors Oct. 17 when it said it would set aside as much as $1.3 billion this quarter to cover anticipated loan losses.  The news came the same day Seattle-based WaMu announced a 72 percent drop in third-quarter profit to $210.
>
> Since then, its stock has fallen 28 percent.
>
> But the real wonder it that WaMu's forecast for fourth-quarter loan-loss provisions wasn't substantially higher.

Jonathan Weil, *Mortgage Mess Hitting WaMu Hard*, Bloomberg News, Nov. 4, 2007.

221.    According to Weil and other finance commentators, WaMu still had not come clean on its full exposure to risky subprime loans.  Weil noted that WaMu's third-quarter "balance sheet maneuvers are a classic case of earnings management."  Jonathan Weil, *Countrywide, WaMu Play Shell Games*, Bloomberg News, Nov. 4, 2007.  As discussed above, WaMu shifted $17 billion of loans to its investment portfolio, which permitted it to avoid accounting for them based on their current market value.  According to Weil:  "While the distinction may look arbitrary, the effect on short-term earnings under the accounting rules can be huge when loan values are falling, as they are now."  *Id.*

222.    On the basis of the Company's third-quarter results, financial analysts panned WaMu.  Between October 18 and October 22, four analysts downgraded the stock.  Lehman Brothers analyst Bruce Harting estimated WaMu's loan losses for 2008 at $5 billion, topping his original estimate of $3.8 billion.  Jessica Mintz, *Tough Looking 2008 Sinks WaMu Shares*, Associated Press, Nov. 7, 2007.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 59
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

223.     The Company's earnings management and incremental disclosure of its loan loss failed to satisfy investors.  The stock, which traded above $40 per share as recently as June of 2007, fell to $19.39 on November 8, 2007.  As a local Seattle columnist noted:

> At the close of trading Wednesday, WaMu stock finished at $20.04 a share.  That's grim enough when put in historical context.  That was the lowest price since June 2000.
>
> It's even worse with a considerably shorter horizon.  WaMu peaked at $46.55 in November 2003.  As recently as June this year, you could have paid $44.41 a share.
>
> And it really gets ugly when looking back a few days.  On Wednesday, WaMu's stock dropped 17 percent from its Tuesday close, down $4.19 a share; at one point during the trading day, it was actually below $20 a share.
>
> To sum up: In less than six months, WaMu has seen more than half of its stock price melt away.

Bill Virgin, *WaMu Executives Try to Rally Investors, Meet Skepticism*, Seattle P.I., Nov. 7, 2007.

224.     On December 10, 2007, the Company announced a series of actions designed to assure the market that it was strengthening its capital and liquidity positions.  In particular, WaMu announced:  (i) a $2.5 billion capital offering of convertible stock; (ii) a reduction in Company-wide noninterest expenses of about $500 million for 2008 as a result of downsizing the Home Loans business and reduced corporate expense; and (iii) a change in the "strategic focus" of the Home Loans business.  Press Release, *WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base* (Dec. 10. 2007).

225.     These measures occurred as JPMorgan Chase & Co. considered buying WaMu.  Punk Ziegel analyst Richard Bove believed that, given the problems at WaMu, the acquisition price would be relatively cheap.  Carol Gutierrez, *JPMorgan Looks Hungry*, Forbes, Dec. 11, 2007.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 60
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

226.     On January 17, 2008, the Company reported a Q4-07 loss of $1.87 billion, including an after-tax write-down of $1.6 billion to WaMu's home loan portfolio. WaMu's home loans volume dropped 97 percent to $19.09 billion compared with the fourth quarter of 2006. WaMu also announced that it would set aside $1.53 billion to cover future loan losses.  Press Release, *WaMu Reports Fourth Quarter Net Loss Per Share of $2.19* (Jan. 17, 2008).

227.     Nonetheless, Defendant and CFO Casey sought to reassure investors and Plan participants, claiming that only $2.1 billion of the Company's $57 billion option ARM portfolio was "at risk," identifying high risk loans as those originated between 2005 and 2007 with an original LTV over 80 percent.  *See* Paul Jackson, *WaMu Posts $1.87 Billion Q4 Loss on Mortgage Woes*, HousingWire.Com, Jan. 17, 2008.  Defendant Casey further noted that the Company expected net charge-offs in the first quarter of 2008 to be up "20-30 percent" versus Q4 of 2007, and that the loss provision would be in the "range of $1.8 to $2.0 billion." *Id.*

228.     On April 8, 2008, the Company reported a $1.1 billion first quarter loss, and announced that it would set aside $3.5 billion to cover future expected losses.  Press Release, *WaMu to Strengthen Capital Position, Raising $7 Billion Anchored by a TPG Capital Investment* (Apr. 8, 2008).

229.     On April 8, 2008, WaMu announced that it had entered into definitive agreements to raise an aggregate of $7 billion through direct sale of equity securities to an investment vehicle managed by TPG Capital ("TPG"), and other investors, including many of WaMu's top institutional investors.  TPG's investment vehicle would purchase $2 billion in newly-issued WaMu securities.  *Id.*

230.     TPG's founder, David Bonderman, was himself a former WaMu Board member, and, as a result of the TPG equity deal, the Company announced that Bonderman would re-join the Board as a director of the Company.  *Id.*

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 61
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

231.     As a result of the TPG deal, which was ultimately approved in June of 2008, shareholders including Plan participants face a nearly 50% dilution to their shares.  Bill Virgin, *Changes at top for WaMu*, Seattle Times, Jun. 2, 2008.

232.     On April 11, 2008, a Goldman Sachs analyst stated that the Company might still face another $23 billion in mortgage-related losses.  David Gaffen, *Goldman: Short WaMu Stock, Buy the Bonds*, MarketBeat, Wall St. J., Apr. 11, 2008.

233.     On June 9, 2008, a UBS AG analyst report stated that WaMu continued to underestimate its losses on home loans.  According to the report, WaMu "will not demonstrate meaningful profitability until late 2010 or later," and total losses to the Company may reach a staggering $27 billion.  WaMu stock dropped on this news to $12.  Ari Levy & Linda Shen, *Washington Mutual Falls on $22 Billion Loss Estimate*, Bloomberg, Jun. 9, 2008.

234.     According to a June 24, 2008 Lehman Brothers analyst report, WaMu would have to set aside as much as $30 billion for credit losses through 2011, including residential mortgages, multi-family mortgages, commercial loans and credit card loans.  Bhaswati Mukhopadhyay, *WaMu May Face $30 Bln Credit Losses Through 2011: Lehman*, Reuters, Jun. 24, 2008.

235.     On July 22, 2008, WaMu reported losses of $3.3 billion for the second quarter of 2008, or a diluted loss per share of $6.58 (including a per-share reduction of $3.24 related to the Company's capital issuance in April of 2008).  These results were "far worse than Wall Street was anticipating."  David Ellis, *Washington Mutual loses $3.3 billion*, CNN Money, July 22, 2008.

236.     According to WaMu's July 22, 2008 press release, the Company increased its loan loss reserves by $3.74 billion in the second quarter of 2008, and those loan loss reserves now totaled $8.46 billion (by contrast, for the second quarter of 2007, the Company reserved only $372 million in loan loss reserves).  Press Release, *WaMu Reports Significant Build-Up of Reserves Contributing to Second Quarter Net Loss of $3.3 Billion* (Jul. 22, 2008).  As a

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 62
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1   percentage of loans held in portfolio, the reserves stood at 3.52%, up from 1.05% at the end of

2   2007.  The ratio of the reserve to nonperforming loans was 87.26% as of June 30, 2008, more

3   than double the 41.99% at the end of 2007. *Id.*

4       237.   The July 22, 2008 release further stated that nonperforming assets had grown to

5   3.62% of the Company's total assets as of June 30, 2008, an increase from 2.87 percent at the

6   end of the first quarter of 2008.  *Id.*

7       238.   Over the course of the Class Period, WaMu shares tumbled from over $38 on

8   October 19, 2005 to under $5 at the close of trading on August 5, 2008, a decline of over 85%

9   from the beginning of the Class Period.

10       **10.   WaMu's financial statements failed to reflect the actual liabilities and losses
      to which the Company was exposed**

11

12       239.   As the following SEC filings and statements illustrate by way of example,

13   Defendants failed to provide the Plan's participants with complete and accurate information

14   regarding WaMu's serious mismanagement and improper business practices, including, among

15   other practices, the Company's: (1) increasingly risk-fraught lending practices; (2) lack of

16   adequate risk-management controls over its improper lending practices contributing to high

17   delinquency and foreclosure rates among borrowers; (3) role in the systematic inflation of

18   property appraisals during the loan origination process; (4) accounting manipulations designed to

19   understate the Company's risk and inflate its income; and (5) misrepresentations regarding the

20   Company's financial condition.  Many such filings and statements were incorporated by

21   reference into Plan documents and Plan-related materials that were directed to participants

22   though the SPD and the Plan's Form S-8.

23       240.   **3Q:05 Results Announced.**  On October 19, 2005 WaMu published its purported

24   earnings for the third quarter of 2005 concluding September 30, 2005.

25

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 63
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

### 3Q 2005 FINANCIAL SUMMARY

| | Sept. 30, 2005 | June 30, 2005 | Mar. 31, 2005 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $661 | $576 | $470 |
| Loans held in portfolio | 2,862 | 2,754 | 2,544 |
| Available-for-sale securities | 238 | 234 | 224 |
| Trading securities | 114 | 91 | 79 |
| Other interest and dividend income | 65 | 51 | 43 |
| | | | |
| Total Interest Expenses | 2,024 | 1,780 | 1,470 |
| Provision for loan and lease losses | 52 | 31 | 16 |
| Net interest income including provisions for loan losses | $1,864 | $1,895 | $1,874 |
| | | | |
| **Profitability Ratios** | | | |
| Return on average common equity | 14.66% | 15.33% | 16.63% |
| Net interest margin | 2.61 | 2.66 | 2.73 |
| Efficiency ratio | 58.52 | 57.24 | 55.77 |
| Nonperforming assets/total assets | 0.52 | 0.53 | 0.57 |
| Tangible equity/total tangible assets | 5.09 | 5.13 | 5.03 |

*See* Press Release, *Washington Mutual Announces Third Quarter 2005 Earnings; Diluted EPS Increased 21 Percent; Board of Directors Increases Cash Dividend* (Oct. 19, 2005).

241.    On November 4, 2005 WaMu filed the Company's third quarter 10-Q Form with the SEC, signed and certified by Defendant Casey.  In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously in the Company's October 19, 2005 release, the 1Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> The preparation of financial statements, in accordance with accounting principles generally accepted in the United States of America, requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the Consolidated Financial Statements and accompanying Notes to the Consolidated Financial Statements. ***The Company believes that the judgments,***

CONSOLIDATED AMENDED COMPLAINT FOR BREACHES OF DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - 64
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

*estimates and assumptions used in the preparation of its Consolidated Financial Statements are appropriate given the facts and circumstances as of September 30, 2005*.

Various elements of the Company's accounting policies, by their nature, are inherently subject to estimation techniques, valuation assumptions and other subjective assessments. *In particular, the Company has identified two accounting policies that, due to the judgments, estimates and assumptions inherent in those policies, and the sensitivity of its Consolidated Financial Statements to those judgments, estimates and assumptions, are critical to an understanding of its Consolidated Financial Statements. These policies relate to the valuation of its MSR and the methodology that determines its allowance for loan and lease losses.*

Management has discussed the development and selection of these critical accounting policies with the Company's Audit Committee. These policies and the judgments, estimates and assumptions are described in greater detail in the Company's 2004 Annual Report on Form 10-K in the "Critical Accounting Policies" section of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

Washington Mutual, Inc. Quarterly Report (Form 10-Q) at 23 (Nov. 4, 2005) (emphasis added).

242.    Defendnat Killinger praised the third quarter results:

*Our solid third quarter earnings reflected excellent retail banking household growth* driven by our long track record of industry leading customer service, *as well as our ability to adjust to a challenging interest rate environment* …The results also highlight our continued focus on balanced growth, earnings diversity and risk management.

Press Release, *Washington Mutual Announces Third Quarter 2005 Earnings; Diluted EPS Increased 21 Percent; Board of Directors Increases Cash Dividend*, (Oct. 19, 2005) (emphasis added).

243.    During the conference call to discuss the Q3-05 earnings Bob Napoli, analyst for Piper Jaffray stated, "On your subprime business, you talked pretty much about the aggressive growth you're seeing in that business, but it seems that the industry is also for the most part at record lows, it seems that maybe this isn't the best time to be aggressively growing that business

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 65
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

…" *Event Brief of Q3 2005 Washington Mutual Earnings Conference Call – Part 2,* The America's Intelligence Wire, Oct. 1, 2005.  WaMu executive Steve Rotella responded, "[W]e think there may be a [sic] inflexion point here both in subprime and prime, where things may get a little tough, but **we believe properly with the growth objectives … we'll come out stronger.**" *Id.*

244.    The statements made by Defendants and others in the earnings release and conference call and those statements contained in the Company's 3Q:05 Form 10-Q were materially false and misleading when made, and were known by Defendants to be false at that time for, among other reasons, the following:

a.    During the Class Period, Defendants artificially inflated the income from the Company's mortgage underwriting and origination, and under-reported its true costs and failed to take adequate reserves for mortgages because Defendants engaged in a conspiracy and illegal course of conduct designed to and which did inflate property appraisals and propped up the Company's results by manipulating WaMu's accounting for revenues and income, and failed to report other material information about the Company;

b.    During the Class Period, unbeknownst to Plan participants and the market as a whole, WaMu materially overstated the Company's profitability by failing to properly reserve for its inflated and high-risk mortgages and by failing to properly account for the Company's results of operations, and by artificially inflating the Company's financial results as detailed above;

c.    Throughout the Class Period, it was also not true that WaMu contained adequate systems of internal operational or financial controls, such that WaMu's reported financial statements were true, accurate or reliable;

d.    As a result of the foregoing, throughout the Class Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules; and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 66
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1

e.       As a result of the aforementioned adverse conditions which Defendants

2

failed to disclose, throughout the Class Period, WaMu lacked any reasonable basis to claim that

3

WaMu was operating according to plan, or that WaMu could achieve guidance sponsored and/or

4

endorsed by the Company.

5

245.     **4Q:05 Results Announced.**  On January 18, 2006, the Company announced its

6

fourth quarter earnings for 2005:

### 4Q 2005 FINANCIAL SUMMARY

| | Dec. 31, 2005 | Sept. 30, 2005 | June 30, 2005 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $673 | $661 | $576 |
| Loans held in portfolio | 3,347 | 2,862 | 2,754 |
| Available-for-sale securities | 303 | 238 | 234 |
| Trading securities | 185 | 114 | 91 |
| Other interest and dividend income | 73 | 65 | 51 |
| Total Interest Expenses | 2,427 | 2,024 | 1,780 |
| Provision for loan and lease losses | 121 | 52 | 31 |
| Net interest income including provisions for loan losses | $2,033 | $1,864 | $1,895 |
| **Profitability Ratios** | | | |
| Return on average common equity | 12.49% | 14.66% | 15.33% |
| Net interest margin | 2.77 | 2.61 | 2.66 |
| Efficiency ratio | 60.79 | 58.52 | 57.24 |
| Nonperforming assets/total assets | 0.57 | 0.52 | 0.53 |
| Tangible equity/total tangible assets | 5.73 | 5.09 | 5.13 |

*See* Press Release, *Washington Mutual Announces Fourth Quarter and 2005 Earnings; Diluted EPS Increased 12 Percent for the Quarter and 14 Percent for the Year Board of Directors Increases Cash Dividend* (Jan. 18, 2006).

246.     On March 15, 2006, the Company filed its Annual report for 2005, signed and

certified by Defendants Killinger and Casey.  The Company reiterated its commitment to the

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 67
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

origination of and purchase of subprime home loans, and claimed to be keeping a vigilant watch on its involved in Option ARM portfolio and the adequacy of its loan loss provisions:

> The Company continually monitors the credit risk inherent in its option adjustable-rate mortgage product ("Option ARM") portfolio and assesses the adequacy of its loan loss allowance in light of prevailing circumstances and the historical and current levels of negative amortization in its Option ARM portfolio. . . . .

> ***The Company remains committed to the subprime mortgage market and intends to increase the loan volume of its subprime mortgage business, Long Beach Mortgage Company, and to maintain the size of its purchased subprime home loan portfolio. . . . .***

Washington Mutual, Inc. Annual Report (Form 10-K) at 23 (Mar. 15, 2006) (emphasis added).

247.    Despite the Company's decision to more than double the provisions for loan and lease losses from the prior quarter, Defendant Killinger touted WaMu's allegedly solid performance and reassured investors  (including Plan participants) that, "Our strategies are sound and we continue to execute on our growth and productivity initiatives."  Press Release, *Washington Mutual Announces Fourth Quarter and 2005 Earnings; Diluted EPS Increased 12 Percent for the Quarter and 14 Percent for the Year Board of Directors Increases Cash Dividend* (Jan. 18, 2006).

248.    **1Q:06 Results Announced**.  On April 18, 2006, WaMu published a press release announcing purported results for the first quarter of 2006, ended March 31, 2006.  This release stated, in part, the following:

### 1Q 2006 FINANCIAL SUMMARY

|  | Mar. 31, 2006 | Dec. 31, 2005 | Sept. 30, 2005 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $466 | $676 | $661 |
| Loans held in portfolio | 3,576 | 3,431 | 2,862 |
| Available-for-sale securities | 322 | 303 | 238 |
| Trading securities | 198 | 185 | 114 |
| Other interest and dividend income | 95 | 73 | 65 |

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 68
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

| | | | |
|---|---:|---:|---:|
| Total Interest Expenses | 2,540 | 2,427 | 2,024 |
| Provision for loan and lease losses | 82 | 217 | 52 |
| Net interest income including provisions for loan losses | $2,117 | $2,024 | $1,864 |
| **Profitability Ratios** | | | |
| Return on average common equity | %14.18 | %12.49 | %14.66 |
| Net interest margin | 2.75 | 2.77 | 2.61 |
| Efficiency ratio | 57.54 | 60.79 | 58.52 |
| Nonperforming assets/total assets | 0.59 | 0.57 | 0.52 |
| Tangible equity/total tangible assets | 5.85 | 5.73 | 5.09 |

249.    In addition to the foregoing, the April 18, 2006 release also quoted Defendant Killinger, in part, as follows:

> *We are very pleased with our first quarter results*, said Kerry Killinger, Washington Mutual chairman and chief executive officer. *The company's strong performance demonstrates the benefits of our continued diversification and enhanced operational focus.* This past quarter we had particularly strong results in Retail Banking and Card Services.
>
> These businesses added customers at a record pace and delivered significant revenue and earnings even in this difficult interest rate environment, Killinger added.  [Emphasis added.]

250.    **1Q:06 Form 10-Q.**  On or about May 10, 2006, WaMu filed with the SEC the Company's 1Q:06 Form 10-Q, for the quarter ended March 31, 2006, signed and certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously in the Company's April 18, 2006 release, the 1Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual" or the "Company"). *The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP")*…. [Emphasis added.]

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 69
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

251.    The Company's 1Q:06 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### Controls and Procedures

### Disclosure Controls and Procedures

*The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report*. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.*

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

### Changes in Internal Control Over Financial Reporting

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. *There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting*…. [Emphasis added.]

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 70
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

252.     In addition to the foregoing, the Company's 1Q:06 Form 10-Q also contained certifications by Defendants Killinger and Casey, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Kerry K. Killinger**, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: May 10, 2006

By: /s/ **KERRY K. KILLINGER**
Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey**, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: May 10, 2006

By: /s/ **THOMAS W. CASEY**
Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
 of Washington Mutual, Inc.  [Emphasis added.]

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 71
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

253.    The statements made by contained in the Company's May 10, 2006 release and in the Company's 1Q:06 Form 10-K were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

254.    **2Q:06 Results Announced**.  On July 19, 2006, WaMu published a release announcing purported results for the second quarter of 2006, the period ended June 30, 2006. This release stated, in part, the following:

> Washington Mutual, Inc. (NYSE:WM) today reported second quarter 2006 net income of $767 million, or $0.79 per diluted share, including an after tax adjustment of $101 million to reflect the pending sale of $2.6 billion of mortgage servicing rights and an after tax restructuring charge of $52 million related to the company's efficiency initiatives.
>
> Net income excluding these two items would have been $920 million, or $0.94 per diluted share, compared with net income of $844 million, or $0.95 per diluted share in the second quarter of 2005.
>
> ***The company announced today a series of actions it is taking that will significantly improve the company's market risk profile, greatly accelerate the achievement of its operating efficiency goals, and be accretive to earnings in 2006 and 2007.***  [Emphasis added.]

### 2Q 2006 FINANCIAL SUMMARY

| | Jun. 30, 2006 | Mar. 31, 2006 | Dec. 31, 2005 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $398 | $466 | $676 |
| Loans held in portfolio | 3,884 | 3,576 | 3,431 |
| Available-for-sale securities | 368 | 322 | 303 |
| Trading securities | 165 | 198 | 185 |
| Other interest and dividend income | 120 | 95 | 73 |
| Total Interest Expenses | 2,875 | 2,540 | 2,427 |
| Provision for loan and lease losses | 224 | 82 | 217 |
| Net interest income including provisions for loan losses | $1,836 | $2,035 | $2,024 |

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 72
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

**Profitability Ratios**

| | | | |
|---|---|---|---|
| Return on average common equity | %11.39 | %14.18 | %12.49 |
| Net interest margin | 2.65 | 2.75 | 2.77 |
| Efficiency ratio | 61.27 | 57.54 | 60.79 |
| Nonperforming assets/total assets | 0.62 | 0.59 | 0.57 |
| Tangible equity/total tangible assets | 5.94 | 5.85 | 5.73 |

Press Release, *Washington Mutual Reports Second Quarter Earnings Per Share of 79 Cents, 94 Cents Per Share Before the Second Quarter Impact of the Pending Sale of Mortgage Servicing Rights and Restructuring Charges* (July 19, 2006) (emphasis added).

255.   **2Q:06 Form 10-Q.**  On or about August 9, 2006, WaMu filed with the SEC the Company's 2Q:06 Form 10-Q, for the quarter ended June 30, 2006, signed and certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's July 19, 2006 release, the 2Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> **Note 1: Summary of Significant Accounting Policies**
>
> *Basis of Presentation*
>
> The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual" or the "Company"). ***The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP")***…. [Emphasis added.]

256.   The Company's 2Q:06 Form 10-Q again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 73
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

## Controls and Procedures

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934***.

In reaching the conclusion that disclosure controls and procedures were effective, management had considered the potential financial impact of control deficiencies associated with the matters giving rise to the restatement described in Note 2 to the Consolidated Financial Statements on page 7. Management believes this restatement is immaterial and was not the result of a material weakness in the Company's internal control over financial reporting. Accordingly, management has not changed its conclusion described above that the Company's disclosure controls and procedures were designed and operating effectively as of June 30, 2006.

***Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis***, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2006 that have

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 74
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

materially affected, or are reasonably likely to materially affect,
the Company's internal control over financial reporting….
[Emphasis added.]

257.     In addition to the foregoing, the Company's 2Q:06 Form 10-Q also contained

certifications by Defendants Killinger and Casey, that attested to the purported accuracy and

completeness of the Company's financial and operational reports, as follows:

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section
906 of the Sarbanes-Oxley Act of 2002, **Kerry K. Killinger,** the
Chief Executive Officer of Washington Mutual, Inc., does hereby
certify that this report on Form 10-Q fully complies with the
requirements of Section 13(a) or 15(d) of the Securities Exchange
Act of 1934 and that ***the information contained in this report***
***fairly presents, in all material respects, the financial condition***
***and results of operations of Washington Mutual, Inc.***

By: /s/ **KERRY K. KILLINGER**
Kerry K. Killinger
Chairman and Chief Executive Officer
  of Washington Mutual, Inc.

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section
906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey**, the
Chief Financial Officer of Washington Mutual, Inc., does hereby
certify that this report on Form 10-Q fully complies with the
requirements of Section 13(a) or 15(d) of the Securities Exchange
Act of 1934 and that ***the information contained in this report***
***fairly presents, in all material respects, the financial condition***
***and results of operations of Washington Mutual, Inc.***

Date: August 9, 2006
By: /s/ **THOMAS W. CASEY**
Thomas W. Casey
Executive Vice President and
Chief Financial Officer of Washington Mutual, Inc.  [Emphasis added.]

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 75
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

258.    The statements made by contained in the Company's July 19, 2006 release and in the Company's 2Q:06 Form 10-Q were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

259.    **3Q:06 Results Announced**.  On October 18, 2006, WaMu published a release announcing purported results for the third quarter of 2006, ended September 30, 2006.  This release stated, in part, the following:

**Washington Mutual Reports Third Quarter Earnings Per Share of 77 Cents; Results Included Charges Associated with the Sale of Mortgage Servicing Rightsand Efficiency Initiatives Board of Directors Increases Cash Dividend to 53 Cents**

SEATTLE – Washington Mutual, Inc. (NYSE: WM) today reported third quarter 2006 net income of $748 million, or $0.77 per diluted share compared with net income of $821 million, or $0.92 per diluted share, in the third quarter of 2005.

Third quarter 2006 earnings included net after tax charges of $31 million, or $0.03 per diluted share, related to the previously announced sale of $2.53 billion of mortgage servicing rights, and after tax charges of $33 million, or $0.04 per diluted share, related to the company's ongoing efficiency initiatives, which are expected to continue into the fourth quarter.

\*    \*    \*

WaMu's Board of Directors declared a cash dividend of 53 cents per share on the company's common stock, up from 52 cents per share in the previous quarter. Dividends on the common stock are payable on November 15, 2006 to shareholders of record as of October 31, 2006.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 76
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

### 3Q 2006 FINANCIAL SUMMARY

|  | Sept. 30, 2006 | Jun. 30, 2006 | Mar. 31, 2006 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $439 | $398 | $466 |
| Loans held in portfolio | 4,008 | 3,884 | 3,576 |
| Available-for-sale securities | 379 | 368 | 322 |
| Trading securities | 140 | 165 | 198 |
| Other interest and dividend income | 139 | 120 | 95 |
| | | | |
| Total Interest Expenses | 3,158 | 2,875 | 2,540 |
| Provision for loan and lease losses | 166 | 224 | 82 |
| Net interest income including provisions for loan losses | $1,781 | $1,836 | $2,035 |
| | | | |
| **Profitability Ratios** | | | |
| Return on average common equity | %11.47 | %11.82 | %14.18 |
| Net interest margin | 2.53 | 2.65 | 2.75 |
| Efficiency ratio | 62.09 | 61.27 | 57.54 |
| Nonperforming assets/total assets | 0.69 | 0.62 | 0.59 |
| Tangible equity/total tangible assets | 5.86 | 5.94 | 5.85 |

Press Release, *Washington Mutual Reports Third Quarter Earnings Per Share of 77 Cents -- Results Included Charges Associated with the Sale of Mortgage Servicing Rights and Efficiency Initiatives* (Oct. 18, 2006) (emphasis added).

260.     In addition to the foregoing, the October 18, 2006 release also quoted Defendant Killinger, in part, as follows:

> *"We continue to focus on the successful execution of our strategic plan despite the challenging operating environment,"* said Kerry Killinger, WaMu Chairman and CEO, noting that, as anticipated, the costs associated with the MSR sale announced in the second quarter and the company's ongoing efficiency initiatives impacted third quarter results. . . .

> Killinger added, *"We remain confident in our strategy to reposition the company and set the stage for stronger performance in 2007."*

*Id.* (emphasis added).

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 77
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

261.    On a conference call also on October 18, 2006, Killinger stated, "Despite the challenging environment impacting the mortgage banking industry, we feel good about the proactive steps we have taken.  Our portfolio remains in very good shape and nonperforming assets remain very low.…  The quality of our Option ARM portfolio remains strong."

262.    **3Q:06 Form 10-Q.**  On or about November 9, 2006, WaMu filed with the SEC the Company's 3Q:06 Form 10-Q, for the quarter ended September 30, 2006, signed and certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's October 18, 2006 release, the 3Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

**Note 1:  Summary of Significant Accounting Policies**

*Basis of Presentation*

The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual" or the "Company"). ***The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP")….*** [Emphasis added.]

263.    The Company's 3Q:06 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

<u>**Controls and Procedures**</u>

**Disclosure Controls and Procedures**

***The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures*** as of the end of the period covered by this report. Based on such evaluation, ***the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of***

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 78
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

*the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company* in the reports that it files or submits under the Securities Exchange Act of 1934.

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis,* which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. ***There have not been any changes in the Company's internal control over financial reporting during the third quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting….***[Emphasis added.]

264.    The Company's 3Q:06 Form 10-Q also contained certifications by Defendants Killinger and Casey, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Kerry K. Killinger**, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: November 9, 2006

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 79
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

By: /s/ **KERRY K. KILLINGER**
Kerry K. Killinger
*Chairman and Chief Executive Officer*
  *of Washington Mutual, Inc.*

## WASHINGTON MUTUAL, INC.
### Certification of the Chief Financial Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey**, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: November 9, 2006

By: /s/ **THOMAS W. CASEY**
Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
  *of Washington Mutual, Inc.*                    [Emphasis added.]

265.    The statements contained in WaMu's October 18, 2006 release and those statements contained in the Company's 3Q:06 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein.

266.    **4Q:06 Results Announced**.  On January 17, 2007, WaMu published a release announcing purported results for the 4Q and FY:2006, ended December 31, 2006.  This release stated, in part, the following:

Washington Mutual, Inc. (NYSE:WM) today reported fourth quarter 2006 net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter of 2005. Net income for 2006 was $3.56 billion, or $3.64 per diluted share, compared with net income of $3.43 billion, or $3.73 per diluted share, in 2005.

* * *

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 80
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

On Jan. 3, 2007, the company entered into an accelerated share repurchase agreement with a dealer, buying back $2.7 billion of its common stock. The company also increased its cash dividend to 54 cents per common share, up from 53 cents per share in the previous quarter.

### 4Q 2006 FINANCIAL SUMMARY

|  | Dec. 31, 2006 | Sept. 30, 2006 | Jun. 30, 2006 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $520 | $439 | $398 |
| Loans held in portfolio | 4,048 | 4,008 | 3,884 |
| Available-for-sale securities | 392 | 379 | 368 |
| Trading securities | 102 | 140 | 165 |
| Other interest and dividend income | 148 | 139 | 120 |
| Total Interest Expenses | 3,212 | 3,158 | 2,875 |
| Provision for loan and lease losses | 344 | 166 | 224 |
| Net interest income including provisions for loan losses | $1,654 | $1,781 | $1,836 |
| **Profitability Ratios** | | | |
| Return on average common equity | %16.03 | %11.47 | %11.82 |
| Net interest margin | 2.58 | 2.53 | 2.65 |
| Efficiency ratio | 62.87 | 62.09 | 61.27 |
| Nonperforming assets/total assets | 0.80 | 0.69 | 0.62 |
| Tangible equity/total tangible assets | 6.04 | 5.86 | 5.94 |

267.   The January 17, 2007 release also quoted Defendant Killinger, in part, as follows:

Killinger noted that opportunities to grow the balance sheet at attractive risk-adjusted returns are limited, making the accelerated share repurchase transaction a superior use of capital.

*Our outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future,* Killinger added. *Those decisive actions have positioned us well to deliver stronger operating performance in 2007.* [Emphasis added.]

268.   **2006 Form 10-K.** On or about March 1, 2007, WaMu filed with the SEC the Company's 2006 Form 10-K, for the quarter and year ended December 31, 2006, certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 81
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

previously in the Company's November 18, 2006 release, the 2006 Form 10-K also provided

statements concerning the Company's significant accounting polices, including the Fair Value of

Certain Financial Instruments and Assets, in part, as follows:

**Fair Value of Certain Financial Instruments and Other Assets**

A portion of the Company's assets are carried at fair value, including: mortgage servicing rights, certain retained interests from securitization activities (which are classified as trading assets), available-for-sale securities and derivatives. In addition, ***loans held for sale are recorded at the lower of carrying value or fair value.*** Changes in fair value of those instruments that qualify as hedged items under fair value hedge accounting are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

***Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date***. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs where readily available and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. ***When observable market prices and data are not readily available, significant management judgment often is necessary to estimate fair value....***

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations

MSR and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 82
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

such sales are generally not readily available. Consequently, the Company estimates the fair value of MSR and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

The discounted cash flow model for MSR calculates the present value of the expected future net cash flows of the servicing portfolio based on various assumptions, such as estimated future servicing costs, expected servicing portfolio prepayment speeds and discount rates that are commensurate with the risk profile of the serviced assets. This model is highly sensitive to changes in certain assumptions. Different expected prepayment speeds, in particular, can result in substantial changes in the estimated fair value of MSR. If actual prepayment experience differs materially from the expected prepayment speeds used in the Company's model, this difference would likely result in a material change in MSR fair value. While the Company's model estimates a value, the specific value used is based on a variety of market-based factors, such as documented observable data and expected changes in prepayment speeds. ***The reasonableness of management's assumptions about these factors is evaluated through quarterly independent broker surveys. Independent appraisals of the fair value of the mortgage servicing rights are obtained at least quarterly, and are used by management to evaluate the reasonableness of the fair value conclusions....*** [Emphasis added.]

269.    In addition to the foregoing, the 2006 Form 10-K also provided statements concerning the Company's accounting for Allowance for Loan Losses and Contingent Risk Liabilities, in part, as follows:

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

***The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date.*** The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, ***the estimated value of underlying collateral***, the interest rate climate as it affects adjustable-rate loans and general economic conditions. ***Loans held***

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 83
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

*in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.*

*The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations.* Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. ***The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.***

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income.  [Emphasis added.]

270.    The Company's 2006 Form 10-K again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

**Controls and Procedures**

**Disclosure Controls and Procedures**

***The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure***

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 84
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

*controls and procedures as of the end of the period covered by this report*. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, *the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.*

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. *There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting*. For management's assessment of the Company's internal control over financial reporting, refer to Management's Report on Internal Control Over Financial Reporting on page 79.

*   *   *

[p.79]  **Management's Report on Internal Control Over Financial Reporting**

*The management of Washington Mutual, Inc. and subsidiaries (the "Company") is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets*. The Company's internal control structure contains monitoring mechanisms, and actions are taken to correct deficiencies identified.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 85
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

1                              *   *   *

2          ***Management assessed the effectiveness of the Company's***
           ***internal control over financial reporting, including safeguarding***
3          ***of assets as of December 31, 2006.*** This assessment was based on
4          criteria for effective internal control over financial reporting,
           including safeguarding of assets, described in "Internal Control –
5          Integrated Framework," issued by the Committee of Sponsoring
           Organizations of the Treadway Commission. ***Based on this***
6          ***assessment, management believes that, as of December 31, 2006,***
           ***the Company maintained effective internal control over financial***
7          ***reporting, including safeguarding of assets.***  [Emphasis added.]

8          271.   The Company's 2006 Form 10-K again contained certifications by Defendants

9   Killinger and Casey that attested to the purported accuracy and completeness of the Company's

10  financial and operational reports, as follows:

11                      **WASHINGTON MUTUAL, INC.**
12                **Certification of the Chief Executive Officer**

13         Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to
           Section 906 of the Sarbanes-Oxley Act of 2002, **Kerry K.**
14         **Killinger,** the Chief Executive Officer of Washington Mutual, Inc.,
           does hereby certify that this report on Form 10-K fully complies
15         with the requirements of Section 13(a) or 15(d) of the Securities
           Exchange Act of 1934 and that ***the information contained in this***
16         ***report fairly presents, in all material respects, the financial***
17         ***condition and results of operations of Washington Mutual, Inc.***

18         Date: March 1, 2007

19         By: **/s/ KERRY K. KILLINGER**
20         Kerry K. Killinger
           *Chairman and Chief Executive Officer*
21            *of Washington Mutual, Inc.*

22                      **WASHINGTON MUTUAL, INC.**
23                **Certification of the Chief Financial Officer**

24         Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to
25         Section 906 of the Sarbanes-Oxley Act of 2002, **Thomas W.**
           **Casey**, the Chief Financial Officer of Washington Mutual, Inc.,
26         does hereby certify that this report on Form 10-K fully complies

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 86
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: March 1, 2007

By: **/s/ THOMAS W. CASEY**
Thomas W. Casey
Executive Vice President and Chief Financial Officer
 of Washington Mutual, Inc.                                    [Emphasis added.]

272.     The statements contained in WaMu's January 17, 2007 release and those statements contained in the Company's 2006 Form 10-K, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein.

273.     **1Q:07 Results Announced**.  On April 17, 2007, WaMu published a release announcing purported results for first quarter of 2007, the period ended March 31, 2007.  This release stated, in part, the following:

> Washington Mutual, Inc. (NYSE:WM) reported first quarter 2007 net income of $784 million, or $0.86 per diluted share, compared with net income of $985 million, or $0.98 per diluted share, in the first quarter of 2006, a period that included an $85 million after tax partial settlement related to Home Savings goodwill litigation.
>
> Based on these earnings and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 47th consecutive quarter to 55 cents per share.

### 1Q 2007 FINANCIAL SUMMARY

|                                | Mar. 31, 2007 | Dec. 31, 2006 | Sept. 30, 2006 |
| ------------------------------ | ------------- | ------------- | -------------- |
| **Interest Income**            |               |               |                |
| (In millions)                  |               |               |                |
| Loans held for sale            | $562          | $520          | $439           |
| Loans held in portfolio        | 3,900         | 4,048         | 4,008          |
| Available-for-sale securities  | 332           | 392           | 379            |
| Trading securities             | 113           | 102           | 140            |

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 87
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

| | | | |
|---|---|---|---|
| Other interest and dividend income | 101 | 148 | 139 |
| Total Interest Expenses | 2,927 | 3,212 | 3,158 |
| Provision for loan and lease losses | 234 | 344 | 166 |
| Net interest income including provisions for loan losses | $1,847 | $1,654 | $1,781 |

**Profitability Ratios**

| | | | |
|---|---|---|---|
| Return on average common equity | %12.99 | %16.03 | %11.47 |
| Net interest margin | 2.79 | 2.58 | 2.53 |
| Efficiency ratio | 58.13 | 62.87 | 62.09 |
| Nonperforming assets/total assets | 1.02 | 0.80 | 0.69 |
| Tangible equity/total tangible assets | 5.78 | 6.04 | 5.86 |

274.   In addition to the foregoing, the April 17, 2007 release also quoted Defendant Killinger, in part, as follows:

> Our Home Loans business was challenged during the first quarter by difficult market conditions, he added.  Over the past 12 months, we have taken a number of prudent actions to reduce our exposure to the subprime mortgage industry. ***These actions, along with a diversified business mix, limited our exposure to the mortgage market's downturn and position us well to expand and grow as market conditions improve.***  [Emphasis added.]

> With a number of competitors going out of business, we're now able to have better pricing, and the credit quality of the loans being originated thus far in '07 is significantly better than '06. ... ***It's too early to declare victory, but we are seeing encouraging signs.***

275.   **1Q:07 Form 10-Q.**  On or about May 10, 2007, filed with the SEC the Company's 1Q:07 Form 10-Q, for the quarter ended March 31, 2007, signed and certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's April 17, 2007 release, the 1Q:07 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 88
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

**Note 1:  Summary of Significant Accounting Policies**

*Basis of Presentation*

The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual", the "Company", "we", "us" or "our"). ***The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP"), which include certain practices of the banking industry.*** All significant intercompany transactions and balances have been eliminated in preparing the consolidated financial statements.   [Emphasis added.]

276.   The Company's 1Q:07 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

<b><u>Controls and Procedures</u></b>

**Disclosure Controls and Procedures**

***The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report***. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, ***as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company*** in the reports that it files or furnishes under the Securities Exchange Act of 1934.

***Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis***, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 89
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. *There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting....* [Emphasis added.]

277.    In addition to the foregoing, the Company's 1Q:07 Form 10-Q also contained certifications by Defendants Killinger and Casey, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Kerry K. Killinger**, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: May 10, 2007

By:  **/s/ KERRY K. KILLINGER**
Kerry K. Killinger
*Chairman and Chief Executive Officer*
  *of Washington Mutual, Inc.*

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey,** the Chief Financial Officer of Washington Mutual, Inc.,

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 90
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: May 10, 2007

By: **/s/ THOMAS W. CASEY**
Thomas W. Casey
*Chief Financial Officer of Washington Mutual, Inc.*   [Emphasis added.]

278.   The statements contained in Washington Mutual's April 17, 2007 release and those statements contained in the Company's 1Q:07 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein.

279.   **Q:07 Results Announced**.  On July 18, 2007, WaMu published a release announcing purported results for the second quarter of 2007, the period ended June 30, 2007. This release stated, in part, the following:

WaMu (NYSE:WM) announced today that second quarter 2007 earnings per share increased 16 percent from a year ago. **_Continued strong performance_** led to net income of $830 million, or $0.92 per diluted share, compared with net income of $767 million, or $0.79 per diluted share, in the second quarter of 2006. Second quarter net income was also up from $784 million, or $0.86 per share, in the prior quarter.

\*   \*   \*

Based on the quarter's solid performance and the company's strong financial position, the Board of Directors increased the cash dividend on the company's common stock for the 48th consecutive quarter to 56 cents per share.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 91
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

### 2Q 2007 FINANCIAL SUMMARY

|  | Jun. 30, 2007 | Mar. 31, 2007 | Dec. 31, 2006 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $421 | $562 | $520 |
| Loans held in portfolio | 3,786 | 3,900 | 4,048 |
| Available-for-sale securities | 351 | 332 | 392 |
| Trading securities | 108 | 113 | 102 |
| Other interest and dividend income | 82 | 101 | 148 |
| Total Interest Expenses | 2,714 | 2,927 | 3,212 |
| Provision for loan and lease losses | 372 | 234 | 344 |
| Net interest income including provisions for loan losses | $1,662 | $1,847 | $1,654 |
| **Profitability Ratios** | | | |
| Return on average common equity | %13.74 | %12.99 | %16.03 |
| Net interest margin | 2.90 | 2.79 | 2.58 |
| Efficiency ratio | 56.38 | 58.13 | 62.87 |
| Nonperforming assets/total assets | 1.29 | 1.02 | 0.80 |
| Tangible equity/total tangible assets | 6.07 | 5.78 | 6.04 |

280.   **2Q:07 Form 10-Q.**  On or about August 9, 2007, WaMu filed with the SEC the Company's 2Q:07 Form 10-Q, for the quarter ended June 30, 2007, signed and certified by Defendants Killinger and Casey.  In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's July 18, 2007 release, the 2Q:07 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> **Note 1:  Summary of Significant Accounting Policies**
>
> *Basis of Presentation*
>
> The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. and its subsidiaries ("Washington Mutual", the "Company", "we", "us" or "our"). ***The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP"),*** which

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 92
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1    include certain practices of the banking industry. All significant
2    intercompany transactions and balances have been eliminated in
     preparing the consolidated financial statements.

3                              *    *    *

4    *Recently Issued Accounting Standards Not Yet Adopted*

5    In September 2006, the Financial Accounting Standards Board
6    ("FASB") issued Statement No. 157, **Fair Value Measurements
     ("Statement No. 157") . Statement No. 157 prescribes a definition
7    of the term "fair value," establishes a framework for measuring
8    fair value and expands disclosure about fair value
     measurements**. Statement No. 157 is effective for fiscal years
9    beginning after November 15, 2007. **We do not expect the
     application of Statement No. 157 to have a material effect on the
10   Consolidated Statements of Income and the Consolidated
     Statements of Financial Condition.**

11
12   In February 2007, the FASB issued Statement No. 159, *The Fair
     Value Option for Financial Assets and Financial Liabilities*
13   ("Statement No. 159"). Statement No. 159 permits an instrument
     by instrument election to account for certain financial assets and
14   liabilities at fair value. Statement No. 159 is effective for fiscal
     years beginning after November 15, 2007. We are currently
15   evaluating the impact that Statement No. 159 will have on the
     Consolidated Statements of Income and the Consolidated
16   Statements of Financial Condition. [Emphasis added.]

17       281.    The Company's 2Q:07 Form 10-Q also contained representations which attested
18   to the purported effectiveness and sufficiency of the Company's controls and procedures, as
19   follows:

20                **Controls and Procedures**

21            **Disclosure Controls and Procedures**

22
23            **The Company's management, with the participation of the
              Company's Chief Executive Officer and Chief Financial Officer,
              has evaluated the effectiveness of the Company's disclosure
24            controls and procedures as of the end of the period covered by
              this report.** Based on such evaluation, the Company's Chief
25            Executive Officer and Chief Financial Officer have concluded that,
              as of the end of such period, **the Company's disclosure controls**
26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 93
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

*and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company* in the reports that it files or furnishes under the Securities Exchange Act of 1934.

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis,* which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

**Changes in Internal Control Over Financial Reporting**

*Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis*, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. *There have not been any changes in the Company's internal control over financial reporting during the second quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting…*  [Emphasis added.]

282.   The Company's 2Q:07 Form 10-Q again contained certifications by Defendants Killinger and Casey, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Kerry K. Killinger**, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date:  August 9, 2007

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 94
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

By: **/s/ KERRY K. KILLINGER**
Kerry K. Killinger
*Chairman and Chief Executive Officer*
 *of Washington Mutual, Inc*

### WASHINGTON MUTUAL, INC.
### Certification of the Chief Financial Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey**, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that *the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.*

Date: August 9, 2007

By: **/s/ THOMAS W. CASEY**
Thomas W. Casey
*Executive Vice President and*
*Chief Financial Officer of Washington Mutual, Inc*.  [Emphasis added.]

283.     The statements contained in the Company's July 18, 2007, release and those statements contained in its 2Q:07 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein.

284.     On September 10, 2007, Killinger spoke at the Lehman Brothers 2007 Financial Services Conference and assured investors that WaMu had positioned itself "to be successful in what is rapidly becoming a challenging business environment."  His presentation included a Powerpoint slide that indicated that 82% of WaMu's loans, including its subprime portfolio, had loan-to-value ratios of less than 80%.  WaMu announced its closure of LBMC just two days later.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 95
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p,
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

285.     Speaking at the Lehman Brothers Conference, Defendant Killinger persisted in providing inaccurate information that did not reflect the Company's exposure to subprime-related losses.  Killinger said:

> As a policy, we don't provide interim updates to our earnings drivers between our quarterly earnings calls.  However, the near-perfect storm in the housing and capital markets I spoke about will impact our second half performance and I want to give you my insights into what that may look like.  Of course, we will be updating our earnings drivers during our third quarter earnings call next month.  Given a weakening housing market, we do expect to see:
>
> o     A continuation of the increase in nonperforming loans which could lead to a higher level of charge-offs in the coming quarters.
>
> o     As a result of this, and in support of our loan portfolio growth, we expect that our loan loss provisioning for the year could be approximately $500 million greater than the full-year guidance we gave in July of $1.5 to $1.7 billion.

*See* Current Report (Form 8-K) (Sept. 10, 2007) at Ex. 99.1.

286.     Just as the July guidance was inaccurate, Defendant Killinger's September estimate at the Lehman Brothers' conference grossly understated the Company's loan loss exposure.   In just a month's time, the Company increased the loan loss provisioning by nearly 30%, or up to between $2.7 and $2.9 billion.  *Washington Mutual, Inc. Prepared Remarks for Third Quarter 2007 Earnings Conference Call*, Oct. 17, 2007.

287.     **3Q:07 Results Announced**.  On October 17, 2007, WaMu published a release announcing purported results for the third quarter of 2007, for the period ended September 30, 2007.  This release stated, in part, the following:

> **WaMu Reports Third Quarter Earnings Per Share of $0.23**
> ***Declares Cash Dividend of 56 Cents***
>
> WaMu (NYSE:WM) announced today third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in the third

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 96
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

quarter of 2006.  The company attributed the decline to a weaker housing market and disruptions in the capital markets.

\* \* \*

The company also announced its Board of Directors declared a quarterly cash dividend on the company's common stock of 56 cents per share.

288.   Regarding the performance of its business, the October 17, 2007, release also reported on the Company's financial performance in part, as follows:

### 3Q 2007 FINANCIAL SUMMARY

| | Sept. 30, 2007 | Jun. 30, 2007 | Mar. 31, 2007 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $248 | $421 | $562 |
| Loans held in portfolio | 3,992 | 3,786 | 3,900 |
| Available-for-sale securities | 392 | 351 | 332 |
| Trading securities | 108 | 108 | 113 |
| Other interest and dividend income | 116 | 82 | 101 |
| | | | |
| Total Interest Expenses | 2,842 | 2,714 | 2,927 |
| Provision for loan and lease losses | 967 | 372 | 234 |
| Net interest income including provisions for loan losses | $1,047 | $1,662 | $1,847 |
| | | | |
| **Profitability Ratios** | | | |
| Return on average common equity | %3.45 | %13.74 | %12.99 |
| Net interest margin | 2.86 | 2.90 | 2.79 |
| Efficiency ratio | 63.42 | 56.38 | 58.13 |
| Nonperforming assets/total assets | 1.65 | 1.29 | 1.02 |
| Tangible equity/total tangible assets | 5.61 | 6.07 | 5.78 |

Press Release, *WaMu Reports Third Quarter Earnings Per Share of $0.23* (Oct. 17, 2007).

289.   The October 17, 2007, release reported the following with respect to the Company's Home Loans Group:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 97
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

|  | Sept. 30, 2007 | Jun. 30, 2007 | Sept. 30, 2006 |
|---|---|---|---|
| **Home Loans Group** | | | |
| (In millions) | | | |
| Net interest income | $183 | $215 | $276 |
| Provisions for loan and lease losses | 323 | 101 | 84 |
| Noninterest income | 184 | 391 | 314 |
| Noninterest expense | 554 | 548 | 528 |
| | | | |
| Loan volume | $26,434 | $35,857 | $41,241 |
| Average loans | 43,737 | 43,312 | 45,407 |

290.   According to the October 17, 2007, release, the Home Loans Group's losses were "[p]artially offset" by strong results from MSR valuation…."

291.   In addition to the foregoing, the October 17, 2007, release also quoted Defendant Killinger, in part, as follows:

> "We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered **good operating performance** during the quarter, **and we continued to adapt our Home Loans business to meet market conditions**." Killinger added that the company remains focused on executing its long-term growth plans.  [Emphasis added.]

292.   The statements made by Defendants and contained in the Company's October 17, 2007, release were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

293.   **4Q:07 Results Announced.**  On January 17, 2008, WaMu announced a fourth quarter 2007 net loss of $1.87 billion.  The Company attributed the loss to the $1.6 billion after-tax charge to writedown Home Loans segment and the housing market weakness.  Press Release, *WaMu Reports Fourth Quarter Net Loss Per Share of $2.19, Reflecting Previously Announced*

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 98
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

*After-Tax Charge to Writedown Home Loans Goodwill of $1.6 Billion and Elevated Loan Loss Provisioning* (Jan. 17, 2008).

294.    Despite these losses Killinger stated, "The substantial infusion of new capital, dividend reduction, significant expense reductions, and the ***major change in our home loans business all combine to further fortify WaMu's strong capital and liquidity position***. *Id.*

295.    Regarding the performance of the Company's business, the January 17, 2008, release also reported:

### 4Q 2007 FINANCIAL SUMMARY

|  | Dec. 31, 2007 | Sept. 30, 2007 | Jun. 30, 2007 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $160 | $248 | $421 |
| Loans held in portfolio | 4,156 | 3,992 | 3,786 |
| Available-for-sale securities | 380 | 392 | 351 |
| Trading securities | 101 | 108 | 108 |
| Other interest and dividend income | 79 | 116 | 82 |
| Total Interest Expenses | 2,829 | 2,842 | 2,714 |
| Provision for loan and lease losses | 1,534 | 967 | 372 |
| Net interest income including provisions for loan losses | $513 | $1,047 | $1,662 |
| **Profitability Ratios** | | | |
| Return on average common equity | %(32.64) | %3.45 | %13.74 |
| Net interest margin | 2.85 | 2.86 | 2.90 |
| Efficiency ratio | 122.13 | 63.42 | 56.38 |
| Nonperforming assets/total assets | 2.17 | 1.65 | 1.29 |
| Tangible equity/total tangible assets | 6.67 | 5.61 | 6.07 |

296.    On February 29, 2008, the Company filed its annual report for the fiscal year ended December 31, 2007 and then amended the filing on May 22, 2008.  The Company's Annual Report contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 99
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

*The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report.*  Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

*Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis*, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant.  Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting.  *There have not been any changes in the Company's internal control over financial reporting during the fourth quarter of 2007* that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

297.   These public filings contained certifications by Defendants Killinger and Casey:

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Company and in the capacities indicated on February 29, 2008.

Date:  February 29, 2008

By: **/s/ KERRY K. KILLINGER**
Kerry K. Killinger
*Chairman and Chief Executive Officer of Washington Mutual, Inc. Director (Principal Executive Officer)*

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 100
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

By: **/s/ THOMAS W. CASEY**
Thomas W. Casey
*Executive Vice President of Washington Mutual, Inc. Chief*
*Financial Officer (Principal Financial Officer)*

298.   The statements made by Defendants and contained in the Company's January 18, 2008, release and subsequent public filings were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

299.   **1Q:08 Results Announced.**  On April 15, 2008, WaMu announced a first quarter net loss of $1.14 billion.  Amidst these staggering losses Defendant Killinger announced, "***[W]e have taken decisive actions to withstand this period of unprecedented credit losses, while maintaining strong liquidity*** …"  Press Release, *Washington Mutual, Inc., WaMu Closes $7 Billion Equity Issuance, Strengthening Capital Position,* (Apr. 15, 2008) (emphasis added).  At this juncture the Company announced plans to exit wholesale lending and close all freestanding home loan offices.

300.   Regarding the performance of the Company's business, the April 15, 2008, release also reported:

### 1Q 2008 FINANCIAL SUMMARY

|  | Mar. 31, 2008 | Dec. 31, 2007 | Sept. 30, 2007 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $87 | $160 | $248 |
| Loans held in portfolio | 3,954 | 4,156 | 3,992 |
| Available-for-sale securities | 357 | 380 | 392 |
| Trading securities | 116 | 101 | 108 |
| Other interest and dividend income | 77 | 79 | 116 |
| Total Interest Expenses | 2,416 | 2,829 | 2,842 |
| Provision for loan and lease losses | 3,511 | 1,534 | 967 |
| Net interest income including provisions for loan losses | $(1,336) | $513 | $1,047 |

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 101
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

**Profitability Ratios**

| | | | |
|---|---|---|---|
| Return on average common equity | %(23.27) | %(32.64) | %3.45 |
| Net interest margin | 3.05 | 2.85 | 2.86 |
| Efficiency ratio | 57.49 | 122.13 | 63.42 |
| Nonperforming assets/total assets | 2.87 | 2.17 | 1.65 |
| Tangible equity/total tangible assets | 6.40 | 6.67 | 5.61 |

301.   **1Q:08 Form 10-Q.**  On or about May 12, 2008, WaMu filed with the SEC the Company's Form 10-Q for the quarter ended March 31, 2008.  In addition to making substantially similar statements concerning the Company's operations, including expenses, costs and ratios, as had been published previously in the Company's April 15, 2008,  release, the Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> *The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report.*  Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.
>
> *Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis,* which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.
>
> Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant.  Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting.  *There have not been any changes in the Company's internal control over financial*

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 102
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

*reporting during the first quarter of 2008 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*

302.   This public filing contained a certification by Defendant Casey:

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on May 12, 2008.

By: **/s/ THOMAS W. CASEY**
Thomas W. Casey
*Executive Vice President and Chief Financial Officer*

303.   The statements made by Defendants and contained in the Company's April 15, 2008, release and subsequent public filings were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

304.   **2Q:08 Results Announced.**  On or about July 22, 2008, WaMu announced a net loss of $3.3 billion for the second quarter of 2008.  Defendant Killinger responded to the losses and stated, **"[W]e are continuing to execute on a comprehensive plan designed to ensure that we have strong capital and liquidity, an appropriately-sized expense base and a strong, profitable retail franchise."**  Press Release, *WaMu Reports Significant Build-Up of Reserves Contributing to Second Quarter Net Loss of $3.3 Billion*, (Jul. 22, 2008).

305.   Regarding the performance of its business, the July 22, 2008, release also reported:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 103
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

## 2Q 2008 FINANCIAL SUMMARY

|  | Jun. 30, 2008 | Mar. 31, 2008 | Dec. 31, 2007 |
|---|---|---|---|
| **Interest Income** | | | |
| (In millions) | | | |
| Loans held for sale | $52 | $87 | $160 |
| Loans held in portfolio | 3,604 | 3,954 | 4,156 |
| Available-for-sale securities | 335 | 357 | 380 |
| Trading securities | 117 | 116 | 101 |
| Other interest and dividend income | 94 | 77 | 79 |
| | | | |
| Total Interest Expenses | 1,906 | 2,416 | 2,829 |
| Provision for loan and lease losses | 5,913 | 3,511 | 1,534 |
| Net interest income including provisions for loan losses | $(3,617) | $(1,336) | $513 |
| | | | |
| **Profitability Ratios** | | | |
| Return on average common equity | %(69.25) | %(23.27) | %(32.64) |
| Net interest margin | 3.22 | 3.05 | 2.85 |
| Efficiency ratio | 84.11 | 57.49 | 122.13 |
| Nonperforming assets/total assets | 3.62 | 2.87 | 2.17 |
| Tangible equity/total tangible assets | 7.79 | 6.40 | 6.67 |

306.    The statements made by WaMu and contained in the Company's July 22, 2008, release were materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein.

**B.      Defendants Knew or Should Have Known That WaMu Stock Was an Imprudent Investment.**

307.    Given the facts described above, Defendant WaMu, and based on their positions within the Company, the individual Defendants, and in particular Defendants Killinger, Casey, Cathcart and Woods among others, knew that WaMu stock was an imprudent investment for the Plan because of, among other things, the Company's:  (a) over-reliance on the origination, securitization, purchase and sale of subprime mortgage loans and other risky mortgage loan products such as "negative amortization" loans; (b) lax underwriting policies for mortgage loans and related loan products; (c) participation in the systematic manipulation of the loan origination and property appraisal processes; (d) failure to implement and maintain risk management control

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 104
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

processes; and (e) failure to properly account for its subprime lending and related business operations, all of which caused WaMu's financial statements to be misleading and which artificially inflated the value of shares of WaMu stock and the WaMu Company Stock Fund in the Plan.

308.    In addition, Defendants, as top executives and high-level officers at WaMu, knew or should have known of several "red flags" that should have caused them to investigate the risks the Plan faced as a result of its huge investment in WaMu stock.

309.    The red flags that Defendants knew or should have known about include the following:

- On July 26, 2005, the *Wall Street Journal* warned that "[m]ortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets:"  WaMu admitted to loosening its lending standards and acknowledged that "[t]here's been a growing awareness over the past six to nine months that the risks are starting to increase with the very, very rapid price escalation we have seen";

- On September 25, 2006, *Reuters* reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against the securities since late 2005";

- On October 4, 2006, the Federal Reserve and other banking agencies issued their final guidelines: *Interagency Guidance on Nontraditional Mortgage Product Risks* in response to the loosened underwriting standards and general lax risk management practices of subprime lenders;

- In early December, 2006, Ownit Mortgage Solutions, Inc. closed its doors and filed for Chapter 11 bankruptcy just a few weeks later;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 105
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

- On December 20, 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market;

- On January 3, 2007, *Consumer Affairs* warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result";

- On March 11, 2007, the *New York Times* reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy;

- On April 2, 2007, New Century Financial Corp., the largest U.S. subprime lender at the time,  filed for Chapter 11 bankruptcy;

- On May 11, 2007, the *Huang v. Washington Mutual Inc.,* complaint was filed against WaMu.  Plaintiff Huang alleges that he witnessed a colleague remove unfavorable data from a "SuperScore Scorecard Monitoring" default-risk report to produce false results for federal banking examiner.  The actions were allegedly reported to Defendant Killinger and other management at the Company;

- On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy;

- On August 9, 2007, French bank BNP Paribas froze three of its funds exposed to United States subprime mortgages, blaming "a complete evaporation of liquidity";

- On August 16, 2007, Countrywide Financial Corporation, the largest U.S. mortgage lender, narrowly avoided bankruptcy by taking out an emergency loan of $11 billion from a group of banks;

- On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 106
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

- On August 31, 2007, Ameriquest, the largest subprime lender in the United States in 2005, announced it was going out of business;

- On September 14, 2007, WaMu announced that it was closing Long Beach Mortgage, a subprime unit of the Company.

310.   Even after the Company's reported losses on October 17, 2007, additional "red flags" were revealed, which would have caused a reasonable fiduciary to investigate the prudence of investing Plan assets in Company stock.  These additional red flags include the following:

- Between October 18 and October 22, 2007, four analysts downgraded WaMu stock;

- On November 1, 2007, the New York Attorney General sued First American and its subsidiary for conspiring with WaMu to inflate real estate appraisals;

- On November 9, 2007, the Company reported that non-performing loans were up 126.3% year-over-year and that on a relative basis, non-performing loans surged from 0.69% of total assets to 1.65% of total assets during the same period;

- On December 10, 2007, WaMu announced that it intended to: (1) discontinue all remaining lending through its subprime mortgage channel; (2) close approximately 190 of 336 home loan centers and sales offices; (3) Close nine Home Loans processing and call centers; (4) eliminate approximately 2,600 Home Loans positions, or about 22 percent of its Home Loans staff; (5) eliminate approximately 550 corporate and other support positions; and (6) close WaMu Capital Corp., its institutional broker-dealer business, as well as its mortgage banker finance warehouse lending operation;

- On December 20, 2007, the *Seattle Post-Intelligencer* reported that WaMu had confirmed that the SEC had launched an inquiry regarding its lending practices;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 107
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

- On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200-300 billion;

- On January 11, 2008, Bank of America made an agreement to bail out Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before;

- On April 8, 2008, WaMu announced that it had entered into definitive agreements to raise an aggregate of $7 billion through direct sale of equity securities, which resulted in a nearly 50% dilution to shares of WaMu stock;

- On April 11, 2008, a Goldman Sachs analyst stated that the Company might still face another $23 billion in mortgage-related losses;

- On June 24, 2008, a Lehman Brothers analyst reported that WaMu would have to set aside as much as $30 billion for credit losses through 2011, including residential mortgages, multi-family mortgages, commercial loans and credit card loans;

- On June 2, 2008, the Company said that it would strip Defendant Killinger of his title of chairman;

- On June 8, 2008, a UBS AG analyst report stated that WaMu continued to underestimate its losses on home loans, and that WaMu "will not demonstrate meaningful profitability until late 2010 or later," and total losses to the Company may reach a staggering $27 billion; and

- On July 22, 2008, WaMu reported losses of $3.3 billion for the second quarter of 2008, or a diluted loss per share of $6.58, which were "far worse than Wall Street was anticipating."  David Ellis, *Washington Mutual Loses $3.3 Billion*, CNN Money.com,

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 108
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

July 22, 2008.

311.    Given the size of the Plan's investment in WaMu stock, the turmoil faced by the subprime and high-risk loan market, and the precipitous decline in the price of WaMu stock, prudent Plan fiduciaries would have fully investigated the risks faced by the Company, carefully monitored the Plan's investment in Company stock and taken appropriate actions to protect the Plan's participants.  Instead, Defendants did nothing.  Indeed, Defendants disregarded sound business practices and failed to implement risk management processes despite the numerous warnings from industry observers and regulators regarding the risks of subprime and high-risk loans and looming trouble in credit markets.

312.    Further compounding the problem and losses to the Plan, several Defendants, including Defendant Killinger, downplayed the risks faced by the Company, both to the market and directly to Plan participants, thereby falsely assuring participants that their retirement savings in WaMu stock were not imperiled.

313.    Defendants' failure to disclose the true risks posed to the Plan as a result of its investment in WaMu stock, through among other imprudent acts, illegal business and accounting practices, and incomplete and inaccurate communications regarding the risks faced by the Company, resulted in the Plan purchasing and holding huge amounts of unduly risky Company stock at inflated prices.

314.    Prudent fiduciaries of the Plan would not have ignored the numerous red flags described above and would not have allowed the risk of loss to the Plan's participants and beneficiaries to increase to unacceptable levels.  Unfortunately, the Defendants did exactly that and for all intents and purposes wiped out a significant portion of the Plan's assets.

315.    As a result of the Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plan's

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 109
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1  participants regarding the Plan's investment in WaMu stock did not effectively inform the Plan's

2  participants of the past, immediate, and future dangers of investing in Company stock.

3      316.    Even in the wake of government inquiries and complaints, Defendants failed to

4  conduct an appropriate investigation into whether WaMu stock was a prudent investment for the

5  Plan and failed to provide the Plan's participants with information regarding WaMu's risky

6  business plan so that participants could make informed decisions regarding their investments in

7  Company stock in the Plan.

8      317.    An adequate investigation by Defendants would have revealed to a reasonable

9  fiduciary that investment by the Plan in WaMu stock, under these circumstances, was imprudent.

10  A prudent fiduciary acting under similar circumstances would have acted to protect participants

11  against unnecessary losses and would have made different investment decisions.

12      318.    Because Defendants knew or should have known that WaMu stock was not a

13  prudent investment option for the Plan, they had an obligation to protect the Plan and its

14  participants from unreasonable and entirely predictable losses incurred as a result of the Plan's

15  continued investment in Company stock.

16      319.    Accordingly, it was imprudent for the Plan's fiduciaries to continue offering

17  WaMu stock as a Plan investment option, to continue holding WaMu stock in the Plan, and

18  continue to make new investments in Company stock during the Class Period.

19      320.    WaMu stock was an imprudent investment for the Plan as it posed an inordinate

20  risk of significant loss, and this risk is not one that should have been borne by the participants

21  and beneficiaries of the Plan.  The Plan's fiduciaries disregarded the Company's deteriorating

22  and dreadful financial circumstances when it came to managing the Plan's investment in WaMu

23  stock, and were unwilling or unable to act prudently to rescue the Plan's investments.  Under the

24  circumstances, the continued investment of millions of dollars of participants' retirement savings

25  in WaMu stock was reckless and imprudent, and contrary to the best interests of the Plan's

26  participants and beneficiaries, and an abuse of their discretion as fiduciaries.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 110
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

321.   Defendants had available to them several different options for satisfying their duties, including:

- making disclosures to co-fiduciaries;

- making appropriate public disclosures as necessary;

- discontinuing or limiting further investment in WaMu stock under the Plan;

- consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plan;

- divesting the Plan of Company stock; and/or

- resigning as fiduciaries of the Plan to the extent that, as a result of their employment by WaMu, they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of WaMu stock.

322.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plan's investment in WaMu stock.

**C.   Defendants Failed to Provide Plan Participants, Beneficiaries, and Co-Fiduciaries with Complete and Accurate Information about the True Risks of Investment in WaMu Stock in the Plan**

323.   ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  *See, e.g., Wayne v. Pacific Bell*, 238 F.3d 1048, 1055 (9th Cir. 2001) (ERISA fiduciaries have a duty to not actively misinform); *Baker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) (fiduciaries have an affirmative duty to provide participants with information material to the participants'

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 111
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1   circumstances, even when the participant has not specifically asked for the information) (*citing*

2   *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)).

3       324.   During the Class Period, Defendant WaMu and Defendant Killinger made direct

4   and indirect communications to Plan participants through numerous Company publications and

5   the Company intranet, and other public statements regarding the financial health of the

6   Company.

7       325.   The Company regularly communicated with employees, including participants in

8   the Plan, about the performance, future financial and business prospects of the Company and

9   Company stock which was, far and away, the single largest asset of the Plan.

10       326.   These communications included, but were not limited to, direct statements to

11   employees in Company-wide communications, SEC filings, annual reports, and press releases

12   that were incorporated by reference into Plan documents and Plan-related materials and directed

13   to participants through the SPD and the Plan's Form S-8, and, thus, were Plan communications

14   undertaken in a fiduciary capacity.  These communications by Defendant WaMu assured the

15   participants that the Company was not unduly exposed to risks related to subprime lending, and

16   that the Company's risk management practices were appropriate, when in fact the extent of the

17   risks faced by the Company was unduly minimized and the extent of the Company's risk

18   management practices was overstated.

19       327.   WaMu, Killinger and the PAC Defendants failed to disclose facts that would have

20   apprised the Plan's participants of the risks presented by Company stock that, in turn, would

21   have allowed them to conclude that their exposure to Company stock through the Plan should be

22   reduced, or that Company stock was not a prudent retirement investment.

23       328.   Defendants, as the Plan's fiduciaries, knew or should have known certain basic

24   facts about the characteristics and behavior of the Plan's participants, well-recognized in the

25   401(k) literature and the trade press, concerning investment in company stock, including that:

26           (a)   Out of loyalty, employees tend to invest in company stock;

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 112
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

(b)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c)     Employees tend not to change their investment option allocations in the plan once made;

(d)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(e)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(f)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001); *see also* Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans: The Importance of Plan Design, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series*, No. 2002 36 (2002).

329.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from their heavy investment in an imprudent retirement vehicle, WaMu stock.

330.    In addition, Defendants failed to provide participants and beneficiaries, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.  As such, participants in the Plan could not appreciate the true risks presented

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 113
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plan.

331.    Specifically, Defendants failed to provide the Plan's participants with complete and accurate information regarding the Company's unduly large and risky exposure to subprime and other highly risky loans, its involvement in the illegal appraisal-inflation scheme, the true impact of those improper business and accounting practices on the Company's financial condition, and the dire circumstances such practices have created for the Company and the Plan's investment in WaMu stock.  As such, the participants were not informed of the true risks of investing their retirement assets in the Plan in WaMu stock.

332.    Defendant Killinger in particular (as well as other top-ranking officers of the Company and the Company itself) communicated directly with employees/Plan participants regarding the Company's subprime market exposure but aggressively and falsely downplayed the risks that this exposure presented to the Company.

333.    Defendant WaMu and Defendant Killinger, and on information and belief, certain other Defendants, knew all (in the case of the Company) or a large portion of the truth about the Company's financial condition and in particular about the risks posed to the Company by its exposure to risky and hard to value investments, especially those which exposed the Company to subprime and other high-risk loans, as detailed previously.  On information and belief, these Defendants with a greater knowledge of the risks posed by the Plan's investment in Company stock failed to disclose this information to their co-fiduciaries who served on the PIC and the PAC, and were empowered by the documents governing the Plan and ERISA to protect the Plan and its participants and beneficiaries by eliminating or limiting investment in Company stock, selling Company stock, and making appropriate disclosures to the Plan's participants and beneficiaries.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 114
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

**D.    Defendants Suffered From Conflicts of Interest**

334.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in WaMu stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

335.    Conflicts of interest abound when a company that invests plan assets in company stock founders.  This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir. 1992) (citation omitted).  Here, Defendants breached this fundamental fiduciary duty.

336.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer WaMu stock as a Plan investment option, and maintain investment in WaMu stock in the Plan.  Moreover, while certain Defendants, including Killinger, Casey, and Cathcart, dumped shares they personally held, they did nothing to protect the Plan from losses due to the Plan's imprudent investment in WaMu stock.

## VII.    THE RELEVANT LAW

337.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

338.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 115
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

> [A]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

339.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

340.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

341.   These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002).  They entail, among other things:

(a)   The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the WaMu Company Stock Fund, which invested in WaMu stock, to ensure that each investment is a suitable option for the plan;

(b)   The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 116
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

(c)     The duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

342.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

343.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 117
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

> circumstances to remedy the breach. . . .  [T]he most appropriate
> steps in the circumstances may be to notify the plan sponsor of the
> breach, or to proceed to an appropriate Federal court for
> instructions, or bring the matter to the attention of the Secretary of
> Labor.  The proper remedy is to be determined by the facts and
> circumstances of the particular case, and it may be affected by the
> relationship of the fiduciary to the plan and to the co-fiduciary, the
> duties and responsibilities of the fiduciary in question, and the
> nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

344.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## VIII.   ERISA § 404(C) DEFENSE INAPPLICABLE

345.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

346.    ERISA § 404(c) does not apply here for several reasons.

347.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering WaMu stock as an investment option in the Plan as this is not a decision that was made or controlled by the participants.  *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 118
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1   express plan language, is not a direct or necessary result of any participant direction of such

2   plan").

3       348.   Secondly, even as to participant-directed investment in WaMu stock, ERISA

4   § 404(c) does not apply because Defendants failed to ensure effective participant control by

5   providing complete and accurate material information to participants regarding WaMu stock.

6   *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient

7   information to make informed decisions").  As a consequence, participants in the Plan did not

8   have informed control over the portion of the Plan's assets that were invested in WaMu stock as

9   a result of their investment directions, and the Defendants remain entirely responsible for losses

10  that result from such investment.

11      349.   Third, in order to be a § 404(c) plan that provides a participant or beneficiary with

12  an opportunity to exercise control over the assets in his account, an identified plan fiduciary (or a

13  person or persons designated by the plan fiduciary to act on his behalf) must provide participants

14  and beneficiaries, in the case of plans that provide an employer stock investment alternative, "a

15  description of the procedures established to provide for the confidentiality of information relating

16  to the purchase, holding and sale of employer securities, and the exercise of voting, tender and

17  similar rights by participants and beneficiaries, and the name, address and phone number of the

18  plan fiduciary responsible."  29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(vii).  On information and

19  belief, no such information was provided to Plan participants.

20      350.   Because ERISA § 404(c) does not apply here, the Defendants' liability to the

21  Plan, the Plaintiffs and the Class (as defined below) for losses caused by the Plan's investment in

22  WaMu stock is established upon proof that such investments were or became imprudent and

23  resulted in losses in the value of the assets in the Plan during the Class Period.

24

25

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 119
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1

2

## IX.   DEFENDANTS' INVESTMENT IN COMPANY STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

3

351.   Some courts have applied a presumption of prudence to decisions by plan

4

fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the

5

Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder.

6

The presumption is based on the dual purpose of an ESOP to allow employee ownership on the

7

one hand, and save for retirement on the other.  *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d

8

Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to

9

balance these concerns).  "A plaintiff may then rebut this presumption of reasonableness by

10

showing that a prudent fiduciary acting under similar circumstances would have made a different

11

investment decision."  *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).  The Ninth Circuit

12

has twice declined to adopt the presumption of prudence.  *In re Syncor ERISA Litig.*, 516 F.3d

13

1095, 1102 (9th Cir. 2008).

14

352.   Here, even if, contrary to Ninth Circuit precedent, the presumption were applied,

15

the presumption is overcome by the facts alleged here, including, among other averments:

16

- A precipitous stock price decline from over $46 to below $5 during the Class Period;

17

- Risk of further imminent collapse of the price of WaMu stock based on WaMu's

18

   practices as discussed in detail herein;

19

- The Company's seriously deteriorating financial condition as well as Defendants'

20

   conflicted status as discussed in detail herein;

21

- Serious, if not gross, mismanagement evidenced by, among other things;

22

23

   - the Company's over-reliance on the origination, securitization and

24

      sale of subprime mortgage loans and other risky mortgage loan

25

      products such as "negative amortization" loans;

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 120
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

- the Company's lax underwriting policies for mortgage loans and related loan products;

- the Company's participation in the systematic manipulation of the loan origination and property appraisal processes;

- the Company's failure to implement and maintain risk management control processes;

- the Company's failure to properly account for its subprime lending and related business operations;

- expanding subprime mortgage origination even after widely-recognized market conditions had already slowed revenue growth and exponentially increased the risk of defaults and loan losses;

- dishonest, misleading, and illegal actions as set forth above that caused the price of WaMu stock to be artificially inflated;

- Defendants' conflicts of interest by which they held the Company's interests above those of Plan participants through their failure to take prompt and effective action to prevent further loss of participants' retirement savings; and

- the artificial inflation of WaMu stock as a result of improper accounting practices and misrepresentations regarding the Company's financial condition.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 121
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

353.     The imprudence of continued investment by Defendants in WaMu stock during the Class Period under the circumstances present here is recognized in Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. § 2509.94-1.  Defendants had available to them investment alternatives to WaMu stock that had either a higher rate of return with risk commensurate to WaMu stock or an expected rate of return commensurate to WaMu stock but with less risk.

354.     Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in WaMu stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result of such investment during the Class Period.

## X.     CAUSES OF ACTION

**A.     Count I:  Failure to Prudently and Loyally Manage the Plan and  Its Assets**

355.     Plaintiffs incorporate by this reference the paragraphs above.

356.     This Count alleges fiduciary breach against the following Defendants:  WaMu, the PIC Defendants, and the HR Committee Defendants (the "Prudence Defendants").

357.     As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

358.     As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill,

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 122
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1   diligence, and prudence required by ERISA.  As such, the PIC was directly responsible for,

2   among other things, selecting prudent investment options and eliminating imprudent options.

3   The HR Committee was responsible for overseeing the management of the Plan's trust fund and

4   periodically reviewing the performance of the funds and investment managers.   The HR

5   Committee exercised such authority when it requested a complete evaluation of fund

6   performance and expenses to ensure that participants continue to have an appropriate range of

7   investment choices.  As alleged previously, the remaining Prudence Defendant (WaMu)

8   exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other

9   Prudence Defendants, making itself fully responsible for the prudent and loyal fulfillment of the

10   *de jure* responsibilities assigned by the governing documents to the other Prudence Defendants,

11   without relieving them of any such responsibility.  In carrying out these responsibilities, the

12   Prudence Defendants were required to evaluate the merits of the Plan's investments on an

13   ongoing basis and take all necessary steps to ensure that the Plan's assets were invested

14   prudently.

15        359.    Yet, contrary to their duties and obligations under ERISA, the Prudence

16   Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during

17   the Class Period, these Defendants knew or should have known that WaMu common stock no

18   longer was a suitable and appropriate investment for the Plan, but was, instead, a highly

19   speculative and risky investment in light of the Company's serious mismanagement, dire

20   financial circumstances, and the imminent risk of collapse of WaMu stock as a result thereof.

21   Nonetheless, during the Class Period, these Defendants continued to offer WaMu stock as an

22   investment option for participant contributions.  They did so despite evidence that the Company

23   was overexposed to the risks of subprime lending and other high-risk loans, including rapidly

24   increasing defaults and corresponding loan losses, and that the price of WaMu stock was

25   artificially inflated as a result of the failure of the Defendants to provide complete and accurate

26   information to Plan participants and the market generally.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 123
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

360.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

361.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in WaMu stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in WaMu stock under these circumstances.

362.    The Prudence Defendants' decisions respecting the Plan's investment in WaMu stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and assets in WaMu stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

363.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 124
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

364.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

365.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  - The composition of the portfolio with regard to diversification;

  - The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  - The projected return of the portfolio relative to the funding objectives of the plan.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 125
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

366.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in WaMu stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan:  (a) the Company's over reliance on subprime and other high-risk loan products; (b) the Company's participation in the systematic manipulation of the loan origination process; (c) the Company's failure to implement and maintain risk management control processes; and (d) the Company's failure to properly account for its subprime lending business operations;

- The risk associated with the investment in WaMu stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in WaMu stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was significantly invested in Company stock, the Prudence Defendants had a

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 126
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11 254688 V1

heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

367.     The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  Upon information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of WaMu stock and/or the publicly reported financial performance of WaMu.  Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

368.     The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plan's investment in WaMu; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made WaMu stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to WaMu's inappropriate practices; and by otherwise placing their own and WaMu's improper interests above the interests of the participants with respect to the Plan's investment in WaMu stock.

369.     These Defendants breached their duty of prudence by knowing of, and in some instances participating in, the imprudent acts, illegal business and accounting practices described above while continuing to hold and purchase artificially inflated WaMu stock for the Plan.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 127
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

370.     Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

371.     Thus, even to the extent that the Plan required the fiduciaries to offer WaMu stock as an investment option, which Plaintiffs dispute, the Prudence Defendants breached their duty of prudence by continuing to offer WaMu stock as an investment option for participant contributions in the Plan, when the Prudence Defendants knew or should have known that WaMu stock no longer was a prudent investment for participants' retirement savings.

372.     As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost over 250 million dollars of retirement savings.

373.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.     Count II:  Failure to Monitor Fiduciaries**

374.     Plaintiffs incorporate by this reference the allegations above.

375.     This Count alleges fiduciary breach against the following Defendants:  WaMu and the HR Committee (the "Monitoring Defendants").

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 128
Case No. 2:08-md-01919-MJP

010002-11  254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

376.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

377.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| WaMu | PIC and PAC Defendants | ¶¶ 49-53 |
| HR Committee | PIC and PAC Defendants | ¶¶ 58-55 |

378.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

379.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

380.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 129
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1    assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions

2    regarding the plan.

3        381.   The Monitoring Defendants breached their fiduciary monitoring duties by, among

4    other things:  (a) failing, at least with respect to the Plan's investment in Company stock, to

5    monitor their appointees, to evaluate their performance, or to have any system in place for doing

6    so, and standing idly by as the Plan suffered enormous losses as a result of their appointees'

7    imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the

8    monitored fiduciaries appreciated the true extent of WaMu's highly risky and inappropriate

9    business practices, and the likely impact of such practices on the value of the Plan's investment

10   in WaMu stock; (c) to the extent any appointee lacked such information, failing to provide

11   complete and accurate information to all of their appointees such that they could make

12   sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to

13   remove appointees whose performance was inadequate in that they continued to make and

14   maintain investments in WaMu stock despite their knowledge of practices that rendered WaMu

15   stock an imprudent investment during the Class Period for participants' retirement savings in the

16   Plan, and who breached their fiduciary duties under ERISA.

17       382.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the

18   Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

19   monitoring duties as described above, the losses suffered by the Plan would have been

20   minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

21   duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost over

22   $250 million dollars of retirement savings.

23       383.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

24   and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

25   breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

26   appropriate.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 130
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

C.      **Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries**

384.    Plaintiffs incorporate by this reference the allegations above.

385.    This Count alleges fiduciary breach against the following Defendants:  Defendant WaMu and Defendant Killinger.

386.    Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans that he serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to their co-fiduciaries, but that such co-fiduciaries need to protect the interests of the plan.  *See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities*, 93 F.3d 1171 (3d Cir. 1996).

387.    The following fiduciaries of the Plan possessed non-public information during the Class Period about the risks posed by WaMu stock, which they knew could be used by other fiduciaries of the Plan (in particular the PIC Defendants and the PAC Defendants) to protect the Plan and its participants and beneficiaries:  (1) Defendant WaMu, as the *de facto* fiduciary that exercised authority and control over the conduct of the HR Committee Defendants, the Investment Committee Defendants and the PAC Defendants; and (2) Defendant Killinger who was a *de facto* fiduciary as a result of his communications directed to Plan participants and his role as a Board member with responsibility for making final determinations with regard to HR Committee resolutions pertaining to, among other things, the Plan.

388.    The HR Committee Defendants, the PIC Defendants and the PAC Defendants should have sought information concerning the risks posed by an investment in Company stock as part of a thorough and careful investigation of the merits of investment in Company stock during the Class Period, but failed to do so.  Nevertheless, those fiduciaries in possession of such knowledge, including but not limited to Defendants WaMu and Killinger, should have supplied that information to HR Committee Defendants, the PIC  Defendants and the PAC Defendants

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 131
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1    voluntarily in the fulfillment of the fiduciary duties they owed to the Plan.  Indeed, Defendant

2    Killinger attended meetings of the HR Committee and failed to supply such information.

3         389.    Defendant WaMu and Defendant Killinger profited from their breach of this duty.

4         390.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

5    and (a)(3), Defendant WaMu and the Defendant Killinger are liable to restore the losses to the

6    Plan caused by their breaches of fiduciary duties alleged in this Count, to disgorge any profits

7    made through their breach and to provide other equitable relief as appropriate.

8    **D.    Count IV: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate**
     **Information to the Plan's Participants and Beneficiaries**

9

10        391.    Plaintiffs incorporate by this reference the allegations above.

11        392.    This Count alleges fiduciary breach against:  WaMu, the Administration

12   Committee Defendants, and Defendant Killinger (the "Communications Defendants").

13        393.    At all relevant times, as alleged above, Defendants listed in this Count were

14   fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were

15   bound by the duties of loyalty, exclusive purpose, and prudence.

16        394.    At all relevant times, the scope of the fiduciary responsibility of WaMu and the

17   PAC included the communications and material disclosures to the Plan's participants and

18   beneficiaries.  In addition, Defendant Killinger acted as a *de facto* communicating fiduciary as a

19   result of his extensive communications directly with employees/Plan participants regarding the

20   Company and its likely future prospects.  Defendant Killinger knew that the employees'

21   retirement savings were invested significantly in WaMu stock in the Plan, his communications

22   concerned this investment, and, thus, concerned Plan benefits, and constituted acts of Plan

23   administration under ERISA.

24        395.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

25   participants, not to mislead them regarding the plan or plan assets, and to disclose information

26   that participants need in order to exercise their rights and interests under the plan.  This duty to

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 132
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plan's investment options, including investment in WaMu stock.

396. Because investments in the Plan were not diversified (*i.e.* the Defendants chose to allow the Plan's assets to be invested heavily in WaMu stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to WaMu stock.

397. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding WaMu's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of WaMu stock, and, generally, by conveying incomplete information regarding the soundness of WaMu stock and the prudence of investing and holding retirement contributions in WaMu equity. These failures were particularly devastating to the Plan and its participants; a large percentage of the Plan's assets were invested in WaMu stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

398. Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plan's investment in WaMu stock.

399. Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plan's participants.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 133
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

400.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

401.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

402.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**E.    Count V:  Co-Fiduciary Liability**

403.    Plaintiffs incorporate by this reference the allegations above.

404.    This Count alleges co-fiduciary liability against the following Defendants:  all Defendants (the "Co-Fiduciary Defendants").

405.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

406.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

407.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 134
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

1    particular, they did not communicate their knowledge of the Company's illegal activity to the

2    other fiduciaries.

3         408.    WaMu, through its officers and employees, engaged in highly risky and

4    inappropriate business practices, withheld material information from the market, and profited

5    from such practices, and, thus, knowledge of such practices is imputed to WaMu as a matter of

6    law.

7         409.    Because Defendants knew of the Company's failures and inappropriate business

8    practices, they also knew that the Prudence Defendants were breaching their duties by continuing

9    to invest in Company stock.  Yet, they failed to undertake any effort to remedy these breaches.

10   Instead, they compounded them by downplaying the significance of WaMu's failed and

11   inappropriate business practices, and obfuscating the risk that the practices posed to the

12   Company, and, thus, to the Plan.

13        410.    **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1),

14   imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with

15   respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an

16   act or omission of such other fiduciary, knowing such act or omission is a breach.  WaMu

17   knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited

18   from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan

19   participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the

20   Prudence Defendants because, as alleged above, they had actual knowledge of the facts that

21   rendered WaMu stock an imprudent retirement investment and yet, ignoring their oversight

22   responsibilities, permitted the Prudence Defendants to breach their duties.

23        411.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability

24   on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

25   administration of his specific responsibilities which give rise to his status as a fiduciary, he has

26   enabled another fiduciary to commit a breach.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 135
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

412.     The Monitoring Defendants' failure to monitor the PIC and the PAC enabled those committees to breach their duties.  Defendant WaMu's and Defendant Killinger's failure to provide critical information regarding the true risks faced by WaMu to the PIC, PAC and HR Committee enabled those committees to breach their duties.

413.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost over $250 million dollars of retirement savings.

414.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**F.     Count VI:  Knowing Participation in a Breach of Fiduciary Duty.**

415.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

416.     To the extent that WaMu is found not to have been fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, WaMu knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

417.     WaMu benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing WaMu stock to the Plan while the value of the stock was inflated as the result of WaMu's highly risky and improper business practices, and providing the market with materially misleading statements and omissions.  Accordingly, WaMu may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of WaMu stock which would have been contributed to the Plan, but for WaMu's participation in the foregoing breaches of fiduciary duty.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 136
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1

## XI.   CAUSATION

2    418.   The Plan suffered over $250 million dollars in principal losses alone because

3 substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants

4 in WaMu stock during the Class Period, in breach of Defendants' fiduciary duties.

5    419.   The Prudence Defendants are liable for losses to the portion of Plan's assets

6 invested in WaMu stock as a result of participant contributions because they failed to take the

7 necessary and required steps to ensure effective and informed independent participant control

8 over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C.

9 § 1104(c), and the regulations promulgated thereunder.

10    420.   The Prudence Defendants also are liable for losses that resulted from their

11 decision to invest nearly all of the assets of the Company Stock Fund in WaMu stock rather than

12 cash or other short-term investment options, as authorized by the Plan, and clearly prudent under

13 the circumstances presented here.

14    421.   Had the Defendants properly discharged their fiduciary and co-fiduciary duties,

15 including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated

16 duties of prudence and loyalty, eliminating WaMu stock as an investment alternative when it

17 became imprudent, and divesting the Plan of WaMu stock when maintaining such an investment

18 became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly,

19 the participants suffered.

20

## XII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

21    422.   The Defendants breached their fiduciary duties in that they knew or should have

22 known the facts as alleged above, and therefore knew or should have known that the Plan's

23 assets should not have been invested in WaMu stock during the Class Period.

24    423.   As a consequence of the Defendants' breaches, the Plan suffered significant

25 losses.

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 137
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

424.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

425.     With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of WaMu stock that the Plan would have acquired had the Plan fiduciaries taken appropriate steps to protect the Plan.  The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

426.     Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of:  (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 138
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

427.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

### XIII.   CLASS ACTION ALLEGATIONS

428.     **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

429.     All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between October 19, 2005, and the present and whose accounts included investments in WaMu stock.

430.     **Class Period.**  The fiduciaries of the Plan knew or should have known at least by October 19, 2005, that the Company's material weaknesses were so pervasive that WaMu stock could no longer be offered as a prudent investment for a retirement plan.

431.     **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plan's Form 5500 for Plan year 2005, more than 70,000 members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

432.     **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 139
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

010002-11  254688 V1

(d)      whether the Plan has suffered losses and, if so, what is the proper measure of damages.

433.   **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

434.   **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

435.   **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

436.   **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because:  (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 140
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

# XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in WaMu stock;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 141
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE:  (206) 623-0594

1

Dated: August 5, 2008.

2

3

HAGENS BERMAN SOBOL SHAPIRO LLP        KELLER ROHRBACK L.L.P.

4

5

By:    s/ Steve W. Berman                      By:    s/ Lynn L. Sarko
     Steve W. Berman, WSBA #12536                 Lynn L. Sarko, WSBA #16569

6

     Andrew M. Volk, WSBA #27639                  Derek W. Loeser, WSBA # 24274
     Tyler Weaver, WSBA #29413                    Erin M. Riley, WSBA # 30401

7

     Genessa Stout, WSBA #38410              1201 Third Avenue, Suite 3200
1301 Fifth Avenue, Suite 2900                  Seattle, Washington 98101-3052

8

Seattle, Washington  98101                     Telephone: (206) 623-1900
Telephone: (206) 623-7292                      Facsimile: (206) 623-3384
Facsimile: (206) 623-0594

9

10

*Interim Co-Lead Counsel for the Class*        *Interim Co-Lead Counsel for the Class*

11

SCOTT & SCOTT, LLP                             SCOTT & SCOTT, LLP

12

13

By:    s/ David R. Scott                       By:    s/ Geoffrey M. Johnson
     David R. Scott                              Geoffrey M. Johnson

14

108 Norwich Avenue                             12434 Cedar Road, Suite 12
P.O. Box 192                                   Cleveland Heights, Ohio  44106

15

Colchester, Connecticut  06415                 Telephone:  (216) 229-6088
Telephone:  (860) 537-5537                     Facsimile:  (216) 229-6092

16

Facsimile:  (860) 537-4432

17

*Additional Counsel for the Proposed Class*    *Additional Counsel for the Proposed Class*

18

SCHIFFRIN BARROWAY TOPAZ &
  KESSLER LLP

19

20

By:    s/ Joseph H. Meltzer

21

     Joseph H. Meltzer
     Edward W. Ciolko

22

280 King of Prussia Road
Radnor, Pennsylvania  19087

23

Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

24

*Additional Counsel for the Proposed Class*

25

26

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT  - 142
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11  254688 V1

1

## CERTIFICATE OF SERVICE

2

On August 5, 2008, I caused to be electronically filed the foregoing with the Clerk of the

3

Court using the CM/ECF system, which will send notification of such filing to the following

4

attorneys of record:

5

6
- **Ronald L Berenstain**

7
  rberenstain@perkinscoie.com, docketsea@perkinscoie.com, jstarr@perkinscoie.com

8
- **Steve W. Berman**
  steve@hbsslaw.com, heatherw@hbsslaw.com
- **Steven P. Caplow**

9
  stevencaplow@dwt.com, jason.klein@wamu.net, david.bourne@wamu.net
- **Edward W. Ciolko**

10
  eciolko@sbtklaw.com
- **Mark K. Gyandoh**

11
  mgyandoh@sbtklaw.com

12
- **Robert I. Harwood**
  rharwood@hfesq.com

13
- **Hilary E. Hoover**

14
  HHoover@perkinscoie.com, hooverhe@yahoo.com, krobinson@perkinscoie.com,
  jnorville@perkinscoie.com, sknowles@perkinscoie.com

15
- **Geoffrey M. Johnson**

16
  gjohnson@scott-scott.com
- **Derek W. Loeser**

17
  dloeser@kellerrohrback.com, chopkins@kellerrohrback.com
- **Lisa Mellas**

18
  lmellas@sbtklaw.com, lloper@sbtklaw.com

19
- **Joseph H. Meltzer**
  jmeltzer@sbtklaw.com

20
- **Multidistrict Litigation, JEFFERY N. LUTHI**
  panelmdl@ao.uscourts.gov

21
- **Barry Robert Ostrager**
  bostrager@stblaw.com

22
- **Robert Jerrod Pfister**
  rpfister@stblaw.com, gdmiller@stblaw.com

23
- **Erin Maura Riley**

24
  eriley@kellerrohrback.com
- **Samuel K. Rosen**

25
  srosen@hfesq.com
- **Stephen M. Rummage**

26
  steverummage@dwt.com, jeannecadley@dwt.com

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 143
Case No. 2:08-md-01919-MJP

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON  98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594

010002-11 254688 V1

- **Lynn Lincoln Sarko**
  lsarko@kellerrohrback.com
- **David R. Scott**
  drscott@scott-scott.com, cmcgowan@scott-scott.com
- **Karin Bornstein Swope**
  kswope@kellerrohrback.com, chopkins@kellerrohrback.com
- **David F. Taylor**
  DFTaylor@perkinscoie.com, docketsea@perkinscoie.com,
  KKlemperer@perkinscoie.com
- **Duncan Calvert Turner**
  duncanturner@badgleymullins.com, courtnotices@badgleymullins.com
- **Andrew M. Volk**
  andrew@hbsslaw.com, dawn@hbsslaw.com
- **Tyler Weaver**
  tyler@hbsslaw.com, dawn@hbsslaw.com
- **Robert B. Weiser**
  rw@weiserlawfirm.com
- **Allyssa Jayne White**
  awhite@badgleymullins.com

Executed this 5th day of August, 2008, in Seattle, Washington.


HAGENS BERMAN SOBOL SHAPIRO LLP


By: _____ s/ Steve W. Berman _____
    Steve W. Berman, WSBA #12536

CONSOLIDATED AMENDED COMPLAINT
FOR BREACHES OF DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT - 144
Case No. 2:08-md-01919-MJP

010002-11 254688 V1

LAW OFFICES OF
Keller Rohrback l.l.p.
1201 Third Avenue, Suite 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

LAW OFFICES OF
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
SEATTLE, WASHINGTON 98101
TELEPHONE: (206) 623-7292
FACSIMILE: (206) 623-0594