The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL, INC.<br>SECURITIES & ERISA LITIGATION | ) ) ) ) ) |
| | No.  2:08-md-1919 MJP |
| IN RE WASHINGTON MUTUAL, INC.<br>SECURITIES LITIGATION | ) ) ) ) |
| | Lead Case No. C08-387 MJP |
| | OD-KKK-3 |
| This Document Relates to:  ALL CASES | ) ) |
| | **LEAD PLAINTIFF'S<br>OPPOSITION TO DEFENDANT<br>KERRY K. KILLINGER'S<br>MOTION TO DISMISS THE<br>AMENDED CONSOLIDATED<br>CLASS ACTION COMPLAINT** |
| | *Note on Motion Calendar*:<br>August 25, 2009 |
| | Oral Argument Requested |

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

I.    PRELIMINARY STATEMENT ..............................................................1

II.   ARGUMENT ...........................................................................................2

    A.    Legal Standard And Judicial Notice ........................................2

    B.    Legal Standards Applicable To Lead Plaintiff's Section
        10(b) Claims..............................................................................3

    C.    Killinger Knowingly Or Recklessly Made Numerous False
        And Misleading Statements About WaMu's Risk
        Management................................................................................4

    D.    Killinger Knowingly Or Recklessly Made Numerous False
        And Misleading Statements About WaMu's Underwriting.................................7

    E.    Killinger Knowingly Or Recklessly Made Numerous False
        And Misleading Statements About WaMu's Appraisals ........................................14

    F.    Killinger Knowingly Or Recklessly Made Numerous False
        And Misleading Statements About WaMu's Financial
        Results And Internal Controls..................................................19

III.   CONCLUSION........................................................................................24

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page i

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2

## TABLE OF AUTHORITIES

3    **Cases**                                                                                  **Page(s)**

4    *Aldridge v. A.T. Cross Corp.*,

5       284 F.3d 72 (1st Cir. 2002) ..............................................................................22

6    *Atlas v. Accredited,*
        556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...........................................................15

7

8    *Backe v. Novatel Wireless, Inc.,*
        607 F. Supp. 2d 1145 (S.D. Cal. 2009) ...........................................................24

9    *Barrie v. Intervoice-Brite, Inc.,*
        409 F.3d 653 (5th Cir. 2005) ............................................................................3

10

11   *Berson v. Applied Signal Tech., Inc.,*
        527 F.3d 982 (9th Cir. 2008) .......................................................................9, 23

12
     *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,*
13      497 F.3d 546 (5th Cir. 2007) ...........................................................................24

14   *In re Charles Schwab Corp. Sec. Litig.,*
        No. C 08-01510 WHA, 2009 WL 262456 (N.D. Cal. Feb. 4, 2009) .....................10

15

16   *In re Connetics Corp. Sec. Litig.,*
        No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) .....................16

17
     *Cooper v. Pickett*,
18      137 F.3d 616 (9th Cir. 1997) ...........................................................................16

19   *In re CornerStone Propane Partners, L.P. Sec. Litig.,*
        355 F. Supp. 2d 1069 (N.D. Cal. 2005) ............................................................12

20

21   *In re Countrywide Fin. Corp. Derivative Litig.,*
        554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................. *passim*

22

23   *In re Countrywide Fin. Corp. Sec. Litig.,*
        588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................................8

24   *In re Daou Sys., Inc.,*
        411 F.3d 1006 (9th Cir. 2005) .............................................................. *passim*

25

26   *DiLeo v. Ernst & Young*,
        901 F.2d 624 (7th Cir. 1990) .....................................................................21, 22

27

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008)..................................................10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................3

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..................................................25

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ..................................................12, 15

*Fouad v. Isilon Sys., Inc.*,
No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ..................................................2

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..................................................2

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..................................................18, 24

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ..................................................21

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ..................................................5

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................22

*McGuire v. Dendreon Corp.*,
No. 07-800MJP, 2008 WL 1791381 (W.D. Wash. Apr. 18, 2008) ..................................................3

*McGuire v. Dendreon*,
No. C07-800MJP, Slip Op. (W.D. Wash. May 21, 2009) ..................................................12

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ..................................................10

*Miller v. Thane Int'l, Inc.*,
508 F.3d 910 (9th Cir. 2007) ..................................................8

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ..................................................17

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page iii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ................................................................................19

*Stocke v. Shuffle Master, Inc.,*
    615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................................24

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) ..................................................................................3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007)..............................................................................2, 4, 24

*Tripp v. Indymac Fin. Inc.,*
    No. CV07-1635 GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) .....................5

*In re Vantive Corp. Securities Litigation,*
    283 F.3d 1079 (9th Cir. 2002) (KK Mot. at 11) ...................................................16

*In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.,*
    No. 2:08-MD-1919, 2009 WL 1393679 (W.D. Wash. May 15, 2009) .......... *passim*

*In re Watchguard Sec. Litig.,*
    No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) .......................23

*In re Williams Sec. Litig.,*
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) .............................................................22

*In re Zumiez Inc. Sec. Litig.,*
    No. C07-1980 JCC, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ...................10

STATUTES & OTHER AUTHORITIES

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b).........................................3

Fed. R. Civ. P. 9(b) ..................................................................................... *passim*

Fed. R. Civ. P. 10b5-1....................................................................................24

Fed. R. Civ. P. 12(b)(6)...................................................................................15

Fed. R. Civ. P. 15(a) ......................................................................................25

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page iv

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

## I.    PRELIMINARY STATEMENT

The Court previously sustained Lead Plaintiff's Securities Act claims related to Washington Mutual, Inc.'s ("WaMu" or the "Company") October 2007 Offering, including claims against Defendant Kerry Killinger ("Killinger") for untrue statements about WaMu's lending and accounting practices that the Court concluded were subject to Rule 9(b)'s heightened pleading standards. *See In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, No. 2:08-MD-1919, 2009 WL 1393679, at *13, *15-17 (W.D. Wash. May 15, 2009) (the "Order").[1]  The Court directed Lead Plaintiff to restructure its claims under the Securities Exchange Act of 1934 ("Exchange Act") in an amended complaint. *Id.* at *20.  Lead Plaintiff complied with the Court's Order and filed its Amended Consolidated Class Action Complaint (the "Amended Complaint" or "Complaint") on June 15, 2009.

The Complaint alleges Killinger's false and misleading statements, by topic and in chronological order, with detailed reasons explaining why those statements were false and misleading when made, and the reasons supporting Killinger's knowledge or reckless disregard of the falsity of his statements.  Killinger admits that Lead Plaintiff's re-organization of its pleading "followed the Court's Order." KK Mot. at 1.[2]  Crucially, Killinger does not claim that the Complaint's allegations are unclear.  Killinger's motion now rests upon factual disputes and credibility arguments – none of which are appropriate for determination on the pleadings.

The Court has already held that Lead Plaintiff has satisfied Rule 9(b) in alleging that Killinger (and Defendant Casey) made false statements in the October 2007 Offering Documents about WaMu's underwriting standards, internal controls, and financial results. *Id.* at *13-17.  As the Court noted, Lead Plaintiff's allegations about Killinger's false statements on these subjects in other documents are identical or substantially similar to the false statement claims that have been sustained. *Id.* at *14 n.10.  Thus, Killinger's present motion effectively rehashes arguments that the Court already considered and rejected.  These arguments, as discussed below, largely hinge on attacks on the credibility and number of WaMu's former employees who stepped

---

[1] All subsequent "*" references to the Order are to the Westlaw version of the Order.
[2] This brief refers to Defendant Killinger's motion to dismiss as the "KK Mot."

forward to report on the widespread fraud at WaMu as confidential witnesses ("CWs"). Contrary to Killinger's arguments, the number of CWs listed in the Complaint is irrelevant; rather, the relevant consideration under Ninth Circuit law is whether they would be in a position to know the facts about which they report.  *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005).  Further, contrary to Killinger's assertion that Lead Plaintiff "rel[ies] on lessons learned from the worst recession in more than a generation to evaluate statements made years before" (KK Mot. at 3), the Complaint is replete with contemporaneous facts demonstrating that Killinger's statements were false when made.  Moreover, the Court has already rejected the notion that "the recent downturn in the housing market . . . caused WaMu's stock price to plummet."  Order at *18.

The allegations of the Complaint support a strong inference of Killinger's scienter, and Killinger largely does not dispute the clarity or substance of those allegations.  Rather, Killinger primarily disputes that he possessed a financial motive to commit fraud while at WaMu. Inconceivably, despite having made over $45 million in profits from his position during the Class Period, Killinger somehow casts himself as the ultimate victim of the WaMu fraud.  KK Mot. at 23-24.  But there is no innocent inference raised by Killinger's spin on WaMu's ultimate failure, especially in light of the Complaint's detailed allegations that explain how pervasive fraud, and Killinger's day-to-day involvement in that fraud, destroyed the Company.

Killinger's motion is without merit and should be denied in its entirety.

## II.    ARGUMENT

### A.    Legal Standard And Judicial Notice

On a motion to dismiss, the Court must accept the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs.  *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *2 (W.D. Wash. Dec. 29, 2008) (Pechman, J.) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007)).  "[A] district court ruling on a motion to dismiss is not sitting as trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."  *In re*

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 2

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    *Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

2    In deciding a motion to dismiss, a court may generally consider only allegations

3    contained in the pleadings, exhibits attached to the complaint, and matters properly subject to

4    judicial notice.  Order at *2 (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007)).

5    Killinger seeks judicial notice of 44 documents.  Lead Plaintiff opposes consideration of those

6    documents that are inappropriate for judicial notice, do not relate to the Complaint's allegations,

7    and are "not necessary to decide the issues presented."  Order at *2.  *See* Davis Decl. (Docket

8    #323) Exs. DD (news article), GG (newsletter), HH (press release), KK (newsletter), and MM

9    (accounting rules abstracts).  In any event, no inferences should be drawn "in favor of defendants

10   from judicially-noticed facts."  *Id.* at *2 (citing *McGuire v. Dendreon Corp.*, No. 07-800MJP,

11   2008 WL 1791381, at *4 (W.D. Wash. Apr. 18, 2008)).  The Court also should not consider

12   Killinger's Appendix 2, which is an unverified accounting analysis that was apparently prepared

13   by Killinger's counsel and represents argument outside the page limit set by the Court.

14   **B.    Legal Standards Applicable To Lead Plaintiff's Section 10(b) Claims**

15   A complaint states a claim under § 10(b) when it alleges "(1) a material misrepresentation

16   or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4)

17   transaction and loss causation, and (5) economic loss."  *Daou,* 411 F.3d at 1014 (citing *Dura*

18   *Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  Killinger challenges only the

19   Complaint's allegations concerning falsity and scienter.

20   In accordance with the Order, the Complaint alleges each of Killinger's false statements,

21   the reasons why each statement was false and misleading when made, and particularized facts

22   giving rise to a strong inference of scienter regarding each false statement.  The Complaint

23   provides these allegations by subject matter, addressing Killinger's statements about WaMu's

24   *risk management* at ¶¶47-60 (statements), ¶¶62-74 (falsity), and ¶¶75-94 (scienter); *appraisals* at

25   ¶¶96-103 (statements), ¶¶105-61 (falsity), ¶¶162-68 (scienter); *underwriting* at ¶¶170-89

26   (statements), ¶¶191-239 (falsity), ¶¶240-65 (scienter); and *financial results and internal controls*

at ¶¶267-90 (statements), ¶¶292-336 (falsity), and ¶¶337-55 (scienter).[3]

"[B]ecause falsity and scienter 'are generally strongly inferred from the same set of facts, . . . the two requirements may be combined into a unitary inquiry under the PSLRA.'" Order at *10 (citing *Daou*, 411 F.3d at 1016).  *Cf. Tellabs*, 127 S. Ct. at 2509 (the appropriate inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (emphasis in original).  Thus, in accordance with the Order, the Complaint alleges the falsity of Killinger's statements about each subject and then alleges his scienter in making statements about that subject.  The discussion below follows a similar structure.  For a more detailed discussion of the law relating to pleading scienter and the falsity of statements, Lead Plaintiff respectfully refers the Court to Lead Plaintiff's Opposition to the Officer Defendants' motion.

## C.    Killinger Knowingly Or Recklessly Made Numerous False And Misleading Statements About WaMu's Risk Management

*Killinger's False Statements:*  Killinger routinely made false statements about WaMu's risk management during the Class Period.  ¶¶46-61.  For example, at the beginning of the Class Period, Killinger stated that the Company's "risk management efforts are on track." ¶50.  Thereafter, Killinger repeatedly touted WaMu's careful planning and supposed foresight in managing its credit risk.  *E.g.*, ¶56 ("[D]ecisive actions have positioned us well to deliver stronger operating performance in 2007."); ¶60 ("'[O]ver two years' earlier, the Company had begun taking 'proactive steps' to prepare for a decline in housing prices.'").

In truth, starting in 2005, WaMu significantly weakened its risk management policies in order to be more "aggressive" (¶64) and "push the envelope" (¶66) in its mortgage lending.  ¶¶62-74.  The Complaint details how Killinger and the other 10(b) Defendants systematically weakened WaMu's risk management policies and undermined those responsible for enforcing the policies.  *Id.*  For example, during the fourth quarter of 2005, CW 18 attended a meeting where the then-Chief Enterprise Risk Officer "informed the Company's credit risk managers that

---

[3] Killinger is also liable for false statements made by other Defendants during conference calls in which he participated. ¶¶61, 104, 190, 291. *See Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005).

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 4

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    WaMu's senior management (which CW 18 understood to include Killinger) had concluded that

2    the Company planned to be more 'aggressive' in its lending and provisioning practices." ¶66. In

3    fact, an internal WaMu memo dated October 31, 2005 stated that "moving forward, risk

4    management at WaMu must occupy a 'customer service'-type function, rather than impose a

5    'regulatory burden' on other Company segments." ¶68.

6         Killinger challenges these statements, claiming that Lead Plaintiff misunderstands the

7    role of risk management, but his argument mischaracterizes both the Complaint and WaMu's

8    own SEC filings. Killinger was not merely responsible for setting the level of risk tolerance.

9    Rather, as set forth in WaMu's SEC filings, the function of WaMu's risk management was also

10   to *enforce* those levels: "Enterprise Risk Management works . . . to establish appropriate policies,

11   standards and limits . . . [and] also provides *objective oversight* of risk elements . . . and *oversees*

12   *compliance* with laws and regulations[.]" ¶47. Internal documents and CWs show that WaMu

13   lacked this objective oversight of compliance with policies, standards, limits, laws, and

14   regulations. *E.g.*, ¶¶67-68 (memo directing risk management not to be a "regulatory burden");

15   ¶72 (WaMu "risk management served a more informative, less regulatory function, such that the

16   underlying goal was simply to 'find a way to get things done'"). As discussed below in Section

17   IV.B.1, the multiple CWs' mutually consistent accounts strengthen the Complaint's allegations

18   about undisclosed weakening of WaMu's risk management. *See Daou*, 411 F.3d at 1015.

19        Nevertheless, Killinger, relying on *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554

20   F. Supp. 2d 1083 (C.D. Cal. 2008) (KK Mot. at 14), criticizes the CWs here. Such reliance on

21   *Impac* is misplaced. The *Impac* court dismissed claims based on alleged misstatements about a

22   company's efforts to improve internal controls because it was undisputed that the company

23   successfully devoted additional resources to internal controls, and thus CW statements did not

24   allege falsity. *Id.* at 1095-96. Killinger's reliance on *Tripp v. Indymac Fin. Inc.*, No. CV07-1635

25   GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) (KK Mot. at 14), is also unavailing, because

26   the CWs there asserted only soft "beliefs and opinions," *id.* at *3, unlike the Complaint's detailed

27   facts about WaMu's poor risk management, including internal WaMu reports.

---

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 5

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    In addition, internal WaMu documents confirm the CW accounts.  ¶¶67-68, 78, 90-91.

2    The "numerous reports" described in the Complaint that informed management about WaMu's

3    risk level are not "inconsistent" with "weakened" risk management, as Killinger asserts.  KK

4    Mot. at 14.  These reports actually show that Killinger *knew* that WaMu was incurring excessive

5    risks, but failed to take corrective action.  *E.g.,* ¶78 (Risk Reports to Killinger "specifically

6    quantified the fact that [WaMu] was exceeding certain risk parameters" but Killinger "simply

7    ignore[d]" those clear warnings); ¶¶90-91 (credit risk reports to Killinger focusing on riskier

8    products such as negative amortization loans).

9        *Killinger's Scienter:*  The Complaint's allegations also support a strong inference of

10   scienter.   Killinger had numerous face-to-face meetings and directly received reports that

11   detailed WaMu's risk exposure resulting from the Company's lending standards.  ¶¶76-94.  For

12   example, William Longbrake, a former senior WaMu executive and Vice Chairman of Enterprise

13   Risk Management during the Class Period, repeatedly warned the Board (of which Killinger was

14   Chairman) that the housing market was becoming too risky and WaMu should limit its exposure

15   to the housing market.   ¶76.   Additionally, Killinger attended monthly Executive Risk

16   Committee meetings, which were described by an attendee as "a forum where all aspects of risk

17   across the bank were discussed, including credit, market and operational risk."  ¶82.  At these

18   meetings, Killinger "engaged in detailed discussions regarding the Company's risk exposure,"

19   such as concentrations of risk in geographic areas and loan categories.  ¶¶83.  During 2006,

20   Killinger also met regularly with the other Officer Defendants to discuss "detailed information

21   regarding levels of delinquencies concerning WaMu's specific loan product types." ¶84.  In fact,

22   a senior WaMu employee explained that Killinger monitored WaMu's lending practices so

23   closely that they could not have been adjusted without his knowledge and consent.  ¶87.

24       Moreover, Killinger regularly received reports demonstrating that WaMu had an

25   untenable risk exposure yet did nothing to fix the issue.  For example, "Risk Reports" delivered

26   quarterly to Killinger "specifically quantified the fact that the Company was exceeding certain

27   risk parameters as dictated by [WaMu's] risk guidelines." ¶78 (CW 17).  CW 17 stated that "the

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 6

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

quantitative risk metrics pertaining to the loan portfolios fell out of the designated ranges on various occasions," but Killinger "simply ignore[d]" those clear warnings. *Id.* Killinger also received Credit Highlights Reports analyzing WaMu's "riskier products," including Option ARM and other negative amortization loans. ¶¶90-91.

Killinger's assertion that he may not have *read* the reports raising red flags regarding WaMu's risk exposure (KK Mot. at 19) highlights his reckless disregard for the truth. Moreover, it is contradicted by his own self-serving admission of adjusting strategy in "respons[e] to risk reports." KK Mot. at 20. Beyond these weak responses, Killinger does not contest the clear evidence of his scienter in making false statements regarding WaMu's risk management.

### D. Killinger Knowingly Or Recklessly Made Numerous False And Misleading Statements About WaMu's Underwriting

*Killinger's False Statements:* Killinger made numerous false statements and material omissions concerning WaMu's underwriting policies and practices. ¶¶170-90. For example, Killinger claimed that WaMu was "vigilant in [its] underwriting standards," was "tightening underwriting," and underwrote its Option ARM loans to the fully-indexed rate. ¶¶170, 188, 179.

These statements were materially false and misleading when made because WaMu was actually diluting its underwriting standards, issuing loans that were unlikely to be repaid, and routinely making exceptions to its underwriting guidelines. ¶¶191-239. For example, according to CW 65, stated-income borrowers (traditionally self-employed persons) could submit letters of reference from anyone; "no attempt was made to verify the information"; and statements such as "[s]o-and-so cuts my lawn and does a good job" were acceptable. ¶231. Numerous other CWs confirmed these practices, stating "it was so commonplace to go outside of the guidelines" (¶220), and guidelines were "loose to the point of disbelief" (¶236). *Contra* KK Mot. at 8 (claiming that only allegation of underwriting violations in Complaint is WaMu's underwriting of Option ARM loans to "teaser" rate). Additionally, the underwriting for WaMu's "flagship product," Option ARM loans, was dangerously deficient as the loans were underwritten to initial "teaser" rates, rather than fully-indexed rates. ¶¶224-26.

Killinger's false and misleading statements include assertions (*e.g.,* ¶¶174, 184) that are

---

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   substantially the same as statements this Court has already found to be false and misleading in

2   the context of Lead Plaintiff's Securities Act claims against Killinger.  *See* Order at *15-16.  For

3   example, the Court found the following statement actionable: "'The Company . . . ensure[s]

4   compliance with its underwriting standards' to mitigate and manage credit risk."  *Id.* at *15.  The

5   Court reasoned that "[s]uch disregard of underwriting standards, where the exceptions nearly

6   swallow the rules, is tantamount to abandoning those standards."  *Id.* at *16 (citing *In re*

7   *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145-46 (C.D. Cal. 2008)).  In finding

8   that Lead Plaintiff "describe[s] with sufficient particularity the misleading nature of the

9   statement," the Court concluded that "[i]f WaMu's lending environment was fraught with such

10  extreme departure from any plausible conception of 'standards,' a statement that the Company

11  followed underwriting standards to manage or mitigate credit risk would mislead a reasonable

12  investor."  Order at *16.  The Complaint's Exchange Act allegations are more detailed than the

13  Securities Act allegations that the Court has sustained and thus, should also be sustained.

14        In response, Killinger argues that the Complaint omits "context" for his false statements.

15  KK Mot. at 5-7.  Killinger is wrong.  The statements are false and misleading even in the

16  supposed context suggested by Killinger.  For example, Killinger argues that although he stated

17  that WaMu's Option ARM portfolio was "very good," he also stated the average FICO score of

18  704 and provided LTV ratios.  KK Mot. at 6.  But even assuming Killinger's quantitative claims

19  are true (which should not be assumed on this motion in light of the alleged widespread appraisal

20  inflation affecting LTV ratios), Killinger did not disclose the facts regarding the lack of

21  documentation, lower collateral requirements, numerous exceptions to underwriting guidelines,

22  and systematic inflation of appraisal values.  Thus, the context proposed by Killinger actually

23  underscores how he misled the public.  *See Miller v. Thane Int'l, Inc.*, 508 F.3d 910, 916 (9th

24  Cir. 2007) ("[S]tatements literally true on their face may nonetheless be misleading when

25  considered in context.").

26        Killinger also contends that the CWs cited in the Complaint offer only inflammatory

27  opinions on WaMu's underwriting that should not be credited.  KK Mot. at 7-9.  In the Ninth

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 8

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Circuit, a securities complaint may rely upon CWs if they are described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains 'adequate corroborating details.'" *Daou*, 411 F.3d at 1015 (citations omitted).  The Complaint more than satisfies this standard. The Complaint's CWs paint a consistent picture of WaMu's fraud.  Indeed, these employees, spread throughout the geographic range and hierarchy of the Company, consistently described Company-wide improper lending policies and practices.  The *Countrywide Derivative* court recognized the value of such diverse viewpoints, observing:

> The Court finds that Plaintiffs' numerous confidential witnesses support a strong inference of a Companywide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards.  Supporting this Companywide inference, the confidential and non-confidential accounts cited in the Complaint (1) emanate from several geographic areas . . . ; (2) span different levels of the Company hierarchy . . . ; and (3) remain consistent across different time periods . . . .  Strikingly, they tell what is essentially the same story – a rampant disregard for underwriting standards – from markedly different angles.

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008).

Moreover, CWs need not have been in a position to know facts "first-hand" so long as they are described with "sufficient particularity to support the probability" the witnesses were "in a position to infer" or "could reasonably deduce" the facts attributed to them.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (finding it "entirely plausible" that CWs who were not in a position to "see the stop-work orders first-hand because they were 'engineers or technical editors' rather than managers" still "would know, or could reasonably deduce," that orders had been cancelled); *see also Countrywide Derivative*, 554 F. Supp. 2d at 1060 (finding strong inference although witnesses had not "ever spoken or had other contact with any of the seven non-management directors . . . and none is alleged to have personal knowledge relating to the two management directors").

The Complaint also cites additional sources of information corroborating the CW statements.  *Daou*, 411 F.3d at 1015.  For example, the Complaint corroborates the multiple credible CW reports that WaMu consistently underwrote its Option ARM loans to the "teaser" rate until late 2007 with an internal WaMu document dated August 1, 2007, which shows that

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 9

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    Option ARM loans were underwritten at the teaser rate until that date. ¶226. These allegations

2    demonstrate the falsity of Killinger's statements (and those for which he is responsible) that

3    WaMu always underwrote loans to the fully-indexed rate. *E.g.*, ¶172 (Nov. 2005), ¶179 (Oct.

4    2006). Killinger attempts to discredit the CWs' accounts and claim that he cannot be held liable

5    for his false statements that WaMu's Option ARMs were underwritten to the fully-indexed rate

6    during the Class Period by pointing to vague statements in 2006 that WaMu had "at one time"

7    underwritten loans to an "administratively set rate" (which WaMu never defined). KK Mot. at 8

8    n.4. Killinger is wrong. The documents Killinger points to state that loan underwriting using an

9    "administratively set rate" ceased "in October [2005]" (Davis Decl. Ex. L at 40) and that loans

10   underwritten with an "administratively set rate" in "2004 and 2005 . . . [were] performing

11   similarly to loans underwritten at or above the fully-indexed rate from the same time period"

12   (Davis Decl. Ex. U at 54). *See also* ¶184. Thus, the purportedly curative "disclosures" Killinger

13   relies upon about WaMu's pre-Class Period underwriting actually include further misstatements.

14        Killinger's reliance on *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d

15   1049 (9th Cir. 2008) (KK Mot. at 7), to discredit the Complaint's CWs is also misplaced.

16   *Metzler* rejected scienter allegations based on a single CW who said only that a defendant

17   described an accounting method as a "grey area," which did not show that the accounting was

18   actually wrong. *Id.* at 1069 n.13. Similarly, the rejection of vague allegations about

19   mismanagement in *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159 (S.D. Cal.

20   2008) (KK Mot. at 7), in no way undermines the numerous, detailed CW statements here about

21   WaMu's poor underwriting. *See also In re Zumiez Inc. Sec. Litig.*, No. C07-1980 JCC, 2009 WL

22   901934, at *9 (W.D. Wash. Mar. 30, 2009) (*cited at* KK Mot. at 8) (rejecting uncorroborated,

23   vague statements by low-level CWs as sufficient); *In re Charles Schwab Corp. Sec. Litig.*, No.

24   C08-01510 WHA, 2009 WL 262456, at *23 (N.D. Cal. Feb. 4, 2009) (*cited at* KK Mot. at 8)

25   (dismissing claims as immaterial based on misvaluation of only 14 assets out of "hundreds if not

26   thousands of assets").

27        Killinger also claims that the Complaint's allegations are not linked to a specific time and

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 10

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that WaMu's underwriting changed over time.  KK Mot. at 7-8.  In fact, the Complaint makes clear that WaMu's underwriting was consistently lax throughout the Class Period, contrary to Killinger's public statements.  *E.g.*, ¶¶171, 213 (Killinger's Nov. 2005 statement "[w]e have excellent . . . underwritings . . . in place" *compared with* CW 48 statement that when he arrived at WaMu in June 2005 he was "stunned" to find supposed "A paper" consisting of loans "to borrowers with credit scores in the 500s"); ¶¶179, 225 (Killinger's Oct. 2006 statement that in underwriting Option ARM loans "we underwrite to the fully indexed rate, we never underwrite to the teaser rate" *compared with* CW 60 report that "until late 2007" WaMu underwrote its Option ARM loans at the "teaser" rate); ¶¶188, 220 (Killinger's July 2007 statement that WaMu had tightened underwriting *compared with* CW 51, a Senior Underwriter from 2007 to 2008, stating that guideline exceptions were "part of the norm").

Killinger also disputes the data presented in the Complaint.  This data shows that WaMu's loan-to-income ratios were much higher than its peers (¶238-39, Chart 2) and thus directly contradicts Killinger's statements comparing WaMu favorably to its peers.  *E.g.,* ¶188 ("the initiatives that we have taken to help lead the industry to what we think is much more prudent and appropriate underwriting standards").  By pointing to a miniscule decline in loan-to-income ratios (from over 2.9 to over 2.8), Killinger further claims that the data demonstrates that WaMu's underwriting did "tighten" during the Class Period (KK Mot. at 7).  However, this internal WaMu loan comparison is irrelevant to the Complaint's allegations and in no way contradicts the Complaint's detailed allegations, supported by Chart 2, that WaMu's loan quality was much worse than its competitors.

Furthermore, although none of Killinger's objectionable statements were presented or qualify as opinions as Killinger contends (KK Mot. at 10-11), this data, along with the reports of WaMu employees and WaMu's internal documents, supports the objective falsity of any of Killinger's statements that may be found to be opinions.  Contrary to Killinger's argument (KK Mot. at 2, 9-10), the Complaint alleges both that Killinger's statements about WaMu's underwriting and credit quality were objectively false, and, as discussed below, that Killinger

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 11

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    received numerous reports contradicting his public statements.   These allegations satisfy the

2    standard for pleading the falsity of opinion statements.  *See McGuire v. Dendreon*, No. C07-

3    800MJP, Slip Op., at *8 (W.D. Wash. May 21, 2009).

4        Killinger also asserts that the alleged false statement that WaMu "tightened

5    underwriting" omits his explanation that WaMu had "cut[] subprime production in half" and

6    "[sold] most Option ARM originations."   KK Mot. at 6.  But these "explanations" address only

7    loan *volume*, not quality, and, as demonstrated by the reports of multiple CWs, had nothing to do

8    with tightening underwriting.   Furthermore, the reduction in loan originations during the latter

9    part of the Class Period actually supports Lead Plaintiff's allegation that Killinger and the other

10   Defendants loosened WaMu's underwriting practices to gain short-term market share at the

11   expense of incurring massive, undisclosed risks.  *E.g.*, ¶202 ("WaMu's priority regarding loans

12   was 'always quantity rather than quality'"; "It was all about sell, sell, sell."); ¶216 ("WaMu's

13   'top priority was to get as many loans closed as quickly as they could close and not worry – they

14   just wanted the volume, and it didn't seem to matter how they got it.'") (CW 9).  In any event,

15   Killinger's arguments rest on contested factual assertions, namely cherry-picked "contextual"

16   statements and the adequacy of such disputed disclosures should not be resolved on a motion to

17   dismiss because "whether adverse facts were adequately disclosed is a mixed question to be

18   decided by the trier of fact."  *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (citation and

19   internal quotations omitted).   Likewise, "the materiality of an omission is a question reserved for

20   a jury unless 'reasonable minds could not differ' on the adequacy of the disclosure . . . ."  *In re*

21   *CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1086 (N.D. Cal. 2005).

22       Finally, Killinger asserts that Lead Plaintiff "disapproves" of WaMu's loan mix and the

23   "steps WaMu took to increase loan volume," but that these matters were disclosed to the public.

24   KK Mot. at 8-9.  Once again, Killinger misstates the allegations in the Complaint.  This action is

25   about disclosure.  Lead Plaintiff is not concerned with the loan mix at WaMu, but with how

26   Killinger misled the public about WaMu's true condition.

27       *Killinger's Scienter:*  Additional facts support a strong inference of Killinger's scienter

---

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 12

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  regarding his statements about underwriting. WaMu's underwriting guidelines could only be

2  modified at the Company's highest levels, and Killinger closely monitored WaMu's

3  underwriting, as evidenced by his quarterly emails and pre-recorded statements detailing the

4  structure of WaMu's underwriting guidelines and explaining that the Company was changing its

5  lending standards to try to increase loan volume. ¶241-42. WaMu's senior management was

6  "'always aware' of what was occurring with respect to [WaMu's] overall loan portfolio" (¶256),

7  and senior management had access to Company databases and reports that revealed the true state

8  of WaMu's loan portfolio (*e.g.*, ¶¶247-55, 257-64), including a system designed to track

9  WaMu's underwriting exceptions (¶¶247-48). Moreover, as Chairman of the Board, Killinger

10  received regular reports about WaMu's underwriting from Defendant Cathcart. ¶93.

11      In addition, as discussed in more detail in Section III.A.1.b, Killinger received regular

12  written reports summarizing WaMu's actual undisclosed risk exposure, including: (i) the "Credit

13  Highlight Report," which focused on WaMu's loan portfolio at the loan level, examining key

14  underwriting issues like LTV, FICO scores, and loan documentation (¶¶88-91); (ii) Risk Reports,

15  which were distributed quarterly to Killinger and specifically quantified the fact that, because of

16  WaMu's loosened underwriting guidelines, the Company was exceeding risk parameters dictated

17  by its risk guidelines (¶78); and (iii) internal audit reports which discussed WaMu's underwriting

18  (¶93). Killinger was also informed of WaMu's excessive exposure in the lending market by

19  WaMu's former Vice Chairman of Enterprise Risk Management (¶¶76-77).

20      In light of the numerous written and oral internal reports about WaMu's deteriorating

21  underwriting delivered to Killinger during the Class Period, Killinger's contention that the

22  Complaint lacks "direct evidence" of his scienter fails. KK Mot. at 19-20. Killinger also

23  contends that allegations about information that was provided to "senior management" cannot

24  provide an inference of *his* scienter. KK Mot. at 19. This is wrong. Not only do numerous facts

25  directly implicate Killinger, WaMu's own public statements consistently described Killinger as a

26  member of the Company's "senior management": all of WaMu's Class Period 10-Ks and 10-Qs

27  contained language defining "senior management" as those WaMu officers who spoke for the

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 13

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    Company.  Davis Decl. Ex. K at K-3.

2        Based on the above, there can be no question that Killinger (1) made false and misleading

3    statements regarding WaMu's underwriting practices (2) with scienter.

4    E.    **Killinger Knowingly Or Recklessly Made Numerous
          False And Misleading Statements About WaMu's Appraisals**

5    *Killinger's False Statements:*  Throughout the Class Period, Killinger made false

6    statements about WaMu's appraisal practices and policies.  Killinger is responsible for false and

7    misleading statements about WaMu's use of LTV ratios in its underwriting as a "key determinant

8    of future performance" (*e.g.*, ¶96) and similar statements such as touting "low LTV ratios"

9    (¶100).   Killinger also made false statements pertaining to the use of purported independent

10   appraisers. ¶98 ("[T]here's a strong governance process over those external appraisers.").

11       These statements were false and misleading because, among other reasons, they omitted

12   that WaMu's appraisals – which served as the bases for its LTV ratios – were systematically

13   inflated.  The Complaint alleges specific facts demonstrating that WaMu routinely pressured

14   both in-house and outside appraisers to artificially inflate values starting in 2005, based on

15   multiple corroborating statements of CWs with direct knowledge of these undisclosed practices.

16   ¶¶105-61.  While the appraisals were performed in-house, production personnel consistently and

17   increasingly contacted appraisers to demand higher values.  ¶¶109-15.  When the appraisals were

18   outsourced, WaMu hand-picked "proven appraisers" from a list (*e.g.*, ¶¶120, 127-133, 155, 157-

19   58), and sales personnel directly contacted appraisers and pressured them to "hit" higher values

20   or "reconsider" previously-determined values (*e.g.*, ¶¶118, 124-26, 137-42, 154).

21       In response, Killinger absurdly contends that Lead Plaintiff acknowledges that LTVs

22   were a "key determinant" of loan performance and "do[es] not allege that there was *not* a 'strong

23   governance process' over third-party appraisers in September 2006."  KK Mot. at 10.  In doing

24   so, Killinger actually highlights the materiality of his misleading statements and omissions

25   pertaining to LTVs, while ignoring almost the entire section in the Complaint discussing the

26   falsity of his appraisal statements.  ¶¶105-61.  As discussed above, "from the very initiation of

27   outsourcing its appraisal work [July 2006], WaMu corrupted the appraisal process by persisting

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 14                                      Bernstein Litowitz Berger & Grossmann LLP
                                             1285 Avenue of the Americas
                                             New York, NY  10019
                                             (212) 554-1400

1    in practices designed to increase appraisal values whenever necessary."  ¶117.  For example,

2    during the first six months that WaMu and eAppraiseIT worked together, eAppraiseIT "regularly

3    receive[d] phone calls from WaMu instructing eAppraiseIT to add or remove appraisers from

4    WaMu's list."  ¶131.  "[A]ppraisers were being removed for not hitting value."  *Id.*  The

5    Complaint also details the abuse of requests for reconsideration of value ("ROVs") (¶¶112, 136-

6    41) and inappropriate direct contact between WaMu salespeople and appraisers (¶¶124-25, 149).

7    These facts demonstrate the *opposite* of a "strong governance process."

8         In addition, Killinger argues that Lead Plaintiff must show the appraisal inflation had a

9    "material effect on LTVs."  KK Mot. at 10-11.  Killinger is wrong; the applicable standard is

10   whether the undisclosed widespread appraisal manipulation was material to investors.  Clearly it

11   was, as demonstrated by the significant decline in WaMu's stock price when news of the NYAG

12   investigation broke.  ¶¶561-62.  At best, this is a materiality argument, and a complaint may not

13   be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions were

14   immaterial unless it is "so obvious that reasonable minds [could] not differ" as to the materiality

15   of the misstatements.  *Fecht*, 70 F.3d at 1081.

16        As for Killinger's quantification argument (KK Mot. at 11), in finding that Lead Plaintiff

17   met Rule 9(b)'s particularity standard with regard to statements about underwriting, including

18   appraisals, in the Offering Documents, this Court explained: "If WaMu's lending environment

19   was fraught with such extreme departure from any plausible conception of 'standards,' a

20   statement that the Company followed underwriting standards to manage or mitigate credit risk

21   would mislead a reasonable investor."  Order at *16.  The same reasoning applies to WaMu's

22   manipulation of appraisals.  Indeed, courts have found misstatements regarding lending policies

23   actionable without quantification of the practices' impact.  *See*, *e.g.*, *Atlas v. Accredited,* 556 F.

24   Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("Although Defendants' allegedly false and misleading

25   statements regarding Accredited's underwriting policies are not as easily quantified, as a

26   mortgage lender, Accredited's underwriting practices would be among the most important

27   information looked to by investors").  Further, the Ninth Circuit has held that transaction-by-

---

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 15

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    transaction analysis is not required.  *See Daou*, 411 F.3d at 1020 (rejecting transaction-by-

2    transaction analysis of accounting allegations in favor of analyzing whether allegations were of

3    "widespread and significant" activity); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)

4    (specific amounts of misstatements not required).[4]

5              Killinger's attempt to undermine Lead Plaintiff's appraisal allegations by once again

6    attacking Lead Plaintiff's CWs, claiming they are "scattered," "branch-level employees" and do

7    not show misconduct, also fails.  KK Mot. at 11.  As discussed above in Section II.B, the

8    multiple CWs' consistent accounts demonstrate the misleading nature of Killinger's statements

9    as well as his scienter (discussed in more detail below).  *See Daou*, 411 F.3d at 1015;

10   *Countrywide Deriv.*, 554 F. Supp. 2d at 1059.  Moreover, the Complaint's appraisal allegations

11   do not rely only on the accounts of "a handful" of CWs.  The Complaint also quotes documents

12   and uses detailed expert analysis.  ¶¶150-61, Cmplt. App. D.  Specifically, the Complaint relies

13   on particular, well-sourced facts such as emails and other communications quoted from the

14   NYAG Complaint (¶¶150-60) – not just the mere existence of the NYAG Complaint or its

15   conclusions, as Killinger contends.  KK Mot. at 12.  The Complaint's inclusion of allegations

16   based on the NYAG Complaint, along with other allegations based on witnesses and documents

17   revealed by Lead Plaintiff's own investigation, is entirely appropriate.  *See New Century*, 588 F.

18   Supp. 2d at 1221 (denying motion to strike allegations based on bankruptcy examiner's report

19   because report was based on underlying documents and plaintiffs also alleged facts revealed by

20   their own investigation); *In re Connetics Corp. Sec. Litig.*, No. C07-02940 SI, 2008 WL

21   3842938, at *4 (N.D. Cal. Aug. 14, 2008) (denying motion to strike allegations based on SEC

22   complaint because plaintiffs also conducted their own investigation).

23             Contrary to Killinger's contentions (KK Mot. at 12), the expert analysis discussed in the

24   Complaint is also strong support for Lead Plaintiff's appraisal allegations.  ¶161.  The granular

25   level of the analysis, on a census-tract-by-census-tract basis, ensures that it is reviewing "apples

26

27   ───────────────

[4] Killinger's reliance on *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079 (9th Cir. 2002) (KK Mot. at 11), is misplaced.  In *Vantive*, the court affirmed dismissal not only because the complaint failed to state the basic details or approximate amount of revenue that the company allegedly misstated, but also because the revenue figures in the complaint actually contradicted plaintiffs' accounting fraud theory.  283 F.3d at 1091.

1    to apples" data.  Cmplt. App. 4.  This level of detail, extrapolated to millions of loans on a

2    nationwide basis, renders the factors cited by Killinger (FICO scores, etc.) statistically

3    insignificant.  Moreover, the analysis is not a "conclusion"; it is an objective summary of

4    industry data, demonstrating that Killinger's statements regarding LTV values and the quality of

5    WaMu's appraisals throughout the Class Period were materially false and misleading.  In any

6    event, it is appropriate for the Court to consider this analysis.  *See Nursing Home Pension Fund,*

7    *Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th Cir. 2004) (securities complaint

8    properly included allegations based on plaintiffs' expert's analysis of Oracle's accounting).

9           Finally, Killinger's claim that there are internal inconsistencies in the Complaint is

10   nonsense.  KK Mot. at 12.  The Company's push to originate more loans through loose

11   underwriting standards is entirely consistent with WaMu loan consultants' push for "high

12   appraisals to get loans approved."  KK Mot. at 12.  It is certainly plausible that WaMu sought to

13   increase loan volume both by loosening underwriting standards and by inflating appraisals.

14          *Killinger's Scienter:*  WaMu's appraisal manipulations – which affected WaMu's LTV

15   ratios, a "key determinant" of credit quality – were directed by WaMu senior management and

16   were the ultimate responsibility of Killinger.  ¶¶163-66.  Indeed, the Complaint alleges that

17   WaMu's regulator, the Office of Thrift Supervision ("OTS"), sent Killinger a letter personally

18   placing him on notice of his obligation to ensure the accuracy of WaMu's appraisals.  ¶165.

19   Thus, Killinger was legally required to prevent such manipulation.  Moreover, as discussed

20   above, Killinger was unquestionably a member of senior management and was directly

21   responsible for WaMu's Company-wide culture of loan volume over quality. To promote this

22   culture, "senior management" issued directives to degrade appraisal procedures, among other

23   lending manipulations set forth in the Complaint.  *E.g.*, ¶¶66, 115, 242.

24          Killinger asserts that it would be "absurd to suggest" that he would be aware of WaMu's

25   appraisal practices, because those activities occurred beneath his level, and that the appraisal

26   manipulations alleged in the Complaint would not have been revealed to Killinger.  KK Mot. at

27   23.  This argument should be rejected.  First, Killinger ignores the OTS letter and the federal

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 17

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

regulations raising appraisal processes to the CEO level.  ¶¶165, 540-45.  Second, Killinger ignores the Complaint's allegations showing that the appraisal manipulations at WaMu were directed by WaMu's senior managers, as demonstrated by, among other things, senior WaMu executives meeting and corresponding with their senior counterparts at eAppraiseIT to pressure them to help WaMu inflate appraisals.  *E.g.*, ¶¶154 (WaMu executive email to eAppraiseIT senior executives directing them to allow the "overrid[ing] and correct[ing]" of third party appraisers); ¶156 (eAppraiseIT's *President* telling other First American senior executives that they had "agreed to roll over and just do it" in regard to WaMu demands for higher values). Third, Killinger's claim that he could not have known of any widespread appraisal manipulations at WaMu is tantamount to an admission that he was not making reasonable efforts to monitor or enforce WaMu's appraisal practices, which would actually *support* an inference of scienter based on recklessness, as Killinger was *legally obligated* to monitor WaMu's appraisals and design and enforce policies preventing appraisal corruption.  ¶¶165-66, 540-45.  Killinger's reliance on *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (KK Mot. at 23) is misplaced.  There, plaintiffs "pled no facts" directly supporting an inference of scienter, and the court declined to draw an inference that, based on his position alone, the defendant CEO knew of an alleged "discrete set" of secret payments by overseas sales agents.  *Id.* at 745-47.

Last, Killinger's argument ignores the relevance of his positions and the core nature of WaMu's home lending business to his scienter.  Killinger was CEO and Chairman of the Board, and the Company-wide misconduct in lending in general, and appraisals in particular, was central to WaMu's core operations.  Killinger amazingly contends that residential lending was not a "core business" of WaMu.  KK Mot. at 22.  However, "residential mortgage lending was WaMu's primary business driver and the source of 70% of WaMu's net interest income" (¶19), and WaMu described LTV ratios as a "key determinant of future performance" (¶96).  Moreover, when WaMu's appraisal fraud partially came to light, analysts commented that widespread appraisal fraud could result in an additional *$2.1 billion* in reserves.  ¶546.  These facts support a strong scienter inference.  *See S. Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 18

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### F.    Killinger Knowingly Or Recklessly Made Numerous False And Misleading Statements About WaMu's Financial Results And Internal Controls

*Killinger's False Statements:* Throughout the Class Period, WaMu's annual and quarterly financial statements materially understated the Allowance and overstated WaMu's net income, earnings per share, and assets. *E.g.*, ¶¶272, 281, 289. In addition to being responsible for the false financial statements, Killinger publicly made false statements regarding the Company's financial results and internal controls. For instance, Killinger stated that "[w]e have excellent . . . reserving methodologies" (¶270) and "[w]hen we do our reserving, . . . we factor in the existing book of business . . . and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs" (¶282). Additionally, Killinger signed false quarterly and annual certifications that WaMu's financial statements were accurate and its internal controls over financial reporting were effective. ¶¶268-69, 272-73, 275, 278, 281, 284-85, 287, 289.

In the Order, the Court held that Lead Plaintiff met Rule 9(b)'s pleading standard with regard to misstatements in the financial statements incorporated into the October 2007 Offering Documents, including the 2006 Form 10-K (also cited in Lead Plaintiff's Exchange Act claims at ¶¶284-85, 410), which included WaMu's financial statements for both 2005 and 2006. The Complaint's Exchange Act allegations comply with the Order. For each quarter of 2006 and 2007, Lead Plaintiff has alleged percentage estimates of WaMu's overstatements of net income. ¶¶329; *see* Order at *17 ("[T]he approximate amount of financial misstatement is one of several facts that a plaintiff might plead to meet the requirements of Rule 9(b).") (citing *Daou*, 411 F.3d at 1016-17). For every quarter of the Class Period, Plaintiffs have also explained "how the loan-related misconduct . . . caused the financial misstatements, providing a time-frame for the misconduct." Order at *17. The Complaint also names Killinger and the other 10(b) Defendants "responsible for the conduct leading to the understatement of the Allowance." *Id.* These misstatements in the financial statements rendered Defendants' qualitative statements about WaMu's reserving process materially false and misleading. *E.g.*, ¶279.

Significantly, the only periodic financial statement included in the Complaint's Exchange Act claims for which the Court has not already determined that Lead Plaintiff has adequately

1   pled misstatements under Rule 9(b) is the Third Quarter 2005 Form 10-Q.  ¶¶268-69.  Lead

2   Plaintiff submits that the Court's prior reasoning with respect to the 2006 Form 10-K applies

3   with equal force to the Third Quarter 2005 Form 10-Q and to Killinger's statements summarizing

4   financial results in press releases and at conferences.[5]

5       Applying Rule 9(b)'s heightened pleading standards, this Court found several statements

6   actionable under the Securities Act that are similar to those statements by Killinger at issue here.

7   In analyzing the Securities Act claims, the Court noted that "[a]lthough Allowance provisioning

8   requires some exercise of judgment, allegations of misstatements regarding loan loss reserves are

9   actionable under the Exchange Act."  Order at *17 (citations omitted).  The Court found similar

10  "misstatements about the adequacy of internal controls . . . actionable."  *Id.*  The Court stated:

11  "WaMu's representation that it continually updated its internal controls to maintain their

12  effectiveness is specifically contradicted by allegations that the Company intentionally decreased

13  the regulatory power of the risk management group during the Class Period and failed to update

14  its systems for predicting credit risk."  *Id.*

15      In response to the Complaint's detailed allegations, Killinger makes several meritless

16  arguments.  *First,* he contends that WaMu appropriately reserved because its provision exceeded

17  its net charge-offs every quarter during the Class Period except one.  KK Mot. at 15-16.  This

18  argument fails.  GAAP required WaMu to consider numerous factors – not just current charge-

19  offs – in setting the Allowance.  ¶299.  WaMu was also required to consider whether credit was

20  granted improperly in the first place (¶297) as well as levels of and trends in delinquencies and

21  impaired loans and effects of changes in risk selection and underwriting standards (¶299).

22  WaMu failed to adequately consider these factors and, thus the Allowance was inadequate.

23      *Second*, Killinger argues that the increases in the reserves in 2007-2008 do not support

24  the allegation that the prior reserves in 2005-2006 were inadequate.  KK Mot. at 18.  However,

25  the Complaint alleges both that (i) the massive increases in the Allowance in 2007-2008

26  contradict WaMu's earlier statements about the appropriate Allowance for 2005-2006; and (ii)

27

---

[5] ¶¶267, 270-71, 274, 276-77, 279-80, 282-83, 286, 288, 290-91.

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*contemporaneous* facts from 2005 and 2006 demonstrate that the Allowance was understated then. Indeed, this Court sustained similar Securities Act claims under Rule 9(b):

> GAAP and SEC guidelines required WaMu to provision for the Allowance at a rate commensurate with the Company's increasing credit risk. Yet Plaintiffs allege that WaMu failed to account for its practices of appraisal inflation, deficient underwriting, and ineffective internal controls when determining provisions for the Allowance, thereby misstating the Company's financial results.

Order at *17. As discussed in Section III.A-C, the Complaint's allegations about WaMu's lending practices are adequate. The Complaint alleges that WaMu should have appropriately reserved in 2005 for the loans it was originating at that time through these improper lending practices, and the failure to do so resulted in misstated financials in 2006 and 2007. ¶297.

In addition, the CRO Report in September 2005 – which was prepared by a WaMu team assembled to "forecast expected losses over the upcoming four years" (¶310) – demonstrated that WaMu's Loan Performance Risk Model (the "LPRM"), the primary model used to calculate the Allowance, was unable to measure risk associated with negatively amortizing loans (such as Option ARMs), a material deficiency that the Company did not even plan to address until mid-2006. ¶¶309-14. Failing to do so also caused WaMu's 2005 financial statements to be materially misstated. Lead Plaintiff's conservative estimate of the misstatements of WaMu's financial reserves (¶¶326-28) does not quantify the misstatement for 2005 (due to one-time events that distort the publicly available information for those quarters, *see* ¶¶320, 327), but the Complaint's allegations about WaMu's lending and reserving policies during that time support the allegation that WaMu's reserves were understated from the beginning of the Class Period.

Moreover, later inconsistent statements following "the revaluation of assets, or the recalculation of loan loss reserves" can be alleged as support for the falsity of earlier statements when plaintiffs also allege "circumstances contemporary to the alleged false statement to explain how and why the statement was misleading when made." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994); *see also* Lead Plaintiff's Opp. to DT Mot. at 10. Killinger's reliance on *Countrywide Derivative Litigation*, 554 F. Supp. 2d 1044 (KK Mot. at 16), and *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) (KK Mot. at 16), is misplaced, because the complaints in

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 21

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

both of those cases alleged *nothing* other than subsequent increased reserves to support the allegation that the original reserves were understated when made. *See Countrywide Deriv.*, 554 F. Supp. 2d at 1070 n.28; *DiLeo*, 901 F.2d at 627-28.

*Third*, Killinger claims that the reserving was appropriate because the financial statements were never restated. KK Mot. at 15. That is not the law:

> [T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("the lack of a restatement did not mean that LDK only engaged in legitimate conduct"). In fact, the Court correctly disregarded Defendants' arguments that a restatement is required to sufficiently allege the falsity of WaMu's financial statements. Order at *16-17.

*Fourth*, Killinger claims that Lead Plaintiff's analysis of the Allowance is inappropriate. KK Mot. at 16-17. Killinger ignores the Court's previous holding that this analysis is adequate. Order at *17. Furthermore, it is Killinger's analysis (improperly presented at Appendix 2) that is incorrect. Lead Plaintiff's analysis appropriately takes into account the fact that WaMu's Allowance built on the provisions of prior quarters, rather than occurring on a one-time basis each quarter, and assumes hypothetical corrections beginning in the third quarter of 2005 that affect subsequent quarters. Indeed, Defendants' rudimentary analysis would require dramatically *higher* provisions in 2007 than Lead Plaintiff asserts. In any event, Lead Plaintiff's analysis is conservative and plausible, especially at the pleading stage, and is, at best, a fact issue. ¶330.

*Fifth*, Killinger argues that the allegations that WaMu's LPRM was not calibrated for 18 months should be disregarded because they are hearsay and do not explain what is meant by "calibration." KK Mot. at 17. Killinger is wrong. There is no requirement that allegations based on CWs satisfy the Rules of Evidence at the pleading stage. See *Berson*, 527 F.3d at 985; *Countrywide Deriv.*, 554 F. Supp. 2d at 1060. Moreover, the Complaint does explain the

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 22

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    significance of "calibration," specifically that the LPRM did not incorporate accurate historical

2    data. ¶¶321-23. CW 78 found out that the LPRM had not been calibrated for 18 months because

3    the LPRM clearly "showed a level of 'charge-offs' that was lower than the actual historical

4    data." ¶323. CW 78 found that "the LPRM consistently understated loan delinquency when

5    held up to WaMu's actual empirical data." *Id.*

6        *Sixth,* Killinger contends that Lead Plaintiff "mischaracterizes" the contents of the CRO

7    Report. KK Mot. at 17-18. Again, Killinger is wrong. The fact that the LPRM was "untested"

8    on products "with the potential to negatively amortize" such as Option ARMs is extremely

9    important to reserving. The Complaint specifically alleges that the Company pushed Option

10   ARMs onto inappropriate borrowers and underwrote Option ARM loans at the "teaser" rate.

11   *E.g.*, ¶¶204-07, 224-26. Option ARM loans were WaMu's "flagship product." ¶454. Thus, if

12   the model the Company used to reserve for losses was "untested" on the Company's "flagship

13   product" whose negative amortization WaMu internally termed a "major and growing risk

14   factor," then there was an enormous risk – which materialized – that the reserves would be

15   inadequate. In fact, the Complaint alleges that almost two years after the CRO Report the LPRM

16   still did not reflect actual loan performance data. ¶323. WaMu's failure to take corrective

17   measures in response to the CRO Report distinguishes this case from *In re Watchguard Sec.*

18   *Litig.*, No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) (KK Mot. at 18), where

19   the complaint itself showed that management took corrective actions in response to an internal

20   report about internal control weaknesses. *Id.* at *8-9. At best, Killinger's assertion that the

21   LPRM issues had no effect on reserves is a fact dispute and cannot be resolved on the pleadings.

22       *Killinger's Scienter:* Killinger knowingly or recklessly made his numerous false

23   statements regarding WaMu's financial results and internal controls. Killinger regularly

24   reviewed internal financial forecasts provided by WaMu's business units with WaMu's Risk

25   Management Committee. ¶338. The CRO Report (discussed above) was created for and

26   circulated among WaMu senior management, of which Killinger was a member. ¶339. Further,

27   the facts alleged regarding Killinger's scienter with regard to WaMu's risk management (¶¶75-

94), appraisals (¶¶162-168), and underwriting (¶¶240-265) also support an inference of Killinger's scienter regarding WaMu's financial reporting, as each of these aspects were key to the appropriate accounting for WaMu's loans.

Allegations of motive and opportunity are not required to allege scienter (*see* Lead Plaintiff's Opp. to OD Mot. at 22), but "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511. Thus, Killinger's receipt of approximately $8.8 million in Class Period bonuses for WaMu's short-term financial performance is relevant to his scienter. ¶¶346-47. *Glazer,* 549 F.3d at 748 (KK Mot. at 20), merely states that profit motive *alone* is insufficient to establish scienter. *Id.* at 748. Moreover, Killinger's claim that he "declined his $1.2 million bonus in 2007" is misleading. KK Mot. at 20. In fact, Killinger's 2007 bonus was "counted toward Killinger's post-retirement benefits." ¶346. Stock sales raise an inference of scienter when they are "suspicious" or "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Backe v. Novatel Wireless, Inc.,* 607 F. Supp. 2d 1145, 1161 (S.D. Cal. 2009). Thus, Killinger's profits of $13 million from the sale of 300,000 shares (an increase of over 200% compared to a prior control period) (¶¶348-50) is highly probative of scienter.

Moreover, Killinger's Rule 10b5-1 trading plan was initiated after he became aware of the hidden problems in WaMu's lending and financial results (¶351-52), contrary to his assertion (KK Mot. at 22) that the Complaint does not allege that Killinger was "in possession of inside information inconsistent with his statements" before instituting his 10b5-1 plan. Accordingly, the 10b5-1 plan does not shield Killinger. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 554 (5th Cir. 2007); *Countrywide Deriv.,* 554 F. Supp. 2d at 1069; *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009).

## III.    CONCLUSION

For the foregoing reasons, Killinger's motion to dismiss should be denied in its entirety. If the Court dismisses any of Lead Plaintiff's claims (and it should not), Lead Plaintiff requests leave to replead. *See* Fed. R. Civ. P. 15(a); *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam).

LEAD PLAINTIFF'S OPPOSITION TO KILLINGER'S
MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP
Page 24

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    Dated:  August 14, 2009                    Respectfully submitted,

2

3                                               BERNSTEIN LITOWITZ BERGER &
                                                   GROSSMANN LLP

4                                               By: /s/ Chad Johnson
                                                Chad Johnson (*pro hac vice*)
5                                               Hannah Ross (*pro hac vice*)
                                                Jerald Bien-Willner (*pro hac vice*)
6                                               Katherine M. Sinderson (*pro hac vice*)
                                                1285 Avenue of the Americas
7                                               New York, New York  10019
                                                Tel:    (212) 554-1400
8                                               Fax:    (212) 554-1444
                                                Email: chad@blbglaw.com
9                                                       hannah@blbglaw.com
                                                        jerryb@blbglaw.com
10                                                      katherine@blbglaw.com

11                                              *Counsel for Lead Plaintiff*
                                                *Ontario Teachers' Pension Plan Board*
12                                              *and Lead Counsel for the Class*

13                                              BYRNES & KELLER LLP
                                                Bradley S. Keller, WSBA# 10665
14                                              Jofrey M. McWilliam, WSBA# 28441
                                                1000 Second Avenue, Suite 3800
15                                              Seattle, Washington  98104
                                                Tel:    (206) 622-2000
16                                              Fax:    (206) 622-2522
                                                Email: bkeller@byrneskeller.com
17                                                      jmcwilliam@byrneskeller.com

18                                              *Liaison Counsel for the Class*

19

20

21

22

23

24

25

26

27

---

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses on the Court's Electronic Mail Notice list.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

By: /s/ Chad Johnson
Chad Johnson (*pro hac vice*)
Hannah Ross (*pro hac vice*)
Jerald Bien-Willner (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
Email: chad@blbglaw.com
            hannah@blbglaw.com
            jerryb@blbglaw.com
            katherine@blbglaw.com

*Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board*
*and Lead Counsel for the Class*

BYRNES & KELLER LLP
Bradley S. Keller, WSBA# 10665
Jofrey M. McWilliam, WSBA# 28441
1000 Second Avenue, Suite 3800
Seattle, Washington 98104
Tel:    (206) 622-2000
Fax:    (206) 622-2522
Email: bkeller@byrneskeller.com
            jmcwilliam@byrneskeller.com

*Liaison Counsel for the Class*

LEAD PLAINTIFF'S OPPOSITION TO
KILLINGER'S MOTION TO DISMISS [OD-KKK-3]
Master No: 2:08-md-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400